1  Roger L. Cohen, CA Bar No. 065489
**Jaburg & Wilk, P.C.**
2  3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
3  rlc@jaburgwilk.com
602.248.1000
4
Attorneys for Plaintiff
5

6

7  **U.S. DISTRICT COURT**

8  **CENTRAL DISTRICT OF CALIFORNIA (SOUTHERN DIVISION)**

9  Jamal Hamadah, an individual

Plaintiff,
10
v.
11
Samer Sannoufi, MD, aka Sam
12  Sannoufi, MD, an individual

13  Defendant.

14

15

Case No. 8:17-cv-00132-CJC-JCG

**STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT**

Hearing Date: January 22, 2018
Time: 1:30 p.m.
Dept.: 9B
Before: The Honorable Cormac J. Carney

16      Plaintiff/Counterdefendant Jamal Hamadah submits this Statement of Genuine

17  Disputes of Material Fact, in accordance with LR 56-2.

18  **I.    AS THE LAWYER FOR A PARTY, AMY MOUSAVI'S DECLARATION
ASSERTING PURPORTED "FACTS" AND HER INTERPRETATION OF
19     THE LAW IS IMPROPER AND SHOULD BE STRICKEN.**

20      As a threshold matter, Hamadah objects to the Declaration of Amy Mousavi,

21  counsel for Defendant/Counterclaimant Samer Sannoufi.  Ms. Mousavi states that the

22  facts in her Declaration are within her "personal knowledge" and that "[i]f called as a

23  witness, I could and would competently testify thereto."  Ms. Mousavi sets forth a series

24  of purported "facts," including assertions as to what information and documents

25  Hamadah purportedly "possessed and had access to" during the parties' course of

26  dealing.  (See Mousavi Decl., ¶ 9, see also ¶¶ 8, 10, 12-17).  It is unclear how Ms.

JABURG|WILK
Attorneys at Law

1   Mousavi could possibly have personal knowledge as to what Mr. Hamadah did or did

2   not "possess" or have access to; nor is it believed that Ms. Mousavi was counsel during

3   the relevant time period.  In any event, lawyers' statements are not evidence. See *United*

4   *States v. Barragan*, 871 F.3d 689, 709 (9th Cir. 2017).

5       A lawyer is generally not permitted to act both as witness and as counsel in

6   litigation.  See Cal. R. of Prof. Conduct 5-210 (lawyer may not testify as a witness

7   before a jury, except with informed consent); see also *United States v. Hermanek*, 289

8   F.3d 1076, 1098 (9th Cir. 2002) (court recognizes the "advocate-witness" rule, which

9   "prohibits an attorney from appearing as both a witness and an advocate in the same

10  litigation").

11      Ms. Mousavi's Declaration is properly stricken from the record and disregarded.

12  The following paragraphs of Sannoufi's Statement of Uncontroverted Facts and

13  Conclusions of Law ("Sannoufi's Statement") rely on Ms. Mousavi's Declaration for

14  purported "facts":  Paragraphs 20, 23, 24, 32, 33, 34, 35, 36, 56 (also relies on Sannoufi

15  Decl.), 72, 73, 74 (also relies on Sannoufi Decl.), 86 (same), 91, 92, 93, 94, 95. All

16  statements of purported "fact" that cite only to Ms. Mousavi's Declaration are

17  unsupported by competent evidence and properly disregarded. See Rule 56(c)(2).

18      Ms. Mousavi also purports to analyze and characterize the First Amended

19  Complaint (FAC) and California law.  (See Mousavi Decl. ¶¶3-7, 11, 18-20).  Ms.

20  Mousavi purports to characterize Plaintiff's claim for breach of fiduciary duties,

21  because she has "continuously litigated this case from its inception."   There is no

22  authority for a lawyer to submit a Declaration in support of her client's motion for

23  summary judgment based upon her understanding of the law, the complaint or her

24  experience in the case.  See Rules of Civil Procedure.  To the extent Ms. Mousavi

25

26

JABURG|WILK
Attorneys at Law

1   purports to be her own expert witness in a case in which she is an advocate there is,

2   again, no legal authority or precedent.  *See Hewlett-Packard Co. v. EMC Corp*., 330 F.

3   Supp. 2d 1087, 1092 (N.D. Cal. 2004) ("It is important to remember that the . . . . .

4   experts perform very different functions in litigation than do attorneys. Experts are not

5   advocates in the litigation but sources of information and opinions").

6       The following paragraphs of Sannoufi's Statement rely on Ms. Mousavi's

7   Declaration for purported interpretation of the FAC and the law:  Paragraphs 3, 4, 5, 6,

8   13, 16, 17, 18, 19, 25, 28, 29, 30, 31, 66, 67, 68, 69, 75, 76, 77, 80, 81, 82, 83. As to

9   these Paragraphs, Ms. Mousavi's Declaration and assertions of herself as a purported

10  expert are properly disregarded.  See *Stencel v. Fairchild Corp*., 174 F. Supp. 2d 1080,

11  1082 (C.D. Cal. 2001) (Courts have inherent power to disqualify experts as part of the

12  court's inherent power to preserve the fairness and integrity of judicial proceedings).

13      If the Court does not strike Ms. Mousavi's Declaration, then counsel for

14  Hamadah should be permitted to cross-examine her. In that event, it is requested that the

15  Court suspend the pending summary judgment proceedings and order Ms. Mousavi to

16  appear for deposition at a date and time convenient to Hamadah's counsel.

17  **II.   DR. SANNOUFI'S STATEMENT RAISES A MYRIAD OF CONTESTED FACTS.**

18

19      Subject to the foregoing, Hamadah responds to the statement of "Uncontroverted

    Facts and Conclusions of Law" filed by Dr. Sannoufi as follows:

20

21      1.      "Defendant has been a licensed physician since 2001, and is licensed to

    practice medicine in the State of California. (Sannoufi Decl. ¶3)"

22

23      *Agree.*

24      2.      "Plaintiff is not and has never been licensed to practice medicine in any

    state, including California. (Sannoufi Decl. ¶5)."

25

26

*(left margin)* JABURG|WILK   Attorneys at Law

1    *Agree.*

2    3.    "California law applies to the current dispute relating to the Walk-In

3    Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company

4    (the 'Company'). (Exhibit A, the Company's Operating Agreement, to Sannoufi Decl.

5    ¶7; Exhibit B, Plaintiff's First Amended Complaint, to Mousavi Decl. ¶3, which allege

6    Counts under Cal. Corp. Code)."

7    *Controverted.*    The only written contract between the parties is the Operating

8    Agreement. (Ex. A to Sannoufi Decl.).    The Agreement includes references to the

9    limited liability company's formation in California, the Company's principal place of

10   business in Irvine, California, and the dissolution of the Company upon the occurrence

11   of an event causing dissolution of the company under the laws of California.  (*Id.*, ¶¶1.1,

12   1.7, 1.4).   Otherwise, there is no reference to any governing state law, and no venue,

13   jurisdiction or choice of law provision.  Exhibit 1 to the Operating Agreement identifies

14   Dr. Sannoufi as the Chief Executive Manager, and lists Dr. Sannoufi's address in

15   Gilbert, Arizona; Exhibit 2 to the Operating Agreement lists Mr. Hamadah and Dr.

16   Sannoufi as the sole members of the Company, with Dr. Sannoufi's address in Gilbert,

17   Arizona and Mr. Hamadah's address in Scottsdale, Arizona.   When the Operating

18   Agreement was signed, both parties lived in Arizona.  (Ex. A-1 and A-2 to Sannoufi's

19   Decl.).

20   Count Four (negligent misrepresentation) arises out of misrepresentations and

21   material omissions made by Dr. Sannoufi to Mr. Hamadah prior to formation of the

22   Company, and while both parties resided in Arizona. (See Hamadah Depo, Ex. 1,

23   attached hereto, pp. 116, 118, 391-392).   Count Four therefore arose under, and is

24   governed by, Arizona law. See *Matanuska Val. Lines, Inc. v. Molitor*, 365 F.2d 358, 360

(9th Cir. 1966)(cases where jurisdiction is founded upon diversity of citizenship, the district courts are to apply the forum state's conflict of laws rules); *Chen v. L.A. Truck Centers, LLC,* 7 Cal. App. 5th 757, 767, 213 Cal. Rptr. 3d 142, 151 (App. 2017)(A different governmental interest analysis must be performed with respect to each particular issue; assuming the existence of a true conflict between states' laws and interests, the governmental interest test of conflicts of law looks to see which jurisdiction's interests would be more impaired if its policy were subordinated to the other jurisdiction's policy).

Count Seven (Fraud in the Offering and Sale of Securities – Rule 10(b)(5)) arises out of the purchase and sale of a security, and states a claim under SEC Rule 10(b) of the Securities Exchange Act of 1934, promulgated by the U.S. Securities and Exchange Commission, and codified at 17 C.F.R. 240.  Count Seven is therefore governed by federal law.

4.      "Under California law, a medical practice, like the Company, cannot operate as a Limited Liability Company ('LLC'). Corp. Code §§ 17701.04(e) and 13401(a); Bus. & Prof. Code §§2052, 2406, 2416; Lathrop v. Healthcare Partners Medical Group (2004) 114 Cal.App.4th 1412, 1420-1421. (Mousavi Decl. ¶4)."

*Controverted.*  This is not an accurate interpretation or application of the law or a proper characterization of the Company.

Corp. Code §13401(a) provides that "professional services" means any type of professional services that may be lawfully rendered only pursuant to a license, certification or registration authorized by the Business and Professions Code, the Chiropractic Act or the Osteopathic Act. Corp. Code § 17701.04(e) provides that "Nothing in this title shall be construed to permit a domestic or foreign limited liability

18318-18318-00002\KMS\RLC\2959298.2

JABURG | WILK
Attorneys at Law

company to render professional services, as defined in" the foregoing Section.  The cited portions of *Lathrop v. Healthcare Partners Med. Group*, 114 Cal. App. 4th 1412, 1420, 8 Cal. Rptr. 3d 668, 673 (2004) holds that physicians have been statutorily authorized to conduct their medical practices in the form of a medical corporation, group, or partnership as long as the shareholders or partners and the employees rendering professional services are themselves licensed. But Sannoufi's citations beg the question whether the Company itself cannot operate as a limited liability company, whether the Company is a "medical practice," and whether the parties' venture could have been legally set up, using the Company as a limited liability company.  The most commonly cited means, and that which would have been feasible under the circumstances, is a management services organization (MSO). Mr. Hamadah and Dr. Sannoufi could have set up a company that provides goods and services to a medical practice owned by Dr. Sannoufi, who would set up a professional medical corporation (PMC), either alone or with another physician. The MSO contracts with the PMC to provide administrative and management services, such as subleasing office space and equipment (under written lease agreements), front desk services, back office administrative services including electronic data exchange, billing and collection, and staffing of unlicensed personnel. None of these functions involve illegal ownership or profit sharing in the medical practice. The MSO would have been compensated at fair market value for the lease rentals, the billing services, and other goods and services provided, without receiving any percentage or portion of profits from the medical practice. The MSO structure is specifically referred to on the California Medical Board website, and in educational materials on the website.

18318-18318-00002\KMS\RLC\2959298.2

1    Accordingly, the Company itself is not illegal as a limited liability company, and

2    the parties' venture could have been legally structured to comply with California law.

3    5.    "Under California law, nonphysicians, like Plaintiff, are strictly prohibited

4    from owning and/or controlling medical services. Bus. & Prof. Code §§2052, 2286,

5    2400, 2417; Corp. Code §§13401, 13401.5, 13403, 13406(a).(Mousavi Decl. ¶5)."

6    *Controverted.* This is not an accurate interpretation or application of the law or a

7    proper characterization of Mr. Hamadah's position.   The statement also omits crucial

8    details about Dr. Sannoufi's role and illegal actions.

9    Cal. Bus. & Prof. Code § 2052(a) provides that any person who practices or

10    holds himself out as practicing "any system or mode of treating the sick or afflicted in

11    this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish,

12    deformity, disease, disfigurement, disorder, injury, or other physical or mental condition

13    of any person" without a valid license is "guilty of a public offense."   Mr. Hamadah did

14    not, in any way, practice or hold himself out as practicing medicine. Nor did he intend

15    to do so.   Without knowledge of any illegality or limitation on the ownership interest,

16    Mr. Hamadah entered into an agreement to own a membership interest in the Company,

17    which would own a medical clinic run solely by Dr. Sannoufi.   (See Hamadah Depo,

18    Ex. 1 attached hereto, pp. 271, 274, 361, 382, 384, 389; Sannoufi Depo, attached hereto

19    as Ex. 2, p. 105).   Dr. Sannoufi testified that he was personally doing business as Walk-

20    In Urgent Care & Family Practice Clinic (the "Clinic").   (*Id.*, p. 12).   Dr. Sannoufi

21    claims that he believed the business was legal because, as he acknowledges, Mr.

22    Hamadah "doesn't get in touch with any documents or any clinical records or any

23    HIPAA violation, then we're good." (*Id.*, p. 105).

24

25

26

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

1    But the statutes cited in Sannoufi's Statement expressly implicate Sannoufi.  Bus.

2  & Prof. Code § 2052 also provides that "[a]ny person who conspires with or aids or

3  abets another to commit any act described in subdivision (a) is guilty of a public

4  offense, subject to the punishment described in that subdivision." To the extent that Mr.

5  Hamadah is guilty of practicing medicine without a license, under §2052(a), his

6  business partner Dr. Sannoufi is guilty of conspiring with or aiding or abetting the

7  practice of medicine without a license under §2052(b).  Moreover, Bus. & Prof. Code §

8  2286 provides that it is "unprofessional conduct for any licensee to violate, to attempt to

9  violate, directly or indirectly, to assist in or abet the violation of, or to conspire to

10  violate any provision or term of Article 18 (commencing with Section 2400), of the

11  Moscone-Knox Professional Corporation Act (Part 4 (commencing with Section 13400)

12  of Division 3 of Title 1 of the Corporations Code), or of any rules and regulations duly

13  adopted under those laws."  This statute, cited in Sannoufi's Statement, applies only to

14  Dr. Sannoufi, the licensee, and does not apply to Mr. Hamadah.

15    6.    "Under California law, an unlicensed person, such as Plaintiff, is

16  prohibited from receiving the benefits of the income of the medical practice 'in any

17  manner.' Bus. and Prof. Code § 2409.(Mousavi Decl. ¶6)."

18    *Controverted.* This is not an accurate interpretation or application of the law and

19  omits prohibitions against Dr. Sannoufi's receipt of benefits in the business. The statute

20  does not refer to "an unlicensed person."

21    Bus. & Prof. Code § 2409 provides that the "income of a medical and podiatry

22  corporation attributable to professional services rendered while a shareholder is a

23  ***disqualified person***, as defined in Section 13401 of the Corporations Code, shall not in

24  any manner accrue to the benefit of such shareholder or his or her shares in such a

25

26

JABURG|WILK
Attorneys at Law

18318-18318-00002\KMS\RLC\2959298.2

professional corporation." "Disqualified person" means a "licensed person who for any reason becomes legally disqualified (temporarily or permanently) to render the professional services that the particular professional corporation or foreign professional corporation of which he or she is an officer, director, shareholder, or employee is or was rendering." Because Mr. Hamadah is not, and never has been, a "licensed person," the statute excluding income to a "disqualified person" does not apply to him. Dr. Sannoufi, on the other hand, is a "licensed person," who was legally disqualified to render the professional services that the Company and the Clinic in which he was a member and employee was rendering.

Dr. Sannoufi has been cited by the Medical Board of California for failure to register the name of the Clinic and for violation of the professional practice statute, in connection with practicing with the Company. (Sannoufi Depo., Ex. 2, pp. 124-125).

Accordingly, the statute applies to Dr. Sannoufi, and not to Mr. Hamadah.

7.      "The Operating Agreement, which issued 50% membership interest of the Company to each (sic) Dr. Sannoufi and Plaintiff, was signed by both Dr. Sannoufi and Plaintiff. (Exhibit A, Sannoufi Decl. ¶7-8)."

*Controverted.* The Operating Agreement was actually "DocuSigned" as to both parties. (See Ex. A to Sannoufi Decl).

8.      "Both Plaintiff and Defendant signed a Certificate of Formation certifying that 'it is the Members express intention to create a limited liability company in accordance with applicable law,' and that the 'operating agreement is adopted and approved by each member.' (pg. 7 to Exhibit A, Sannoufi Decl.¶¶7,9)."

*Controverted.* See Paragraph 7, above.

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

1    9.    "Defendant has never dealt with the Company as or on behalf of a person

2 having any adverse interest to the Company. (Sannoufi Decl. ¶10)."

3    *Controverted.*  Dr. Sannoufi testified that his discovery that the Company was

4 purportedly illegal gave him the right, in substance to terminate the Company, close the

5 Clinic, and divert all the Company's assets to his own, solely-owned business. Dr.

6 Sannoufi in fact caused the primary asset of the Company – the PrimeCare Capitation

7 Contract – to be transferred to himself for use in his new business, and caused the

8 business of the clinic, including two of its three employees, to be transferred intact to

9 his new company as a going concern.  (Sannoufi Depo, Ex. 2, pp. 103-104, 106-107,

10 112-114).

11    10.    "Defendant has never competed with the interests of the Company.

12 (Sannoufi Decl. ¶11)."

13    *Controverted.*  See Paragraph 9, above.

14    11.    "Defendant has never engaged in 'grossly negligent or reckless conduct,

15 intentional misconduct, or a knowing violation of law.'(Sannoufi Decl. ¶12)."

16    *Controverted.*  When he became licensed to practice medicine in California, Dr.

17 Sannoufi understood that he was obligated to comply with California law.  (Sannoufi

18 Depo, Ex. 2, p. 250). While purporting to deny an obligation to know the law, Dr.

19 Sannoufi acknowledges that he had an obligation to comply with the law, consisting of:

20    every law that's basically instructed by those entities to –
      basically to perform business.· Whether it's through the
21    medical board, what they tell you to do and -- or the – you
      know, the other agencies that basically come and check
22    everything in your office.

23 (*Id.*, pp. 267-269).

24

25

26

1    Dr. Sannoufi's hair-splitting aside, he undoubtedly had an obligation to

2  familiarize himself with, and be aware of, at least in general terms, applicable laws, as

3  he would otherwise be unable to satisfy his acknowledged obligation of compliance;  he

4  is therefore precluded from asserting a lack of knowledge of the law pertaining to the

5  corporate practice of medicine, including Corp. Code §§ 17701.04(e) and 13401(a);

6  Bus. & Prof. Code §§ 2052, 2286, 2400, 2406, 2407, 2416, 2017.

7    Aside from the foregoing, Dr. Sannoufi was grossly negligent in failing to take

8  reasonable steps to determine the lawfulness of the proposed clinic business prior to

9  entering into any contracts with Hamadah and allowing Hamadah to become an investor

10  in the Company and the Clinic. Among other things, he never looked on the medical

11  board website to see if there is a guide to the laws governing the practice of medicine in

12  California, (*Id*., p. 254), and therefore never reviewed the "Guide to Laws Governing

13  the Practice of Medicine," which is available for download from the Board's website

14  http://www.mbc.ca.gov/About_Us/Laws/laws_guide.pdf [1] and which states clearly as

15  follows:

> F. Corporate Practice of Medicine
> "Corporations and other artificial entities shall have no professional rights, privileges, or powers" (BUSINESS AND PROFESSIONS CODE §2400). BUSINESS AND PROFESSIONS CODE §2052 defines the practice of medicine as "Any person who practices ... advertises or holds himself or herself our as practicing, any system or mode of treating the sick or afflicted ... or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder . . ." The policy expressed in these sections against the corporate practice of

---

[1] The Court may take judicial notice of information on a government website when neither party disputes either the website's authenticity or the accuracy of the information displayed. See *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999–00 (9th Cir. 2010); *Applegate v. CCI*, 116CV01343MJSPC, 2017 WL 1494695, at *1 (E.D. Cal. Apr. 26, 2017), report and recommendation adopted, 116CV01343DADMJSPC, 2017 WL 2472236 (E.D. Cal. June 8, 2017)

JABURG|WILK
Attorneys at Law

JABURG|WILK
Attorneys at Law

1   medicine is to prevent unlicensed persons from interfering with or influencing the physician's professional judgment.

2   Ownership of a medical practice is largely limited to physicians. Partial or full ownership of a physician's practice
3   by lay persons is prohibited. Business and Professions Code §2400 and similar laws apply to privately held, partnership,
4   and incorporated practices, except that the law (CORPORATIONS CODE §§13400-13410; THE
5   MOSCONE-KNOX PROFESSIONAL CORPORATION ACT) allows some non-physician licensed health
6   professionals to own up to 49 percent of the shares in a professional medical corporation.

7
8   The following types of medical practice ownership and operating structures are also prohibited:

9   •   Non-physicians operating a business for which physician ownership and operation are required: any
10      business advertising, offering, and/or providing patient evaluation, diagnosis, care, and/or treatment –
11      services that can only be offered or provided by physicians.

12  •   Physician(s) operating a medical practice as a limited
13      liability company.

14  •   Management Service Organizations arranging for, advertising, or providing medical services rather than
15      only providing administrative staff and services for a physician's medical practice (non-physicians
16      exercising controls over physician medical practices, even where physicians own and operate the
17      business).

18  •   A physician acting as "medical director" when physicians do not own the practice. For example, a
19      business offering spa treatments that include medical procedures such as Botox injections and laser hair
20      removal that contracts with a physician to be its "medical director."

21  In the above examples, non-physicians would be involved in
22  the unlicensed practice of medicine, and the physician may be aiding and abetting the unlicensed practice of medicine.

23  (Exhibit 41 at pp. 25-26 to Sannoufi Depo. Ex. 2).

24

25  STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
26  12

Indeed, before he was cited by the Board, Dr. Sannoufi never looked on the Board website, or looked at any applicable "bylaws" (sic).  (Sannoufi Depo., Ex. 2,  p. 255).

Dr. Sannoufi is expected to excuse his inaction by asserting that he had an attorney, Mr. Ethan Nelson, review the proposed purchase agreement, and that Mr. Nelson "gave his blessing" to the transaction. (*Id.,* p. 105).  This characterization of the advice given by counsel is rebutted by the contemporaneous correspondence between Dr. Sannoufi and Mr. Nelson, in which Mr. Nelson carefully enumerated and delineated the tasks he undertook to perform, none of which involved passing on the lawfulness of the transaction. Specifically, Mr. Nelson wrote to Dr. Sannoufi, by email:

Dr. Sannoufi:

> Attached please find a copy of the Asset Purchase Agreement for the Riverside practice (in Word and PDF format). As we discussed, I reviewed and amended the contract, which you drafted, to suit your needs for purchase. I included a few provisions to protect you, namely an arbitration provision and an attorney's fees provision. I also reworded the introductory paragraph, pursuant to our conversation, to ensure the purpose of this contract was clear between the parties.
>
> I also cleaned up some of the phrasing of the document you provided to me, spaced the paragraphs, and checked for typos and grammatical errors. Other than that, I did not make any material alterations which wuld (sic) effect (sic) the contract you provided to me.

(*Id.*, Exhibit 38).

12. "Defendant has always held as trustee for the Company as property, profit, or benefit derived by his services or from the Company's property or opportunity. (Sannoufi Decl. ¶13)."

*Controverted.*  See Paragraph 9, above.

JABURG│WILK
Attorneys at Law

13.    "Plaintiff's claim for breach of fiduciary duties is based on the contention that the alleged misrepresentations regarding the down-payment amount, the legality of the LLC structure, or estimated profits happened prior to the formation of the Company, to induce Plaintiff's investment in the Company. (Exhibit B, Plaintiff's First Amended Complaint, ¶46, to Mousavi Decl. ¶¶3,7)."

*Controverted.*  The statement is ambiguous and incoherent and misstates and mischaracterizes the allegations of the FAC.  See also Paragraph 9, above.

14.    "Defendant has been a licensed physician since 2001, and is licensed to practice medicine in the State of California. (Sannoufi Decl. ¶3)."

*Agreed.*

15.    "Plaintiff is not and has never been licensed to practice medicine in any state, including California. (Sannoufi Decl. ¶5)."

*Agreed.*

16.    "California law applies to the current dispute relating to the Walk-In Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company (the "Company"). (Exhibit A, the Company's Operating Agreement, to Sannoufi Decl. ¶7; Exhibit B, Plaintiff's First Amended Complaint, to Mousavi Decl. ¶3, which allege Counts under Cal. Corp. Code)."

*Controverted.*  See Paragraph 3, above.

17.    "Under California law, a medical practice, like the Company, cannot operate as a Limited Liability Company ("LLC"). Corp. Code §§ 17701.04(e) and 13401(a); Bus. & Prof. Code §§2052, 2406, 2416; Lathrop v. Healthcare Partners Medical Group (2004) 114 Cal.App.4th 1412, 1420-1421. (Mousavi Decl. ¶4)."

*Controverted.*  See Paragraph 4, above.

18.     "Under California law, nonphysicians, like Plaintiff, are strictly prohibited from owning and/or controlling medical services. Bus. & Prof. Code §§2052, 2286, 2400, 2417; Corp. Code §§13401, 13401.5, 13403, 13406(a). (Mousavi Decl. ¶5)."

*Controverted.*  See Paragraph 5, above.

19.     "Under California law, an unlicensed person, such as Plaintiff, is prohibited from receiving the benefits of the income of the medical practice 'in any manner.' Bus. and Prof. Code § 2409. (Mousavi Decl. ¶6)."

*Controverted.*  See Paragraph 6, above.

20.     "Plaintiff's first request for information was made on Defendant through a demand letter served by Plaintiff's counsel on December 23, 2016. (Mousavi Decl. ¶8)."

*Controverted.*  Hamadah repeatedly requested that Dr. Sannoufi provide form 1099s showing the amounts paid by various health insurance carriers to Dr. Sannoufi or the Company, and Dr. Sannoufi refused to provide them to Hamadah or the Company's accountant. (Hamadah Depo., Ex. 1,  p. 379; Declaration of Coleen Hager ("Hager Decl.") ¶4, attached hereto as Ex. 3). The accountant was therefore unable to reconcile bank deposits with gross payments. (Hager Decl. ¶4, Ex. 3).

21.     "The lease for the Company's premises was terminated on December 13, 2016, by the landlord, without any option to extend or renew. (Exhibit C, Sannoufi Decl. ¶14)."

*Controverted.*  While the lease for the specific premises used for the clinic was terminated, substitute space was readily available in the same medical complex, as evidenced by Dr. Sannoufi's actions in leasing space for his new clinic, which substitute space could have been used by the Company. (Sannoufi Depo., Ex. 2, p. 105).

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

22. "The Company has not physically existed nor been operating since December of 2016. (Sannoufi Decl. ¶15)."

*Controverted.* This statement is nonsensical; a limited liability company has no physical existence. The foregoing notwithstanding, while listed on the Secretary of State's website as "SOS SUSPENDED," the Company has never been dissolved and continues to exist. See

https://businesssearch.sos.ca.gov/CBS/SearchResults?SearchType=LPLLC&SearchCriteria=walk-in+urgent+care&SearchSubType=Keyword[2]

23. "During the years the Company was in operation, Plaintiff possessed and had access to the corporate documents related to the Company's structure and formation, banking records/information, and tax information/returns, all of which he produced to Defendant during the course of discovery in this matter. (Mousavi Decl.¶9)."

*Controverted in part.* See Paragraph 20, above.

24. "For 2013 - 2016, The Company's CPA sent the Company's federal and state tax returns to Plaintiff's address at: 6902 E. Crocus Dr., Scottsdale, AZ 85254. (Exhibits D, E, F, G, Mousavi Decl. ¶10)."

*Agreed.*

25. "Under California law, nonphysicians, like Plaintiff, cannot possess or access of (sic) patient information protected by HIPAA. Civil Code §56 et. seq; 1798 et. seq. (Mousavi Decl. ¶11)."

---

[2] *Applegate v. CCI*, 116CV01343MJSPC, 2017 WL 1494695, at *1 (E.D. Cal. Apr. 26, 2017), report and recommendation adopted, 116CV01343DADMJSPC, 2017 WL 2472236 (E.D. Cal. June 8, 2017).

*Controverted.*   HIPAA is a federal statute not governed by California law. Further, see Paragraph 5, above.

26.   "Defendant has been a licensed physician since 2001, and is licensed to practice medicine in the State of California. (Sannoufi Decl. ¶3)."

*Agreed.*

27.   "Plaintiff is not and has never been licensed to practice medicine in any state, including California. (Sannoufi Decl. ¶5)."

*Agreed.*

28.   "California law applies to the current dispute relating to the Walk-In Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company (the "Company"). (Exhibit A, the Company's Operating Agreement, to Sannoufi Decl. ¶7; Exhibit B, Plaintiff's First Amended Complaint, to Mousavi Decl. ¶3, which allege Counts under Cal. Corp. Code)."

*Controverted.*  See Paragraph 3, above.

29.   "Under California law, a medical practice, like the Company, cannot operate as a Limited Liability Company ("LLC"). Corp. Code §§ 17701.04(e) and 13401(a); Bus. & Prof. Code §§2052, 2406, 2416; Lathrop v. Healthcare Partners Medical Group (2004) 114 Cal.App.4th 1412, 1420-1421. (Mousavi Decl. ¶4)."

*Controverted.*  See Paragraph 4, above.

30.   "Under California law, nonphysicians, like Plaintiff, are strictly prohibited from owning and/or controlling medical services. Bus. & Prof. Code §§2052, 2286, 2400, 2417; Corp. Code §§13401, 13401.5, 13403, 13406(a). (Mousavi Decl. ¶5)."

*Controverted.*  See Paragraph 5, above.

18318-18318-00002\KMS\RLC\2959298.2

31.    "Under California law, an unlicensed person, such as Plaintiff, is prohibited from receiving the benefits of the income of the medical practice "in any manner." Bus. and Prof. Code § 2409. (Mousavi Decl. ¶6)."

*Controverted.*  See Paragraph 6, above.

32.    "Plaintiff and Defendant received the same amount of distribution each year (2013-2016) as seen by the Schedule K-1s prepared and filed by the Company's CPA. (Exhibit D, E, F, G, Mousavi Decl. ¶¶10,12)."

*Controverted.* Schedule K-1s do not purport to show the amount of distributions made to the members of an LLC; rather, the K-1s show amounts of income (profit) and loss allocated to the members. In this case, Plaintiff and Defendant received dramatically different amounts of distributions, as evidenced by the Company's accounting records and the declaration testimony of the Company's accountant. (Hager Decl. Ex. 3; See also Exhibits D, E, F and G to Defendants' Statement of Uncontroverted Facts.

33.    "No distributions were taken by either Plaintiff or Defendant in 2013. (Exhibit D, Mousavi Decl. ¶¶10,13).

*Controverted.*  In 2013, Plaintiff took no distributions, and Dr. Sannoufi took distributions, in the form of expenses classified as "non K-1 earnings," in the amount of $30,000.00. (Hager Decl. ¶9,  Ex. 3, and schedules A, B thereto).

34.    "Distributions in 2014 were equal for Plaintiff and Defendant, each receiving 50% of the net ordinary income of the Company. (Exhibit E, Mousavi Decl. ¶¶10,14)."

*Controverted.*  See Paragraph 32, above.  In 2014, Plaintiff took distributions of $18,173.00, and Dr. Sannoufi took distributions of $167,424.20, in the form of expenses

JABURG|WILK
Attorneys at Law

1  of which $149,251.20 were reclassified as professional fees. (Hager Decl. ¶9, Ex. 3,
2  Schedule B).

3      35.   "Distributions in 2015 were equal for Plaintiff and Defendant, each
4  receiving 50% of the net ordinary income of the Company. (Exhibit F, Mousavi Decl.
5  ¶¶10,15)."

6      *Controverted*.  See Paragraph 32, above.  In 2015, Plaintiff took distributions of
7  $38,900.00, and Dr. Sannoufi took distributions $180,731.16, in the form of expenses of
8  which $170,593.16 were reclassified as professional fees. (Hager Decl. ¶9, Exhibit B).

9      36.   "Distributions in 2016 were equal for Plaintiff and Defendant, each
10  receiving 50% of the net ordinary income/loss of the Company. (Exhibit G, Mousavi
11  Decl. ¶10,16)."

12      *Controverted*.  See Paragraph 32, above.  In 2016, Plaintiff took distributions of
13  $41,000.00, and Dr. Sannoufi took distributions of  $122,124.48, in the form of
14  expenses which were reclassified as professional fees. (Hager Decl. ¶9,  Schedule  B).

15      37.   "Defendant was never able to collect his full salary during any year the
16  Company was in operation. (Sannoufi Decl. ¶16)."

17      *Controverted*.   The parties are in disagreement as to the amount of Dr.
18  Sannoufi's salary. There is nothing in the Company Operating Agreement regarding Dr.
19  Sannoufi's salary.  (Sannoufi Depo, Ex. 2, pp. 94-95).  Dr. Sannoufi now claims he was
20  entitled to a salary of $220,000.00 .  (*Id.*, p. 245), but that testimony is contradicted by
21  Hamadah.  (Hamadah Depo. Ex. 1, pp. 123-127, 133, 144).  Further, because Dr.
22  Sannoufi elected to receive compensation in the form of expense payments, rather than
23  salary (Sannoufi Depo, Ex. 2, p. 55), it is difficult to determine the amount he received.
24  However, based on the summary prepared by the Company's accountant, Ms. Hager,

25

26

JABURG|WILK
Attorneys at Law

and because no debt for unpaid salary appears in the Company's books (Hager Decl. ¶10), it appears that Dr. Sannoufi did receive compensation, on a prorated basis, in accordance with the parties' agreement.

38.    "Prior to 2013, Defendant had never owned a medical practice outside of Arizona. (Sannoufi Decl. ¶4)."

*Agreed.*

39.    "Sometime in 2013, Defendant moved to California and was considering purchasing his first medical practice in California. (Sannoufi Decl. ¶4)."

*Controverted.*   At the time Dr. Sannoufi was considering the purchase of the Clinic, he had not yet moved to California, and was residing in Arizona. (Hamadah Depo., Ex. 1, p. 116).

40.    "Plaintiff agreed to invest in Defendant's California medical practice, which was ultimately named the Walk-In Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company (the 'Company'). (Sannoufi Decl. ¶6)."

*Agreed.*

41.    "Prior to the formation of the Company, Defendant had no idea that the laws of California, unlike that of Arizona, prohibit a nonphysician, such as Plaintiff, from owning or operating a medical practice. (Sannoufi Decl. ¶17)."

*Controverted.*  For reasons made clear above, see Paragraph 11, Dr. Sannoufi, as a California-licensed physician, is deemed at all times to have had knowledge of the basics of California law pertaining to the corporate practice of medicine.

42.    "Prior to the formation of the Company, Defendant had no idea that the laws of California, unlike that of Arizona, prohibit a medical practice from operating as an LLC. (Sannoufi Decl. ¶XX (sic))."

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

1     *Controverted.*  For reasons made clear above, see Paragraph 11, Dr. Sannoufi, as

2 a California-licensed physician, is deemed at all times to have had knowledge of the

3 basics of California law pertaining to the corporate practice of medicine.

4     43.    "Defendant never expressly represented to Plaintiff that the Company's

5 LLC structure was legal. (Sannoufi Decl. ¶19)."

6     *Controverted.*  This purported uncontroverted fact is submitted in bad faith and

7 for the apparent purpose of either catching unaware or imposing a burden on counsel for

8 Plaintiff . Having been present at Mr. Hamadah's deposition, counsel Ms. Mousavi has

9 express knowledge that this alleged fact is directly contradicted by Hamada's testimony

10 and is therefore not uncontroverted:

11
12     · Q.·  ·But I just want to make clear, ***did Dr. Sannoufi***
    ***represent to you that under the -- what you were doing***
13     ***under the purchase agreement was legal?***

14      A.·  ·***Legal.***

     Q.·  ·Did he tell you that what you were doing under the
15     LLC documents was legal?
    ·
16     A.·  ·***Legal.··Everything legal***.

17     Q.·  ·Did he tell you that?

18     A.·  ·Yes.

19 (Hamadah Depo., Ex. 1, p. 385(emphasis added); see also, pp. 359-361, 382).

20     44.    "The Company was formed in Riverside, California, around August,

21 2013. (Exhibit A, Sannoufi Decl. ¶¶6-7)."

22     *Agreed.*

23     45.    "For the formation of the Company, Plaintiff communicated with

24 MyUSACorporation.com ("MyUSA"). (Exhibit H, Sannoufi Decl. ¶20)."

25

26

JABURG | WILK
Attorneys at Law

*Controverted.* While a form transmittal letter was addressed to Hamadah, and while Hamadah received emails requesting his signature, Hamadah had no direct communications with anyone at MyUSA. All communications with MyUSA regarding the formation of the Company were through Dr. Sannoufi and/or Ghaida (sometimes spelled "Ghayda") Shoora, a relative or family friend of Dr. Sannoufi, who undertook to cause the Company to be set up. (Hamadah Depo., Ex. 1, pp. 122-123, 147-149, 394-395). Hamadah's testimony in this regard is corroborated by contemporaneous evidence, including without limitation (a) email dated May 21, 2013, from Ray Albert of MyUSA to Dr. Sannoufi and Ms. Shoora, evidencing communications regarding the formation of a California LLC occurring prior to Hamada's involvement in the transaction (Exhibit 32 to Sannoufi Depo., Ex. 2), and (b) email string of August 4-5, 2013, evidencing the following sequence of events:

- Richard Mercedes of MyUSA sent to Hamadah by email, the proposed Operating Agreement of the Company;

- Hamadah, rather than responding directly, wrote to Dr. Sannoufi by email, stating "I don't understand y(sic) he send this . . .";

- Ms. Shoora, having apparently become aware of the communications through Dr. Sannoufi, wrote to Mr. Hamadah, stating, in part:

I reviewed the documents and they made a mistake by not adding Dr. Sannoufi's name. I contacted them and they will send another operating agreement. For now they need the following information:

1) Please confirm the percentage of ownership for each member in the LLC.

2) please let me know if you intend to list in the operating agreement any initial contributions- $0- is fine too

(Ex. 37 to Sannoufi Depo., Ex. 1).

JABURG|WILK
Attorneys at Law

46.   "Plaintiff executed a Power of Attorney on behalf of the Company to allow MyUSA to file documents for the formation of the Company. (Exhibit I, Sannoufi Decl. ¶21)."

*Controverted.*  The Power of Attorney was DocuSigned.

47.   "Plaintiff also signed, under penalty of perjury, the application to obtain an Employer Identification Number for the Company. (Exhibit J, Sannoufi Decl. ¶22)."

*Controverted.*   The Application for Employer Identification Number was "DocuSigned."  (See Ex. J, Sannoufi Decl.).

48.   "The formation documents and communication from MyUSA were addressed to Plaintiff. (Exhibit K, Sannoufi Decl. ¶23)."

*Controverted.* As set forth in Paragraph 45, above, while a form transmittal letter was addressed to Hamadah, and while Hamadah received emails requesting his signature, Hamadah had no direct communications with anyone at MyUSA. All communications with MyUSA regarding the formation of the Company were through Dr. Sannoufi and/or Ghaida (sometimes spelled "Ghayda") Shoora, a relative or family friend of Dr. Sannoufi, who undertook to cause the Company to be set up.  (Hamadah Depo., Ex. 1, pp. 122-123, 147-149, 394-395).

49.   "Around August 2013, MyUSA prepared the Operating Agreement ("OA") for the Company, and provided such OA for Plaintiff's review. (Exhibit L, Sannoufi Decl. ¶24)."

*Agreed.*

50.   "The OA, which issued 50% membership interest of the Company to each Dr. Sannoufi and Plaintiff, was signed by both Dr. Sannoufi and Plaintiff. (Exhibit A, Sannoufi Decl. ¶7,8)."

JABURG|WILK
Attorneys at Law

*Controverted.* The OA initially presented was modified, prior to being signed, at the direction of Ms. Shoora, as set forth in Paragraph 45, above. Further, see Paragraph 7, above.

51. "Both Plaintiff and Defendant signed a Certificate of Formation certifying that "it is the Members express intention to create a limited liability company in accordance with applicable law," and that the "operating agreement is adopted and approved by each member." (pg. 7 to Exhibit A, Sannoufi Decl. ¶7, 9)."

*Controverted.* See Paragraph 7, above.

52. "The Company's anticipated source of revenue was the "Primecare Contract" that Dr. Kistler sold to the Company in or about August 2013. (Exhibit M, Sannoufi Decl. ¶25)."

*Agreed.*

53. "The purchase of Dr. Kistler's "Primecare Contract" was reviewed and approved by a California attorney, Ethan Nelson, in or about August 2013. (Sannoufi Decl. ¶26)."

*Controverted.* As set forth in Paragraph 11, Mr. Nelson's scope of services, as communicated to Dr. Sannoufi, did not include the "approval" of the purchase agreement.

54. "The purchase of the "Primecare Contract" was contingent on the Company being able to assume Dr. Kistler's office location. (§2.01, Exhibit M, Sannoufi Decl. ¶25, 27)."

*Controverted.* The contingency set forth in §2.01 of the Purchase Agreement, quoted below, does not refer to or require include assumption of the lease for Dr. Kistler's office:

18318-18318-00002\KMS\RLC\2959298.2

> 2.01 Lease Agreement: This Agreement is further contingent upon Buyer being able to successfully negotiate with the lessor of the Premises a waiver of any all Seller obligations under the existing lease. Buyer will, upon assumption and credential of the Prim Care Contract, negotiate terms to operate Buyer's business at the location terms satisfactory to Buyer in Buyer's sole discretion.

55.   "Even though the purchase agreement for Dr. Kistler's 'Primecare Contract' expressly stated that the Company was a Limited Liability Company, Mr. Nelson never raised any issues as to the corporate structure of the Company to Defendant. (Sannoufi Decl. ¶28)."

*Controverted.* This purported fact rests upon the unstated and incorrect assumption that Mr. Nelson's scope of engagement included reviewing and approving the structure of the transaction. See Paragraphs 11 and 53, above.

56.   "Ultimately, Plaintiff invested $80,000 in the Company. (Sannoufi Decl. ¶29; Exhibit N, Plaintiff's Answer to Counterclaim, ¶6, to Mousavi Decl. ¶17)."

*Agreed.*  Hamadah has now verified that the investment amount was $80,000.00.

57.   "Plaintiff and Defendant agreed that Defendant would receive an annual salary for the medical services he rendered for the Company. (Sannoufi Decl. ¶30)."

*Controverted.*  It was initially discussed that Dr. Sannoufi would take an annual salary of $180,000.00.   (Hamadah Depo., Ex. 1, pp. 123-127, 133, 144). However, Dr. Sannoufi elected to take his compensation in the form of personal expenses. (Sannoufi Depo., Ex. 2, pp. 55-57).

58.   "Plaintiff and Defendant agreed that they would each take 50% of the profits of the Company, after salaries and other expenses were paid. (Sannoufi Decl. ¶31)."

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

*Agreed, with qualifications.*   Because Dr. Sannoufi elected to receive his compensation in the form of payment of personal expenses, the amount of those expenses was credited against Dr. Sannoufi's salary. (Sannoufi Depo., Ex. 2, pp. 55-57).

59.   "Between 2014 and 2016, Plaintiff has received at least $98,000 in distributions from the Company. (Exhibit O, Sannoufi Decl. ¶32)."

*Agreed.*

60.   "In or about September or October of 2016, through the advice of counsel, Dr. Sannoufi discovered for the first time that the shared ownership and profit sharing arrangement with Plaintiff was in violation of California law. (Sannoufi Decl. ¶33)."

*Controverted and Objection.*   When asked at his deposition how he discovered the illegality issue, Dr. Sannoufi started to explain that he learned about it from his attorney, and then his attorney interrupted and instructed him not to answer as to communications between Dr. Sannoufi and her. (Sannoufi Depo, Ex. 2, pp. 10-11). Having prevented Plaintiff from inquiring into the purported communications with counsel, Dr. Sannoufi is precluded from asserting reliance on advice of counsel as a defense in this matter. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (party cannot use advice of counsel as both a sword and a shield). Further, for reasons made clear above, see Paragraph 11, Dr. Sannoufi, as a California-licensed physician, is deemed at all times to have had knowledge of the basics of California law pertaining to the corporate practice of medicine.

61.   "Upon discovery of the illegality of the Company, Defendant attempted to dissolve the Company; however, Plaintiff refused to sign the dissolution request. (Exhibit P, Sannoufi Decl. ¶34)."

18318-18318-00002\KMS\RLC\2959298.2

1   *Controverted.*   The proposed Certificate of Dissolution was presented in

2   connection with Dr. Sannoufi's letter stating that the landlord had refused to renew the

3   Company's lease, and was not related to any purported discovery of illegality.

4   (Hamadah Depo., Ex. 1, p. 288).

5   62.   "The lease for the Company's premises was terminated on December 13,

6   2016, by the landlord, without any option to extend or renew. (Exhibit C, Sannoufi

7   Decl. ¶14)."

8   *Controverted.* See Paragraph 21, above.

9   63.   "The Company has not physically existed nor been operating since

10   December of 2016. (Sannoufi Decl. ¶15)."

11   Controverted.  This statement is nonsensical; a limited liability company has no

12   physical existence.  The foregoing notwithstanding, while listed on the Secretary of

13   State's website as "SOS SUSPENDED," the Company has never been dissolved and

14   continues to exist.

15   64.   "Defendant has been a licensed physician since 2001, and is licensed to

16   practice medicine in the State of California. (Sannoufi Decl. ¶3)."

17   *Agreed.*

18   65.   "Plaintiff is not and has never been licensed to practice medicine in any

19   state, including California. (Sannoufi Decl. ¶5)."

20   *Agreed.*

21   66.   "California law applies to the current dispute relating to the Walk-In

22   Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company

23   (the "Company"). (Exhibit A, the Company's Operating Agreement, to Sannoufi Decl.

24

25

26

JABURG|WILK
Attorneys at Law

¶7; Exhibit B, Plaintiff's First Amended Complaint, to Mousavi Decl. ¶3, which allege Counts under Cal. Corp. Code)."

*Controverted.* See Paragraph 3, above.

67.    "Under California law, a medical practice, like the Company, cannot operate as a Limited Liability Company ("LLC"). Corp. Code §§ 17701.04(e) and 13401(a); Bus. & Prof. Code §§2052, 2406, 2416; Lathrop v. Healthcare Partners Medical Group (2004) 114 Cal.App.4th 1412, 1420-1421. (Mousavi Decl. ¶4)."

*Controverted.* See Paragraph 4, above.

68.    "Under California law, nonphysicians, like Plaintiff, are strictly prohibited from owning and/or controlling medical services. Bus. & Prof. Code §§2052, 2286, 2400, 2417; Corp. Code §§13401, 13401.5, 13403, 13406(a). (Mousavi Decl. ¶5)."

*Controverted.* See Paragraph 5, above.

69.    "Under California law, an unlicensed person, such as Plaintiff, is prohibited from receiving the benefits of the income of the medical practice "in any manner." Bus. and Prof. Code § 2409. (Mousavi Decl. ¶6)."

*Controverted.* See Paragraph 6, above.

70.    "The lease for the Company's premises was terminated on December 13, 2016, by the landlord, without any option to extend or renew. (Exhibit C, Sannoufi Decl. ¶14)."

*Controverted.* See Paragraph 21, above.

71.    "The Company has not physically existed nor been operating since December of 2016. (Sannoufi Decl. ¶15)."

*Controverted.*  This statement is nonsensical; a limited liability company has no physical existence.  The foregoing notwithstanding, while listed on the Secretary of

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

State's website as "SOS SUSPENDED," the Company has never been dissolved and continues to exist.

72. "The Company's "final" tax returns prepared for 2016, shows that the only assets, both tangible and intangible, belonging to the Company was "goodwill" and "equipment." (Exhibit G, Mousavi Decl. ¶10)."

*Controverted.* The reference to goodwill and equipment is on a schedule of depreciable assets, which schedule appears to have been prepared for taxes and does not purport to constitute an exhaustive listing of the Company's assets.

73. "The value of the "goodwill" and "equipment" of the Company has been liquidated and depreciated by the Company. (Exhibit G, Mousavi Decl. ¶10)."

*Agreed, with qualification.* The tax return reflects the transaction whereby Dr. Sannoufi asserted to himself, without compensation to the Company, the Company's equipment and goodwill as a going concern. (Hager Decl. ¶11)

74. "As of the end of 2016, there were no "Clinic Property" or Company assets remaining; at the closing of the Company's operation, Defendant took nothing from the Company. (Mousavi Decl. ¶10; Sannoufi Decl. ¶35)."

*Controverted.* As set forth in Paragraph 73, the lack of assets as of the end of 2016 is premised upon Dr. Sannoufi's prior conduct in closing the Company's business and asserting to himself, without compensation to the Company, the Company's equipment and goodwill as a going concern. (Hager Decl. ¶11)

75. "'Patient relationships' are not capable of precise definition, nor capable of exclusive possession or control. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). (Mousavi Decl. ¶18)."

1    *Controverted.*   The cited case does not pertain to, or even mention, "patient

2    relationships."

3         76.    "'Business opportunities' are not capable of precise definition, nor

4    capable of exclusive possession or control. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th

5    Cir. 2003). (Mousavi Decl. ¶19)."

6         *Controverted.*   The cited case does not pertain to, or even mention, "business

7    opportunities."

8         77.    "'Goodwill' is not capable of precise definition, nor capable of exclusive

9    possession or control in this case. Also, per the Company's 2016 final tax return, no

10   "goodwill" remained after 2016. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir.

11   2003). (Mousavi Decl. ¶20)."

12        *Controverted.*   The cited case does not pertain to, or even mention, goodwill.

13   The foregoing notwithstanding, "goodwill" has a well-recognized definition. See

14   *Inglewood Redevelopment Agency v. Aklilu*, 153 Cal. App. 4th 1095, 1109, 64 Cal. Rptr.

15   3d 519, 529 (2007), as modified (Aug. 20, 2007):

16                 'Goodwill value is a transferable property right which is
17                 generally defined as the amount a willing buyer would pay
                   for a going concern above the book value of the assets.'
                   [Citation.]" (Redevelopment Agency of San Diego v.
18                 Attisha (2005) 128 Cal.App.4th 357, 367, 27 Cal.Rptr.3d
                   126.)
19

20   Further, the absence of goodwill at the end of 2016 is premised upon Dr. Sannoufi's

21   prior conduct in closing the Company's business and asserting to himself, without

     compensation to the Company, the Company's equipment and goodwill as a going
22
     concern. (Hager Decl. ¶11)
23
          78.    "Defendant has been a licensed physician since 2001, and is licensed to
24
     practice medicine in the State of California. (Sannoufi Decl. ¶3)."
25

26

JABURG|WILK
Attorneys at Law

*Agreed.*

79.    "Plaintiff is not and has never been licensed to practice medicine in any state, including California. (Sannoufi Decl. ¶5)."

*Agreed.*

80.    "California law applies to the current dispute relating to the Walk-In Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company (the "Company"). (Exhibit A, the Company's Operating Agreement, to Sannoufi Decl. ¶7; Exhibit B, Plaintiff's First Amended Complaint, to Mousavi Decl. ¶3, which allege Counts under Cal. Corp. Code)."

*Controverted.*  See Paragraph 3, above.

81.    "Under California law, a medical practice, like the Company, cannot operate as a Limited Liability Company ("LLC"). Corp. Code §§ 17701.04(e) and 13401(a); Bus. & Prof. Code §§2052, 2406, 2416; Lathrop v. Healthcare Partners Medical Group (2004) 114 Cal.App.4th 1412, 1420-1421. (Mousavi Decl. ¶4)."

*Controverted.*  See Paragraph 4, above.

82.    "Under California law, nonphysicians, like Plaintiff, are strictly prohibited from owning and/or controlling medical services. Bus. & Prof. Code §§2052, 2286, 2400, 2417; Corp. Code §§13401, 13401.5, 13403, 13406(a). (Mousavi Decl. ¶5)."

*Controverted.* See Paragraph 5, above.

83.    "Under California law, an unlicensed person, such as Plaintiff, is prohibited from receiving the benefits of the income of the medical practice "in any manner." Bus. and Prof. Code § 2409. (Mousavi Decl. ¶6)."

*Controverted.*  See Paragraph 6, above.

JABURG|WILK
Attorneys at Law

84.     "The lease for the Company's premises was terminated on December 13, 2016, by the landlord, without any option to extend or renew. (Exhibit C, Sannoufi Decl. ¶14)."

*Controverted.* See Paragraph 21, above.

85.     "The Company has not physically existed nor been operating since December of 2016. (Sannoufi Decl. ¶15)."

*Controverted.*  This statement is nonsensical; a limited liability company has no physical existence.  The foregoing notwithstanding, while listed on the Secretary of State's website as "SOS SUSPENDED," the Company has never been dissolved and continues to exist.

86.     "Plaintiff invested $80,000 in the Company. (Sannoufi Decl. ¶29; Exhibit N, Plaintiff's Answer to Counterclaim, ¶6, to Mousavi Decl. ¶17)."

*Agreed.*

87.     "Plaintiff and Defendant agreed that Defendant would receive an annual salary for the medical services he rendered for the Company. (Sannoufi Decl. ¶30)."

*Controverted.* It was initially discussed that Dr. Sannoufi would take an annual salary of $180,000.00.  (Hamadah Depo., Ex. 1,  pp 123-127, 133, 144). However, Dr. Sannoufi elected to take his compensation in the form of personal expenses. (Sannoufi Depo., Ex. 2, pp. 55-57).

88.     "Plaintiff and Defendant agreed that they would each take 50% of the profits of the Company, after salaries and other expenses were paid. (Sannoufi Decl. ¶31)."

JABURG|WILK
Attorneys at Law

*Agreed, with qualifications.*   Because Dr. Sannoufi elected to receive his compensation in the form of payment of personal expenses, the amount of those expenses was credited against Dr. Sannoufi's salary. (Sannoufi Depo., Ex. 2, pp. 55-57).

89.   "Between 2014 and 2016, Plaintiff has received at least $98,000 in distributions from the Company. (Exhibit O, Sannoufi Decl. ¶32)."

*Agreed.*

90.   "Defendant was never able to collect his full salary during any year the Company was in operation. (Sannoufi Decl. ¶16)."

*Controverted.*   The parties are in disagreement as to the amount of Dr. Sannoufi's salary. There is nothing in the Company Operating Agreement regarding Dr. Sannoufi's salary.  (Sannoufi Depo, Ex. 2, pp. 94-95).  Dr. Sannoufi now claims he was entitled to a salary of $220,000.00 (*Id.*, p. 245), but that testimony is contradicted by Hamadah.  (Hamadah Depo. Ex. 1, pp. 123-127, 133, 144).  Further, because Dr. Sannoufi elected to receive compensation in the form of expense payments, rather than salary (Sannoufi Depo, Ex. 2, p. 55), it is difficult to determine the amount he received. However, based on the summary prepared by the Company's accountant, Ms. Hager, and because no debt for unpaid salary appears in the Company's books (Hager Decl. ¶10), it appears that Dr. Sannoufi did receive compensation, on a prorated basis, in accordance with the parties' agreement.

91.   "Plaintiff and Defendant received the same amount of distribution each year (2013-2016) as seen by the Schedule K-1s prepared and filed by the Company's CPA. (Mousavi Decl. ¶12)."

*Controverted.* Schedule K-1s do not purport to show the amount of distributions made to the members of an LLC; rather, the K-1s show amounts of income (profit) and

loss allocated to the members. In this case, Plaintiff and Defendant received dramatically different amounts of distributions, as evidenced by the Company's accounting records and the declaration testimony of the Company's accountant. (Hager Declaration; see also Exhibits D, E, F and G to Defendants' Statement of Uncontroverted Facts.

92.   "No distributions were taken by either Plaintiff or Defendant in 2013. (Exhibit D, Mousavi Decl. ¶10,13)."

*Controverted*.  In 2013, Plaintiff took no distributions, and Dr. Sannoufi took distributions, in the form of expenses classified as "non K-1 earnings," in the amount of $30,000.00. (Hager Decl. ¶9, Ex. 3, and schedules A, B thereto).

93.   "Distributions in 2014 were equal for Plaintiff and Defendant, each receiving 50% of the net ordinary income of the Company. (Exhibit E, Mousavi Decl. ¶10,14)."

*Controverted*.  See Paragraph 32, above.  In 2014, Plaintiff took distributions of $18,173.00, and Dr. Sannoufi took distributions of $167,424.20, in the form of expenses of which $149,251.20 were reclassified as professional fees. (Hager Decl. ¶9, Ex. 3, Schedule B).

94.   "Distributions in 2015 were equal for Plaintiff and Defendant, each receiving 50% of the net ordinary income of the Company. (Exhibit F, Mousavi Decl. ¶X10,15)."

*Controverted*.  See Paragraph 32, above.  In 2015, Plaintiff took distributions of $38,900.00, and Dr. Sannoufi took distributions $180,731.16, in the form of expenses of which $170,593.16 were reclassified as professional fees. (Hager Decl. ¶9, Exhibit B).

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

95.     "Distributions in 2016 were equal for Plaintiff and Defendant, each receiving 50% of the net ordinary income/loss of the Company. (Exhibit G, Mousavi Decl. ¶10,16)."

*Controverted.*  See Paragraph 32, above.  In 2016, Plaintiff took distributions of $41,000.00, and Dr. Sannoufi took distributions of  $122,124.48, in the form of expenses which were reclassified as professional fees. (Hager Decl. ¶9,  Schedule  B).

96.     "Prior to 2013, Defendant had never owned a medical practice outside of Arizona. (Sannoufi Decl. ¶4)."

*Agreed.*

97.     "Sometime in 2013, Defendant moved to California and was considering purchasing his first medical practice in California. (Sannoufi Decl. ¶4)."

*Controverted.*   At the time Dr. Sannoufi was considering the purchase of the Clinic, he had not yet moved to California, and was residing in Arizona. (Hamadah Depo., Ex. 1, p. 116)

98.     "Plaintiff agreed to invest in Defendant's California medical practice, which was ultimately named the Walk-In Urgent Care and Family Practice Clinic LLC, a California Limited Liability Company (the "Company"). (Sannoufi Decl. ¶6)."

*Agreed.*

99.     "Prior to the formation of the Company, Defendant had no idea that the laws of California, unlike that of Arizona, prohibit a non- physician, such as Plaintiff, from owning or operating a medical practice. (Sannoufi Decl. ¶17)."

*Controverted.*  For reasons made clear above, see Paragraph 11, Dr. Sannoufi, as a California-licensed physician, is deemed at all times to have had knowledge of the basics of California law pertaining to the corporate practice of medicine.

100.   "Prior to the formation of the Company, Defendant had no idea that the laws of California, unlike that of Arizona, prohibit a medical practice from operating as an LLC. (Sannoufi Decl. ¶18)."

*Controverted.*  For reasons made clear above, see Paragraph 11, Dr. Sannoufi, as a California-licensed physician, is deemed at all times to have had knowledge of the basics of California law pertaining to the corporate practice of medicine.

101.   "The Company was formed in Riverside, California, around August 2013. (Exhibit A, Sannoufi Decl. ¶6,7)."

*Agreed.*

102.   "For the formation of the Company, Plaintiff communicated with MyUSACorporation.com ("MyUSA"). (Exhibit H, Sannoufi Decl. ¶20)."

*Controverted.* As set forth in Paragraph 45, while a form transmittal letter was addressed to Hamadah, and while Hamadah received emails requesting his signature, Hamadah had no direct communications with anyone at MyUSA. All communications with MyUSA regarding the formation of the Company were through Dr. Sannoufi and/or Ghaida (sometimes spelled "Ghayda") Shoora, a relative or family friend of Dr. Sannoufi, who undertook to cause the Company to be set up.  (Hamadah Depo., pp. 122-123, 147-149, 394-395).

103.   "Plaintiff executed a Power of Attorney on behalf of the Company to allow MyUSA to file documents for the formation of the Company. (Exhibit I, Sannoufi Decl. ¶21)."

*Controverted.*  The Power of Attorney was DocuSigned.

104.   "Plaintiff also signed, under penalty of perjury, the application to obtain an Employer Identification Number for the Company. (Exhibit J, Sannoufi Decl. ¶22)."

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

36

*Controverted.*   The Application for Employer Identification Number was "DocuSigned."  (See Ex. J, Sannoufi Decl.).

105.   "The formation documents and communication from MyUSA were addressed to Plaintiff. (Exhibit K, Sannoufi Decl. ¶23)."

*Controverted.* As set forth in Paragraph 45, above, while a form transmittal letter was addressed to Hamadah, and while Hamadah received emails requesting his signature, Hamadah had no direct communications with anyone at MyUSA. All communications with MyUSA regarding the formation of the Company were through Dr. Sannoufi and/or Ghaida (sometimes spelled "Ghayda") Shoora, a relative or family friend of Dr. Sannoufi, who undertook to cause the Company to be set up.  (Hamadah Depo., pp. 122-123, 147-149, 394-395).

106.   "Around August 2013, MyUSA prepared the Operating Agreement ("OA") for the Company, and provided such OA for Plaintiff's review. (Exhibit L, Sannoufi Decl. ¶24)."

*Agreed.*

107.   "The OA, which issued 50% membership interest of the Company to each Dr. Sannoufi and Plaintiff, was signed by both Dr. Sannoufi and Plaintiff. (Exhibit A, Sannoufi Decl. ¶7,8)."

*Controverted.* The OA initially presented was modified, prior to being signed, at the direction of Ms. Shoora, as set forth in Paragraph 45, above. Further, see Paragraph 7, above.

108.   "Both Plaintiff and Defendant signed a Certificate of Formation certifying that "it is the Members express intention to create a limited liability company in

18318-18318-00002\KMS\RLC\2959298.2

accordance with applicable law," and that the "operating agreement is adopted and approved by each member." (pg. 7 to Exhibit A, Sannoufi Decl. ¶9)."

*Controverted.* See Paragraph 7, above.

109. "The Company's anticipated source of revenue was the "Primecare Contract" that Dr. Kistler sold to the Company in or about August 2013. (Exhibit M, Sannoufi Decl. ¶25)."

*Agreed.*

110. "The purchase of Dr. Kistler's "Primecare Contract" was reviewed and approved by a California attorney, Ethan Nelson, in or about August 2013. (Sannoufi Decl. ¶26)."

*Controverted.* As set forth in Paragraph 11, Mr. Nelson's scope of services, as communicated to Dr. Sannoufi, did not include the "approval" of the purchase agreement.

111. "The purchase of the "Primecare Contract" was contingent on the Company being able to assume Dr. Kistler's office location. (§2.01, Exhibit M, Sannoufi Decl. ¶27)."

*Controverted.* The contingency set forth in §2.01 of the Purchase Agreement, quoted below, does not refer to or require include assumption of the lease for Dr. Kistler's office:

> 2.01 Lease Agreement: This Agreement is further contingent upon Buyer being able to successfully negotiate with the lessor of the Premises a waiver of any all Seller obligations under the existing lease. Buyer will, upon assumption and credential of the Prim Care Contract, negotiate terms to operate Buyer's business at the location terms satisfactory to Buyer in Buyer's sole discretion.

18318-18318-00002\KMS\RLC\2959298.2

112.   "Even though the purchase agreement for Dr. Kistler's "Primecare Contract" expressly stated that the Company was a Limited Liability Company, Mr. Nelson never raised any issues as to the corporate structure of the Company to Defendant. (Sannoufi Decl. ¶28)."

*Controverted.* This purported fact rests upon the unstated and incorrect assumption that Mr. Nelson's scope of engagement included reviewing and approving the structure of the transaction. See Paragraphs 11 and 53, above.

113.   "Ultimately, Plaintiff invested $80,000 in the Company, in exchange for ownership interest in the Company. (Sannoufi Decl. ¶29)."

*Agreed.*

114.   "Defendant invested and offered his professional services to the daily operation of the Company, in exchange for ownership interest in the company. (Sannoufi Decl. ¶29)."

*Controverted.*  Dr. Sannoufi caused the Company to be formed and offered an investment opportunity to Hamadah in the form of a membership interest. Sannoufi demanded and expected to receive compensation, in the form of salary or expense payments, for his services. (Sannoufi Depo., Ex. 2, pp 55-57).

115.   "Plaintiff and Defendant agreed that Defendant would receive an annual salary for the medical services he rendered for the Company. (Sannoufi Decl. ¶30)."

*Controverted.*   The parties are in disagreement as to the amount of Dr. Sannoufi's salary. There is nothing in the Company Operating Agreement regarding Dr. Sannoufi's salary.  (Sannoufi Depo, Ex. 2, pp. 94-95).  Dr. Sannoufi now claims he was entitled to a salary of $220,000.00 (Id., p. 245), but that testimony is contradicted by Hamadah.  (Hamadah Depo., Ex. 1, pp. 123-127, 133, 144).  Further, because Dr.

JABURG|WILK
Attorneys at Law

1   Sannoufi elected to receive compensation in the form of expense payments, rather than

2   salary (Sannoufi Depo, Ex. 2,  p. 55), it is difficult to determine the amount he received.

3   However, based on the summary prepared by the Company's accountant, Ms. Hager,

4   and because no debt for unpaid salary appears in the Company's books, it appears that

5   Dr. Sannoufi did receive compensation, on a prorated basis, in accordance with the

6   parties' agreement.

7        116.   "Plaintiff and Defendant agreed that they would each take 50% of the

8   profits of the Company, after salaries and other expenses were paid. (Sannoufi Decl.

9   ¶31)."

10       *Agreed, with qualifications.*   Because Dr. Sannoufi elected to receive his

11   compensation in the form of payment of personal expenses, the amount of those

12   expenses was credited against Dr. Sannoufi's salary. (Sannoufi Depo., Ex. 2, pp. 55-57).

13       117.   "Between 2014 and 2016, Plaintiff has received at least $98,000 in

14   distributions from the Company. (Exhibit O, Sannoufi Decl. ¶32)."

15       *Agreed.*

16       118.   "In or about September or October of 2016, through the advice of counsel,

17   Dr. Sannoufi discovered for the first time that the shared ownership and profit sharing

18   arrangement with Plaintiff was in violation of California law. (Sannoufi Decl. ¶33)."

19       *Controverted and Objection.*   When asked at his deposition how he discovered

20   the illegality issue, Dr. Sannoufi started to explain that he learned about it from his

21   attorney, and then his attorney interrupted and instructed him not to answer as to

22   communications between Dr. Sannoufi and her. (Sannoufi Depo, Ex. 2, pp. 10-11).

23   Having prevented Plaintiff from inquiring into the purported communications with

24   counsel, Dr. Sannoufi is precluded from asserting reliance on advice of counsel as a

25

26

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

40

18318-18318-00002\KMS\RLC\2959298.2

defense in this matter. *Chevron*, 974 F.2d at 1162 (attorney client privilege cannot be sued as both a shield and a sword). Further, for reasons made clear above, see Paragraph 11, Dr. Sannoufi, as a California-licensed physician, is deemed at all times to have had knowledge of the basics of California law pertaining to the corporate practice of medicine.

119.   "The lease for the Company's premises was terminated on December 13, 2016, by the landlord, without any option to extend or renew. (Exhibit C, Sannoufi Decl. ¶14)."

*Controverted*. See Paragraph 21, above.

120.   "The Company has not physically existed nor been operating since December of 2016. (Sannoufi Decl. ¶15)."

*Controverted*.  This statement is nonsensical; a limited liability company has no physical existence.  The foregoing notwithstanding, while listed on the Secretary of State's website as "SOS SUSPENDED," the Company has never been dissolved and continues to exist.

### III.   ADDITIONAL MATERIAL FACTS

121.   The parties met when Mr. Hamadah visited Dr. Sannoufi in jail and offered him sympathy, friendship, and financial assistance.  (Sannoufi Depo, Ex. 2, pp. 129-130, 135).

122.   The present business venture arose after Dr. Sannoufi was acquitted and released from jail, and went to Mr. Hamadah's jewelry store "to thank him for being there."  (Id., p. 133).

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

123.    Dr. Sannoufi approached Mr. Hamadah in connection with the proposed acquisition of an Urgent Care Clinic in Riverside, California. (Hamadah Depo, Ex. 1, pp. 391-392).

124.    At the time Dr. Sannoufi approached Mr. Hamadah, he and a friend (or relative) Ghaida (sometimes spelled "Gayda") Shoora, had been in communication with MyUSACorporation.com regarding the formation of a California limited liability company. (Hamadah Depo, Ex. 1, pp. 122-123, 147-149, 394-395).

125.    Dr. Sannoufi solicited Mr. Hamadah's involvement as an investor in the company to be formed to own the clinic:

> He say he has clinic ready now he like.··He need money to buy this one.··He need partner, and he say, Jamal, I like -- I like you because you help me –

*Id.*, p. 392).

126.    Dr. Sannoufi acknowledges that he caused the company to be formed and offered an investment opportunity to Hamadah in the form of a membership interest. Sannoufi demanded and expected to receive compensation, in the form of salary or expense payments, for his services. (Sannoufi Depo., Ex. 2, pp 55-57).

127.    Mr. Hamadah ultimately agreed to invest $80,000.00 in exchange for a 50% interest in the company.  (Hamadah Depo, Ex. 1, pp. 393).

128.    Dr. Sannoufi represented to Mr. Hamadah that the business was legal:

> Q.· ·Did he tell you that what you were doing under the LLC documents was legal?
>
> A.· ·Legal.··Everything legal.
>
> Q.· ·Did he tell you that?
>
> A.· ·Yes.
>
> Q. Did you rely on that?

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

JABURG|WILK

Attorneys at Law

A. 100% .

(*Id.*, p. 384; see also pp. 385, 359-361, 382).

129.  Mr. Hamadah would not have invested in the business if he knew it was illegal:

I don't want to go partners with him if it's not legal.

(*Id.*, p. 255).

130.  Dr. Sannoufi further stated to Mr. Hamadah that in order for the transaction to be legal, he would have to have 51% control of the company. (*Id.*, p. 139).

131.  At the same time he presented Mr. Hamadah with a handwritten document reflecting his 51% control, which he and Mr. Hamadah signed. A copy of that document has never been provided to Mr. Hamadah, however.  Mr. Hamadah relied on Dr. Sannoufi's representation that the agreement would be legal in proceeding with the transaction and in making an investment in the company. (*Id.*, pp. 359-360).

132.  Dr. Sannoufi acknowledges that, when he became licensed to practice medicine in California, he was obligated to comply with California law.  (*Id.*, Sannoufi Depo, Ex. 2, pp. 250, 267-269).

133.  He acknowledges further that he never looked on the medical board website and never saw the "Guide to Laws Governing the Practice of Medicine," which was available for download from the Board's website.  (*Id.*, p. 254).

134.  Because Mr. Hamadah was providing money, the account with MyUSA was opened in his name.  In addition, Mr. Hamadah received communications from MyUSA.  However, Mr. Hamadah never engaged in communications to MyUSA and provided no instructions or input regarding the company documents, all of which were handled by Ms. Shoora.  (Hamadah Depo., Ex. 1, pp. 122-123, 147-149, 162-164, 394-395).

1    135.   In connection with the purchase of the clinic, Dr. Sannoufi retained an

2 attorney for limited purposes as stated in an email from the attorney, which did not

3 include reviewing the transaction for legality.  Mr. Hamadah had no communications

4 with the attorney but allowed his credit card to be used to pay the attorney's fee. (*Id.*,

5 pp. 178-180).

6    136.   Dr. Sannoufi represented to Mr. Hamadah, and the purchase agreement

7 reflects, that the sole asset being acquired was the PrimeCare contract. (Ex. 19 to

8 Hamadah's Depo, Ex. 1; see also Ex. 1, p. 382).

9    137.   Dr. Sannoufi represented to Mr. Hamadah that the PrimeCare contract

10 would produce monthly revenues and in addition would produce bonuses of $75,000.00

11 every six months. (*Id.*, pp. 107-108).

12    138.   It was initially discussed that Dr. Sannoufi would receive a salary of

13 $180,000.00 (the amount is disputed) and that profits after payment of expenses would

14 be split 50/50. (*Id.*, p. 123).

15    139.   However, Dr. Sannoufi elected not to take a salary and instead took

16 compensation in the form of personal expenses. (Sannoufi Depo, Ex. 2, pp. 55-57).

17    140.   The company's accountant tracked the expenses and classified them as

18 "non-K-1 earnings."   Dr. Sannoufi never advised the accountant that there was an

19 unpaid amount due him for accrued salary and the company's books did not reflect any

20 such liability.  (Hager Decl. Ex. 3).

21    141.   In fall, 2016, Dr. Sannoufi sent Mr. Hamadah a letter stating that the

22 clinic's lease had expired and that the landlord would not renew.. That letter did not

23 mention anything about the business being unlawful.   When Mr. Hamadah raised

24 questions and refused to sign a document dissolving the company, Dr. Sannoufi for the

25

26

18318-18318-00002\KMS\RLC\2959298.2

JABURG|WILK
Attorneys at Law

1  first time advised Mr. Hamadah that the business was illegal.  (Hamadah Depo, Ex. 2, p.
2  247, 267, 273 – 275, 278).

3    142.   Purportedly because the business was unlawful, Dr. Sannoufi shut down
4  the clinic and transferred the PrimeCare contract and the ongoing clinic operations to a
5  new company of which he is the sole owner.  The new company has the benefit of the
6  PrimeCare contract, revised to extend its term, and two of the three employees of the
7  clinic immediately went to work for Dr. Sannoufi's new company.   (Sannoufi Depo.,
8  pp. 103-104, 105-107, 112-114).

9    143.   Dr. Sannoufi has neither restored nor offered, on the condition that Mr.
10 Hamadah do likewise, to restore to Mr. Hamadah "everything of value which he has
11 received from him under the contract" as required by Civil Code § 1691(b). To the
12 contrary, Dr. Sannoufi demanded that Mr. Hamadah consent to dissolution of the
13 Company without any equitable adjustment and without undoing the Company's prior
14 existence; Dr. Sannoufi's theory of relief would therefore leave the Company intact
15 until the date he allegedly discovered the illegality and would provide no equitable
16 adjustment under Civil Code § 1692.  (Sannoufi Depo, Ex. 2, pp. 221, 227, 228).

17   144.   Dr. Sannoufi has been cited by the Medical Board of California for failure
18 to register the name of the Clinic and for violation of the professional practice statute, in
19 connection with practicing with the Company.  (Sannoufi Depo., Ex. 2, pp. 124-125).

20   145.   The present transaction was entered into in lieu of other equally lucrative
21 (and clearly lawful) investment opportunities, in the form of the potential purchase of a
22 shopping center property in Chicago, Illinois, and/or the profits he would have earned
23 from the Company, had it been properly set up in accordance with California law.
24 (Hamadah Depo, Ex. 1, p. 107).

25
26

JABURG|WILK
Attorneys at Law

DATED this 5th day of January, 2018.

**Jaburg & Wilk, P.C.**

_/s/ Roger L. Cohen_
Roger L. Cohen
Attorneys for Plaintiff

18318-18318-00002\KMS\RLC\2959298.2

1

**CERTIFICATE OF SERVICE**

2

**STATE OF ARIZONA, COUNTY OF MARICOPA**

3        I am employed in Maricopa County, State of Arizona, I am over the age of 18
4 years and not a party to the action; my business address is 3200 N. Central Avenue, #2000, Phoenix, AZ 85012

5        On the below date, I electronically filed the Statement of Genuine Disputes of
6 Material Fact with the Clerk of the United States District Court for the Central District of California, using the CM/ECF system.  The Court's CM/ECF system will send an
7 email notification of the filing to the following party and counsel of record who are registered with the Court's CM/ECF system:

8 Amy A. Mousavi
MOUSAVI LAW GROUP, APC
9 2020 Main Street, Suite 900
Irvine, CA 92614
10 Attorney for Defendant

11 Stephen Mashney
Mashney Law Offices
12 335 N. Brookhurst St.
Anaheim, CA 92801
13 Co-Counsel for Plaintiff

14

15 ☒        **(BY ELECTRONIC SERVICE VIA CM/ECF SYSTEM)**
In accordance with the electronic filing procedures of this Court, service has
16 been effected on the party above, whose counsel of record is a registered participant of the CM/ECF, via electronic service through the CM/ECF system.

17 ☒        **(FEDERAL)**
I declare under penalty of perjury that the foregoing is true and correct, and that I
18 am employed at the office of a member of the car of this Court at whose direction the service was made.

19
Executed on the 5th day of January, 2018, at Phoenix, Arizona.
20

21

*/s/        Joy J. Brown*
22

23

24

25

26

18318-18318-00002\KMS\RLC\2959298.2