# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA (SOUTHERN DIVISION)

JAMAL HAMADAH, an individual,    )
                                    )
               Plaintiff,     )
                                    ) Civil Action No.
vs.                             ) 8:17-cv-00132 CJC
                                    ) (JCGx)
SAMER SANNOUFI, M.D., aka SAM    )
SANNOUFI, M.D., an individual,  )
                                    )
               Defendant.    )
_____)

DEPOSITION OF JAMAL HAMADAH

MONDAY, DECEMBER 18, 2017, 10:07 A.M.

Reported by Sandra Jo Roberts, CSR No. 5086

```
 1   6 something.

 2       Q.   All right.

 3       A.   You know.

 4       Q.   Okay.  And then what happened?

 5       A.   After that --

 6       Q.   Yeah, he said that he needed a partner?

 7       A.   Yes.

 8       Q.   Okay.

 9       A.   I told him I have already, I try to make deal

10   in Chicago.

11       Q.   Uh-huh.

12       A.   I have small plaza.  We say plaza.  Shopping

13   center.  Like seven store in the floor.  Second floor

14   will be seven offices.  $465,000.  Bank own it.

15   Approximately 135, and I have flier.  I send it to you

16   if you want.

17       Q.   Yes, I'd like that.  Thank you.

18       A.   Okay.

19       Q.   And then -- okay.  I apologize.

20            Go ahead.  So you told him that you wanted to

21   buy a shopping center --

22       A.   Yes.

23       Q.   -- in Chicago?

24       A.   He told me, Jamal, the clinic, they make a lot

25   of money.  I say, how much.  He say, look, PrimeCare
```

107

 1  only, they pay $75,000 just bonus every six months.

 2  That bonus come in in March and December.  Every year,

 3  two times.  Like $150,000 every year.  75- every six

 4  months.  In March and in September.

 5       Q.   All right.  Let's hold on here.

 6            So the property that you had seen in Chicago,

 7  did you put an offer?

 8       A.   Yes.

 9       Q.   Okay.

10       A.   We try to negotiation (sic).

11       Q.   Please answer my questions, Mr. Hamadah.

12       A.   Okay.

13       Q.   Thank you.

14            Did you put an offer on that property?

15       A.   Yes.

16       Q.   Okay.  Was your offer accepted?

17       A.   Not yet.

18       Q.   It was never accepted?

19       A.   Not yet.

20       Q.   Right?

21       A.   Not yet.  Because --

22       Q.   What do you mean not yet?  We have passed three

23  years, and to this date it hasn't been -- your offer is

24  still pending?

25       A.   You don't let me to continue.

                                                             108

```
 1        A.    Okay.

 2        Q.    Where was his house, Dr. Sannoufi's house?

 3        A.    Really, I don't --

 4        MR. COHEN:  He said his family's house.

 5        THE WITNESS:  His family house.  Fantisia

 6   (phonetic), Fantasia (phonetic).  Like Italian name.

 7   BY MS. MOUSAVI:

 8        Q.    He did not live in California at that time?

 9        A.    At that time, no.  He was in Arizona.

10        Q.    Okay.

11        A.    Me and him, we sleep in his family house.

12        Q.    Okay.  All right.

13        A.    And the area, Fatasia, Santasia, I don't know.

14   We find for you or ask you him.  He knows.

15        Q.    Okay.  All right.  So we got a little bit

16   distracted I think.  I want to know -- we're going to

17   break this down.

18             I'm still talking about the visit from

19   Dr. Sannoufi with his dad to your house that you had

20   recently purchased in Arizona, okay?

21             Was there anything else said by Dr. Sannoufi to

22   you that you haven't told me yet?

23        A.    In the house?

24        Q.    Yes.

25        A.    He told me he will make a lot of money, 75,000
```

116

1    Q.   -- you know, you knew your deposition was

2    today.  I need this information.

3    A.   Thank you.

4    Q.   All right.  So let's start again --

5    A.   Uh-huh.

6    Q.   -- from that visit by Dr. Sannoufi and his dad

7    to your house.

8    A.   Okay.

9    Q.   Okay?  I want you to please tell me everything

10   that Dr. Sannoufi told you.

11   A.   Okay.  Okay.  Sannoufi, when he told me

12   exactly, he told me, Jamal, we have a clinic over there,

13   but now leave everything.  You know, after I come into

14   your house -- to your jewelry store, we talk.  He

15   doesn't like to talk in front of his dad.  You know, I

16   say, what?  It's okay.

17          I put the food.  I put something.  I say, you

18   know, we don't -- you know, he doesn't talk more detail

19   in the business in front of his dad.  You know what I

20   mean?  I don't know.  I do respect it because he's my

21   guest.  And we enjoy everything, and he left.

22          And secondly, he come into my jewelry store,

23   and he told me all detail about 75,000 every single

24   month.  No.  I'm sorry.  Not every single month.  Every

25   six months, 75,000.  In one --

                                                          118

 1 | that?

 2 |       A.   Conversation to open LLC.

 3 |       Q.   Okay.

 4 |       A.   Not by my accountant Coleen.

 5 |       Q.   Okay.

 6 |       A.   He say, to save more money and she's more

 7 | professional, Ghaida here in his -- his cousin or his

 8 | relative from Syria.

 9 |       Q.   Okay.

10 |       A.   You know?  I told him, Dr. Sannoufi, do

11 | whatever you want.  You know, your business and you know

12 | her and I know my accountant, but it's okay.  If you

13 | feel more comfortable, go ahead.  Do it with her.  He

14 | say, thank you.

15 |       Q.   So you guys agreed -- are you telling me that

16 | in that visit in your jewelry store --

17 |       A.   Yes.

18 |       Q.   -- you talked about purchasing the clinic

19 | together --

20 |       A.   Yes.

21 |       Q.   -- opening an LLC?

22 |       A.   Yes.

23 |       Q.   Everything?

24 |       A.   Yes.

25 |       Q.   Okay.  How was your partnership supposed to be?

122

1        A.    Okay.

2        Q.    As far as -- let's start with money.  As far as

3   contribution of money, capital contribution, how much

4   were you supposed to put in?

5        A.    Okay.  I talk?

6        Q.    Yes, please.

7        A.    From the beginning?

8        Q.    Yes.

9        A.    Thank you.

10       Q.    And I apologize again.  This is all happening

11  in that visit in your jewelry store.

12       A.    Yes.

13       Q.    All right.  Perfect.  So tell me what the

14  arrangement was.

15       A.    Okay.  He said, you know, the LLC, he open the

16  LLC in, you know, in -- by California.  Her name Ghaida.

17  I say, okay.  Do whatever you want.

18             What about the share.  He like it to take

19  $180,000, his salary.

20       Q.    Okay.

21       A.    And everything left -- the first 180 for him,

22  and everything left, 50/50.

23       Q.    Okay.  You guys agreed on that?

24       A.    Yes.

25       Q.    Okay.  What else did you agree on?  How much

123

```
 1   money, for example, were you supposed to put in?
 2       A.   The clinic, 200,000.  He said to me 200,000.  I
 3   told him, try to negotiation (sic) because I am
 4   businessman.  I don't try to pay everything cash.  He
 5   say, okay.  What you need?  You know, what do you think?
 6       Q.   I am talking right now --
 7       A.   Yes.
 8       Q.   Okay.  First we went through everything that he
 9   and you talked about, and you told me everything, right?
10       MR. COHEN:  Amy, we've been going two hours.  Can we
11   take five minutes?
12       MS. MOUSAVI:  Sure.  Actually, there's a question
13   pending.  Can I just finish this line?
14       MR. COHEN:  Go ahead.  Finish the question.
15       MS. MOUSAVI:  Okay.
16       MR. COHEN:  It's getting hot in here, too.
17       MS. MOUSAVI:  You did tell me -- you're more than
18   welcome to take off your jacket.
19   BY MS. MOUSAVI:
20       Q.   So we just finished for the past 20, 20
21   minutes, 25 minutes, I think, I'm trying to ask you
22   about the conversations that happened in the jewelry
23   store.
24       A.   Uh-huh.
25       Q.   Is there anything else that you haven't told
```

                                                            124

```
 1   me?

 2       A.   I try to remember, but you don't let me

 3   continue.  Let me talk.

 4       Q.   Okay.  So first I want to talk -- I want you to

 5   tell me whatever Dr. Sannoufi told you --

 6       A.   Yes.

 7       Q.   -- and before the break, actually --

 8       A.   Uh-huh.

 9       Q.   -- I need to finish what agreements did you

10   guys specifically make --

11       A.   Uh-huh.

12       Q.   -- on that day.

13       A.   Okay.

14       Q.   Okay?  All right.

15       A.   180,000 for him.

16       Q.   Now we're talking about agreements, right?

17       A.   The agreement.

18       Q.   Okay.  So $180,000 for salary for Dr. Sannoufi?

19       A.   Yes.

20       Q.   Okay.

21       A.   And everything left, 50/50.

22       Q.   Okay.

23       A.   Included the bonus will be salary 50/50.

24       Q.   Everything after he --

25       A.   Yes.
```
                                                                    125

```
 1       Q.   -- took his salary out?

 2       A.   Yes.

 3       Q.   So the agreement wasn't for 220,000.  It was

 4  for 180,000?  His salary, Dr. Sannoufi's salary?

 5       A.   Honestly, I don't see any contract from him.

 6  He never show me nothing, but whatever he talk to me --

 7       Q.   Yeah.

 8       A.   -- he said --

 9       Q.   That's what I'm talking about.

10       A.   Yes.  He say 200,000.

11       Q.   He said 200,000?

12       A.   He said 200,000.

13       Q.   Okay.

14       A.   And after that, we agree to be -- he agreed to

15  be $80,000.

16       Q.   180 you mean?

17       MR. COHEN:  No.  He's talking about -- he's not

18  talking about the salary.

19           Jamal, she's asking about the salary.  You're

20  talking about the purchase price.

21       THE WITNESS:  Yes.

22       MR. COHEN:  He just skipped to a different subject,

23  the 200,000.

24  BY MS. MOUSAVI:

25       Q.   Please stay with me.
```

```
 1              Okay.  How much Dr. Sannoufi wanted to take in
 2    salary?
 3       A.   180,000.
 4       Q.   It wasn't 220,000?
 5       A.   No.
 6       Q.   Okay.  All right.  So how much money did you
 7    agree?  Forget about the discussions now.
 8       A.   Uh-huh.
 9       Q.   Okay?
10       A.   Uh-huh.
11       Q.   How much money were you required to put in?
12       A.   To put in $80,000.
13       Q.   $80,000.
14       A.   Yes.
15       Q.   Okay.  And you did put in the $80,000, correct?
16       A.   Actually, before, because I pay for him 10, I
17    say 9.
18       Q.   I thought 5,000 of it was a gift.
19       A.   I say 5,000, you know, like gift.  It's okay.
20    You know what I mean?  Gift.  Don't worry about it.
21    85-.
22       Q.   Mr. Hamadah, I'm specifically talking about
23    this entity, not money that you loaned him or anything.
24    I'm specifically --
25       A.   80,000.
```

127

```
 1        A.    Yes.

 2        Q.    Okay.  And then you had no further conversation

 3   with him about this clinic until he came and visited you

 4   in the jewelry store?

 5        A.    Yes.

 6        Q.    Your jewelry store, correct?

 7        A.    Yes.  Yes.

 8        Q.    And you testified that when he was in your

 9   jewelry store, that you guys made some agreements,

10   right?

11        A.    Uh-huh.

12        Q.    Okay.  And the agreement was that you would put

13   up $80,000.

14        A.    Uh-huh.

15        Q.    Right?  And that Dr. Sannoufi will receive a

16   salary of $180,000.

17        A.    Yes.

18        Q.    And everything that is over the salary, if

19   there are any profits left, they're going to be split

20   50/50 between you and --

21        A.    And him.

22        Q.    -- Dr. Sannoufi.

23              Anything else on that date?  Did you guys agree

24   to anything else on that date?

25        A.    On that day --
```

 1  He told me, you know, he's doctor and he knows

 2  everything about it.  I say, go ahead.  Do it.

 3       Q.    Okay.  So your duty was limited to putting

 4  $80,000 in?

 5       A.    $80,000, yes.

 6       Q.    Okay.  And before --

 7       A.    Uh-huh.

 8       Q.    -- we got to the agreement, you said that

 9  Dr. Sannoufi had represented to you that he's going to

10  get this PrimeCare contract and that is very important

11  and lucrative; is that correct?

12       A.    PrimeCare, the PrimeCare, PrimeCare --

13  PrimeCare?  PrimeCare.  He told me the PrimeCare, if he

14  take 51 percent, the PrimeCare accepted him because he

15  is a doctor.  I say, go ahead, do it, 51 percent.

16       Q.    Now you're changing your statement that you

17  guys got 50 percent each to the fact that he had

18  51 percent?

19       A.    50 percent profit.

20       Q.    Okay.

21       A.    But 51 percent to control everything and will

22  be everything legal in his name, in his -- in the

23  company.

24       Q.    Okay.  I wasn't asking you about this.  I don't

25  know what you talked about during lunch with your

                                                            139

```
 1   something.
 2       Q.   72,000.
 3       A.   72-.
 4       Q.   Okay.
 5       A.   Plus 75-.
 6       Q.   Okay.  And then the company was supposed to get
 7   $75,000 every six months?
 8       A.   Yes.
 9       Q.   And that is based on what?
10       A.   Bonus from PrimeCare.
11       Q.   Okay.  And Dr. Sannoufi was supposed to take
12   $180,000 in salary?
13       A.   Yes.
14       Q.   Were there any employees?
15       A.   He has employee, but I don't know how many
16   employee he has.
17       Q.   And you don't look at your tax returns?
18       A.   No.  He knows.
19       Q.   Who prepared the tax returns --
20       A.   My accountant.  Her name Coleen.
21       Q.   Coleen.  How long have you known Coleen?
22       A.   How long I know her?
23       Q.   Uh-huh.
24       A.   Over ten years.
25       Q.   Over ten.
```

144

```
1        A.    After June.

2        Q.    Okay.

3        A.    After July, whatever.

4        Q.    Okay.

5        A.    You know, I think after June, that means July.

6   After July.  You know, something like this over, you

7   know.

8        Q.    All right.  And at some point --

9        A.    Uh-huh.

10       Q.    -- you contacted MyUSACorporation to set up an

11  LLC?

12       A.    Not me.  He.

13       Q.    He contacted?

14       A.    He contacted with Ghaida.  Ghaida, she work in

15  this company.

16       Q.    Okay.  So if MyUSACorporation --

17       A.    Yes.

18       Q.    -- has you only as the account holder, are they

19  making a mistake, then?

20       A.    What's mean?

21       Q.    If MyUSACorporation --

22       A.    Okay.

23       Q.    -- states that they have only your information

24  on file, would they be lying to me?

25       A.    Only my name?
```

147

```
 1        Q.   Yes.

 2        A.   That's mean he did by purpose.  He did.  Samer,

 3   he did by purpose.

 4        Q.   I am asking you, you were not in contact --

 5        A.   I don't know.

 6        THE REPORTER:  Excuse me.

 7        THE WITNESS:  I'm sorry.  I'm sorry.

 8        THE REPORTER:  I cannot write it.

 9        THE WITNESS:  I'm sorry.

10   BY MS. MOUSAVI:

11        Q.   Were you in communication with MyUSACorporation

12   or not to form the LLC?

13        A.   No.

14        Q.   You were not?

15        A.   Between Ghaida and Samer and Ghaida, she talked

16   to me, behalf of Samer.

17        Q.   So that you were not communicating with

18   MyUSACorporation, right?

19        A.   They send it for me email.  I'm sorry.

20             (Whereupon Deposition Exhibit 1 was marked for

21   identification.)

22   BY MS. MOUSAVI:

23        Q.   Okay.  I'm going to show you a document.

24        A.   I'm sorry.

25        Q.   We are going to mark this as Exhibit 1.  It's
```

148

```
 1   dated August 12, 2013.

 2       A.   Uh-huh.

 3       Q.   Have you seen this document before?

 4       A.   This one from email.  I have it here already in

 5   my email.  They send it for me over five, six email.

 6   Ghaida.

 7       Q.   So this letter is dated August 12, 2013,

 8   correct?

 9       A.   Yes.

10       Q.   Okay.  And it's from MyUSACorporation.com,

11   right?

12       A.   Yes.

13       Q.   All right.  And it's addressed to you.

14       A.   Yes.

15       Q.   "Dear Jamal Hamadah."

16       A.   Yes.

17       Q.   Correct?

18       A.   Uh-huh.

19       Q.   It's not addressed to Ghaida, is it?

20       A.   No.  Ghaida, she --

21       Q.   Please answer my question.

22       A.   Okay.

23       Q.   No.  Is it?

24       A.   No.

25       Q.   Is it addressed to Dr. Sannoufi?
```

149

```
 1   mark that -- is it Exhibit 5?

 2             Have you ever seen this document before?

 3        A.    Which one?

 4        Q.    This document, Exhibit 5.

 5        A.    Everything.  You send it, I receive it in my

 6   email.  Yes.

 7        Q.    Okay.

 8        A.    Yes.

 9        Q.    I really don't want to, like, suspend this

10   deposition to go in front of a referee.

11        A.    Yes, I receive it.

12        Q.    So please answer my questions.

13        A.    Okay.

14        Q.    You know I've been really, really patient.

15        A.    Okay.

16        Q.    Thank you.

17        A.    I receive it.

18        Q.    Okay.  All right.  And you see that it's

19   addressed to you, Jamal Hamadah, right?

20        A.    Yes.

21        Q.    Okay.  What does the subject line say?

22        A.    "Walk-In Urgent Care."

23        Q.    Yes.  It says, "Reminder:  Order #44189" --

24        A.    Yes.

25        Q.    -- "Operating Agreement for Walk-In Urgent
```

                                                           162

```
 1   Care" --

 2       A.   Yes.

 3       Q.   -- "& Family Practice Clinic" --

 4       A.   Yes.

 5       Q.   -- "LLC," correct?

 6       A.   Yes.

 7       THE REPORTER:  I'm sorry.

 8       THE WITNESS:  Sorry.  Yes.

 9       THE REPORTER:  "Operating Agreement for Walk-In

10   Urgent Care"?

11       MS. MOUSAVI:  "& Family Practice Clinic, LLC."

12   BY MS. MOUSAVI:

13       Q.   Is that correct?

14       A.   Yes.

15       Q.   And who is this document addressed to?  Do you

16   see this "Hello" --

17       A.   To Jamal Hamadah.

18       Q.   -- "Jamal Hamadah," right?

19       A.   Uh-huh.

20       Q.   All right.  You did receive this document?

21       A.   Yes, I received it.

22       Q.   All right.  All right.  And by the way, who

23   paid for this LLC?

24       A.   He told me, use your credit card.  I use it, my

25   Discover or Visa, MasterCard, and --
```

                                                          163

1    Q.   You need to stop that, okay?  I didn't ask you

2    who told you.  Did I ask you who told you to sign it or

3    did I ask --

4    A.   Okay.  I paid.

5    Q.   Yes.

6    A.   I paid.

7    Q.   Okay.  You paid for that --

8    A.   Yes.

9    Q.   -- right?

10   A.   Yes, I paid.

11   Q.   Which credit card did you use to pay for that?

12   A.   Visa or Discover or something like this.

13   Q.   Okay.  All right.  Thank you.

14        I apologize.  I might have asked this question

15   before.

16   A.   Uh-huh.

17   Q.   But you said that you did not contact Coleen,

18   your CPA, with respect to the form of the entity to form

19   in California?  You didn't ask her to form a corporation

20   or LLC?

21   A.   No, no.

22   Q.   Okay.  Have you ever had a corporation?

23   A.   Yes, I have.

24   Q.   Which one was that?

25   A.   LLC.

```
 1        A.    Uh-huh.

 2        Q.    Did you then have someone draft an asset

 3   purchase agreement for you?

 4        A.    Asset purchase agreement.  I don't receive

 5   nothing from Samer.  No --

 6        Q.    You did not review the asset purchase agreement

 7   with Dr. Kistler?

 8        A.    No, nothing.

 9        Q.    You did not review it?

10        A.    No.  No.

11        Q.    Okay.  Did you talk to Coleen about this asset

12   purchase agreement?

13        A.    I don't remember.

14        Q.    Did you see an attorney?

15        A.    I don't see -- an attorney?

16        Q.    Uh-huh.

17        A.    Which attorney?

18        Q.    Did you talk to an attorney who reviewed this

19   agreement?

20        A.    No.

21        Q.    You didn't talk to any attorney?

22        A.    No.  You know, nothing.  Samer, he told me he

23   will take care of everything.

24        Q.    Okay.  So you never talked to an attorney

25   called Ethan Nelson?
```

```
 1        A.    Ethan Nelson from him side).  I don't know him.

 2        Q.    You didn't talk to him?

 3        A.    No.

 4        Q.    You didn't talk to the attorney?

 5        A.    He's from his side.  I don't know his attorney

 6   or his corporation.  I don't know nothing about what he

 7   did between him and Ghaida.

 8        Q.    You did not submit a letter to Ethan Nelson,

 9   allowing him to charge your credit card?

10        MR. COHEN:  That's a different question.

11        THE WITNESS:  This one, yes, I send it to Ghaida.

12   BY MS. MOUSAVI:

13        Q.    Okay.  Not to Mr. Nelson?

14        A.    Ghaida, she worked with Mr. Nelson.  She

15   recommend.  Everything, what she say, I say, yes, take

16   my credit card.  Everything like that.

17        Q.    I want to make sure that you never talked to

18   Mr. Nelson, the attorney.

19              Is that what you're saying?

20        A.    What talk, by phone?

21        Q.    Yes, by phone.

22        A.    I don't remember.  I don't remember.  Honestly,

23   I don't remember.

24        Q.    Okay.  But you are aware that there was an

25   attorney that reviewed this asset purchase agreement,
```

179

```
 1  right?
 2      A.    Really, I don't know.  Whatever he say, Samer,
 3  I am blind with him.  100 percent I make for him do.
 4  Everything.
 5      Q.    Did you make payment to this attorney,
 6  Ethan Nelson?
 7      A.    I think they take my credit card.
 8      Q.    Okay.  So you know there was an attorney at
 9  least involved that you talked to once at least, right?
10      A.    Of course.  You know, they said --
11      MR. COHEN:  Objection.  Misstates the testimony.  He
12  never said he talked to him at this point.
13      MS. MOUSAVI:  He actually said --
14      THE WITNESS:  Not so.
15      MS. MOUSAVI:  -- yes right now.
16      MR. COHEN:  No.
17      THE WITNESS:  No.
18      MR. COHEN:  Yeah, but that's because you're
19  misquoting the testimony.
20      THE WITNESS:  This one --
21      MS. MOUSAVI:  All right.  So --
22      MR. COHEN:  There's a language issue.
23  BY MS. MOUSAVI:
24      Q.    Hold on.  So if Mr. Nelson said he had talked
25  to you over the phone, he would be lying.
```

                                                                    180

```
 1  letter?
 2      A.    Maybe he send it.  I forget.  Maybe.  But when?
 3  And Dr. Sannoufi, please --
 4      Q.    At any time in 2016 did you receive a letter
 5  from Dr. Sannoufi or an email saying that we received a
 6  letter from the landlord and he's terminating our lease
 7  here?
 8      A.    I received letter from him.
 9      Q.    Okay.
10      A.    He say, Jamal, the landlord, he doesn't give
11  me -- the reason he close the business, but he knows in
12  the beginning when he bought, when he buy the --
13      Q.    Strike it as nonresponsive.
14            Did you receive that letter or not?
15      A.    I say yes, but let me talk.
16      Q.    No.  I don't want you to talk.  This is my
17  deposition.
18      A.    Because he knows in 2016 --
19      MR. COHEN:  Jamal, Jamal, Jamal.
20  BY MS. MOUSAVI:
21      Q.    This is my deposition, not yours.
22      MR. COHEN:  No.  Just remember --
23      THE WITNESS:  Yes.
24      MR. COHEN:  -- to answer the question.
25      THE WITNESS:  I see.  I see.
```

```
 1   BY MS. MOUSAVI:

 2        Q.   Okay.

 3        A.   No.

 4        Q.   All right.  So --

 5        A.   I don't want to go partners with him if it's

 6   not legal.

 7        Q.   Exactly.  And --

 8        A.   He should to tell me.

 9        Q.   And do you know that your operating agreement

10   states that this company must be dissolved once the

11   purpose of it is illegal?

12        A.   I don't know nothing.

13        Q.   You don't know nothing?

14        A.   He knows and you know, and you teach him.  You

15   teach him, he told me, to close the clinic --

16        Q.   Okay.  I'm stopping this.

17        A.   Honestly.  He told me --

18        Q.   No.  I'm suspending this deposition.

19        A.   He told me she encourage him.

20        MS. MOUSAVI:  I have --

21        MR. COHEN:  Amy, take it --

22        THE WITNESS:  Amy, this what happen.

23        MS. MOUSAVI:  I have -- no.

24        MR. COHEN:  Jamal.

25        MS. MOUSAVI:  I am over my limit.
```

                                                                        255

 1        MR. COHEN:  No, we're not suspending the deposition.

 2   Come on.

 3        MS. MOUSAVI:  Okay.  Don't agree.  I will suspend,

 4   and I will take this to court.

 5        MR. COHEN:  We're doing the best we can.

 6        MS. MOUSAVI:  No, you're not.  None of you are.

 7        MR. COHEN:  Well, that's your opinion.

 8   BY MS. MOUSAVI:

 9        Q.   All right.  Did you read every -- did you read

10   the entire email that Dr. Sannoufi sent you?

11        A.   At that time, yes.

12        Q.   Okay.  Did you understand that this entity was

13   not legal and had to be dissolved?

14        A.   In that time, yes.

15        Q.   Okay.  Now after that, did he send you a

16   certificate of cancellation of the LLC?

17        A.   Yes.

18        Q.   Okay.  And did you sign that?

19        A.   No.

20        Q.   Why didn't you sign it?

21        A.   Because I have to know exactly what he has in

22   his mind.  I ask also my accountant, you know.  I told

23   her --

24        Q.   I did not ask about that.

25        A.   I'm sorry.

                                                            267

```
 1   is not right only for the illegal.  This one, the new
 2   information for me.
 3        Q.   Okay.
 4        A.   Everything for illegal, new information.
 5        Q.   Yeah, it was new information for everybody.
 6   Apparently the lawyer --
 7        A.   Yes.
 8        Q.   -- who reviewed the agreement didn't catch it,
 9   correct?
10        A.   Miss Amy, I don't know nothing.  He send it to
11   me, and he sended for me your office number, and he
12   sended for me everything.  He say, read the article from
13   the office, your name.
14        Q.   Okay.
15        A.   Okay.
16        Q.   Okay.
17        A.   And this one here, after that, I take it after
18   maybe -- maybe one month or something, I take it to
19   Mr. Roger.
20        Q.   Okay.  So you waited one month, and then you
21   took this to --
22        A.   I say approximately.
23        Q.   Okay.
24        A.   I'm not computer to know exactly when date I
25   take it.
```

271

```
 1         MS. MOUSAVI:  Okay.

 2         MR. COHEN:  There's no reason to --

 3    BY MS. MOUSAVI:

 4         Q.   All right.  So I want to know that despite all

 5    of this, why didn't you agree to dissolve the company?

 6    If you know that's an illegal company and has to be

 7    dissolved --

 8         A.   Very good.  I will tell you why.

 9         Q.   Okay.

10         A.   Can I talk?

11         Q.   Of course you can.

12         A.   Okay.

13         Q.   Tell me why.

14         A.   Because before all this letter you show me, he

15    sended for me letter in December 2 or 4.

16         Q.   Uh-huh.

17         A.   He write it in his hand.

18         Q.   Uh-huh.

19         A.    In his hand, okay?  And he told me, Jamal, he

20    close the Walk-In Urgent Care because of the lease,

21    non-renew.  The owner, he doesn't give him option to

22    renew.

23         Q.   That was when?  That was in September or

24    October?

25         A.   Before.  Before this letter.
```

273

```
 1      Q.    In October.  Okay.  I got that.

 2      A.    Thank you.

 3      Q.    Okay.  I'm not talking about that.

 4      A.    Can I --

 5      Q.    I'm talking about after you received this email

 6  on December 8, 2016 --

 7      A.    Yes.

 8      Q.    -- with the explanation of why --

 9      A.    Uh-huh.

10      Q.    -- this company is illegal.

11      A.    Because I need to --

12      Q.    No, no, no, no.

13      A.    Go ahead.

14      Q.    Wait.  Okay.  I'm not talking before this

15  letter.

16            After this letter, you received that, okay?

17      A.    Yes.

18      Q.    Why didn't you agree to dissolve the company,

19  knowing now that it's illegal?

20      A.    Because I don't believe him.  After when he

21  close and he take the money, how can I trust him?  I

22  have to ask some legal, you know, to explain for me

23  what's going on.

24      Q.    But as you sit right now, you understand --

25      A.    Yes.
```

274

```
 1        Q.    -- and you agree that the company is illegal
 2   and must be dissolved?
 3        A.    Now.   Now?
 4        Q.    Now.
 5        A.    Now, whatever you say -- Mr. Roger, he say yes.
 6        Q.    So you agree with that?
 7        MR. COHEN:   Object to --
 8        THE WITNESS:   Legal stuff, you know, you should to
 9   ask my attorney, my legal.   But now, what you explain
10   for me, yes.
11   BY MS. MOUSAVI:
12        Q.    So you agree?
13        A.    I'm not agree, but I say, yes, I know.
14   Different between agree or between I know.
15        Q.    Okay.   So you understand that this company is
16   illegal, but you don't believe -- you don't agree that
17   it has to be dissolved?
18        A.    That's why I know nothing --
19        Q.    Yes or no.
20        A.    Let me tell.   I don't --
21        Q.    No.   There's a simple question.
22        A.    The question --
23        MR. COHEN:   Objection.   Calls for a legal
24   conclusion.
25   / / /
```

 1        A.    That's not my business to look for the

 2  location.   His -- he's doctor.  He will find what

 3  location.

 4        Q.    Okay.  Did you look for another location?

 5        A.    I don't.  I don't.

 6        Q.    Okay.  Did you suggest to him, "Let's look for

 7  another place"?

 8        A.    No, no, no.  Nothing.  Everything what he did,

 9  believe me --

10        Q.    So you did not -- you basically did nothing,

11  correct?

12        A.    Not what I did nothing.  I listened to him, and

13  he told me, Jamal, the landlord, he close the business

14  for landlord.  Not for cocaine and not for illegal.  No.

15  He never mentioned this one.

16        Q.    All right.  When he said that the lease is

17  terminating and he showed you the letter from the

18  landlord, did you try to look for another location?

19        A.    It is not my mission.  Because he's doctor.

20        Q.    Did you ask him to look for another location?

21        A.    I told him, go find different location if you

22  like.

23        Q.    Was that verbal or in writing?

24        A.    No, no.

25        Q.    Was it a text message, an email --

                                                              278

```
 1    BY MS. MOUSAVI:
 2        Q.    Mr. Hamadah, did your agreement with
 3    Dr. Sannoufi about 50/50 distribution and membership
 4    ever change?
 5        A.    50/50 about what, the LLC?
 6        Q.    Yes.
 7        A.    He say 50/50 in LLC.
 8        Q.    Yes.
 9        A.    He name it in his name, in his mouth.
10        Q.    Did that ever change?
11        A.    After he change it, he make it 51.
12        Q.    You believe that Dr. Sannoufi changed that to
13    51/49?
14        A.    51, he did.  And he come into my store, and I
15    sign it for him.
16        Q.    Okay.
17        A.    And what he did in the paper, maybe he give to
18    PrimeCare.  You never know.
19        Q.    Yeah.
20        A.    Maybe he cheated PrimeCare, too.  I don't know.
21        Q.    All right.  So --
22        A.    And he told me --
23        Q.    -- other than the 50/50 membership interest
24    that you communicated to MyUSACorporation, did that
25    arrangement ever change?
```

                                                                     359

```
 1        MR. COHEN:  Object.  Object to the form.  That
 2   misstates his testimony.
 3   BY MS. MOUSAVI:
 4        Q.   All right.  You can answer.
 5        A.   The 51, he bring it after that, and he told me
 6   will be legal if he do it 51.
 7        Q.   You know what?  I know you've probably been
 8   coached to say this, but doesn't matter.  You can't even
 9   own one percent in a medical practice, okay?
10        A.   Okay.  But I will tell you what he told me.
11        Q.   I don't care about that.
12        A.   Maybe.  Okay.  My problem, I trust him.
13        Q.   Did your agreement with Dr. Sannoufi ever
14   change?
15        A.   Change what?
16        Q.   I don't know.  You told me at the beginning of
17   the deposition, I asked you what your agreement was.
18   You said he's going to get 180,000 in salary, 50/50,
19   we're going to be 50/50 members.
20             So did any of this ever change?
21        A.   It changed after he make it 51 and 49.
22        Q.   Okay.  That was the only change?
23        A.   What?
24        Q.   That was the only change?
25        A.   This is the change, in the last one.
```

                                                            360

1    Q.   Okay.  So you're saying that you told him make

2    it 51/49?

3    A.   No, I don't say.  He told me.  I don't say

4    nothing to him.  He, he's doctor.  I trust him, and I

5    say -- you know, I help him a lot.  I say, no way.

6    Q.   So he was supposed to have 51 percent and you

7    49 percent, and then you, in the documents, you guys are

8    both 50 percent members.

9         Is that the only change?

10   A.   To be legal, he do it 51.  He said.  He told me

11   to be legal, 51, Jamal, because I am doctor.  I say,

12   okay.  Go ahead.  Do it.

13   Q.   All right, Mr. Hamadah.  We got that.

14   A.   Thank you.

15   Q.   Other than that, there was no change?

16   A.   I don't think so.  If he did something without

17   my knowledge, I don't know.

18   Q.   No.  As far as you know, there was no change in

19   the agreement between you and Dr. Sannoufi?

20   A.   I don't -- I don't remember nothing right now.

21   Only 50/50 and after that, 51/49.  That's it.

22   Q.   Okay.

23   A.   If he has some new verbal, different story.  If

24   he created something from his mind, I have no idea.  Ask

25   him.

361

```
 1        A.    1099 for the insurance company, PrimeCare, they

 2   see how much --

 3        THE REPORTER:  "1099 for the insurance company."  I

 4   don't understand you.

 5        THE WITNESS:  The insurance company, the 1099, they

 6   say exactly how much you collect every single year to

 7   put it to -- to send it to Coleen, my accountant, our

 8   accountant, and Coleen to claim to the IRS the right

 9   amount, how much we have to claim to IRS.

10   BY MR. COHEN:

11        Q.    Were the 1099's requested?

12        A.    No.

13        Q.    Did you request -- did you ask Dr. Sannoufi --

14        A.    I ask, yes, but he never sent it.

15        Q.    Thank you.

16        MS. MOUSAVI:  And, Roger, you're claiming that I

17   never sent those 1099's to you, correct?

18        MR. COHEN:  I don't have any 1099's.

19        MS. MOUSAVI:  Okay.  So if I produce an email that I

20   sent those to you, then you'll take that back, right?

21        MR. COHEN:  Of course.

22        MS. MOUSAVI:  Okay.

23        MR. COHEN:  If you sent them to me, but I don't

24   recall ever seeing the 1099's.

25        MS. MOUSAVI:  All right.
```

1      A.   And Walk-In Urgent Care buy the contract from

2   PrimeCare and from Dr. Kistler.

3      THE REPORTER:  And what?

4      THE WITNESS:  And from Kistler, Dr. Kistler.

5           I'm sorry.  My accent.

6   BY MR. COHEN:

7      Q.   Was it important to you that the company was

8   the buyer of the PrimeCare contract?

9      A.   Of course.  If not -- if not the company, I

10  don't go with Dr. Sannoufi.

11     Q.   Did Dr. Sannoufi tell you the company would be

12  the owner of the PrimeCare contract?

13     A.   Yes.

14     Q.   Did Dr. Sannoufi ever talk to you about the

15  business being legal or what would be needed for the

16  business to be legal?

17     A.   He say should be 51 for him and 49 for me.

18     Q.   Did you believe that when he said it?

19     A.   I believe.  I trust him.

20     Q.   And when he said that, did you do something in

21  reliance on that?  Did you sign the document that he

22  gave you?

23     A.   Yeah.  He bring it to me, and I talk to Ghaida,

24  and she -- you know, I told her, did you send it for him

25  by fax.  You see the answer.  And I sign it for him, and

382

 1         THE WITNESS:  Okay.

 2    BY MR. COHEN:

 3         Q.   But I just want to make clear, did Dr. Sannoufi

 4    represent to you that under the -- what you were doing

 5    under the purchase agreement was legal?

 6         A.   Legal.

 7         Q.   Did he tell you that what you were doing under

 8    the LLC documents was legal?

 9         A.   Legal.  Everything legal.

10         Q.   Did he tell you that?

11         A.   Yes.

12         Q.   Did you rely on that?

13         A.   100 percent.

14         Q.   Okay.  You talked about the practice being

15    closed.  Do you know what happened to the practice, to

16    the urgent care practice, when it was closed?

17         A.   He talked to me, and he sent for me letter.  He

18    say, Jamal, no more practice.  We have to close this --

19    the urgent care, the clinic.  And I told you, Jamal,

20    when we close, we'll be done, because the landlord, he

21    doesn't give extension.

22         Q.   Okay.  That's not my question.

23              My question is, do you know what Dr. Sannoufi

24    did with the practice?  Did he just walk away from it,

25    or did he move it someplace else?

                                                          384

```
 1        A.   He move it across the street.

 2        MS. MOUSAVI:  Objection.  Leading.  Why don't you

 3   just coach him?

 4        THE WITNESS:  He move it across the street.

 5   BY MR. COHEN:

 6        Q.   Do you know, Mr. Hamadah, that there was an

 7   amended complaint and a -- both an original complaint

 8   and an amended complaint in this case?

 9        A.   Repeat it, please, for me.

10        Q.   Did you know that -- well, I'm looking at

11   Exhibit 21 and 22.

12             Are you aware that we filed both of these

13   documents on your behalf?

14        A.   I don't wonder you.  Tell me exactly what the

15   question.

16        Q.   The question is, do you know, are you aware

17   that we filed an original complaint and then later on we

18   filed an amended complaint?

19        A.   We find it in your company.

20        Q.   Yeah.  You're aware that I did this one in

21   January --

22        A.   Yes.

23        Q.   -- of 2017 --

24        A.   Yes.  Yes.

25        Q.   -- and then --
```

385

```
 1        Q.   Mr. Hamadah --

 2        A.   Listen to me.

 3        Q.   Mr. Hamadah --

 4        A.   He transferred the money --

 5        Q.   -- there is no question pending.

 6        A.   -- to different accountant, and the accountant,

 7   we need from him to file return, tax to Walk-In Urgent

 8   Care --

 9        THE REPORTER:  I don't understand your answer.

10        MS. MOUSAVI:  You know what?  I don't understand

11   him, either.

12        MR. COHEN:  Jamal, there is no question.

13   BY MS. MOUSAVI:

14        Q.   Okay.  Mr. Hamadah --

15        A.   Okay.

16        Q.   -- did Dr. Sannoufi specifically tell you that

17   this LLC is legal and we can practice in California

18   legally?

19        A.   He say legal.  He never say anything about

20   this.  Only legal everything.

21        Q.   He never said about California; is that what

22   you're saying?

23        A.   In California, we operate in California.  Not

24   in Arizona.

25        Q.   Okay.  And when you talked about these
```

                                                                    389

```
 1   Arizona --
 2       A.   Yes.
 3       Q.   Okay.
 4       A.   Yes.
 5       Q.   -- that we are going to -- "I want to purchase
 6   a practice in California"?  Is that what he told you?
 7       A.   No.  He say, "we."  You know what I mean?
 8       Q.   Well, I apologize.  "We are going to purchase
 9   a" --
10       A.   He say you coming --
11       Q.   -- "practice in California"?
12       THE REPORTER:  Hey.
13       THE WITNESS:  I'm sorry.
14       THE REPORTER:  One at a time.
15       THE WITNESS:  Okay.
16       MS. MOUSAVI:  Okay.
17       THE WITNESS:  Go ahead.
18   BY MS. MOUSAVI:
19       Q.   Did he say, "We are going to purchase a
20   practice in California"?
21       A.   He say he has clinic ready now he like.  He
22   need money to buy this one.  He need partner, and he
23   say, Jamal, I like -- I like you because you help me --
24       Q.   But where?  The clinic was where?  Was it in
25   Arizona?
```

392

Case 8:17-cv-00132-CJC   Document 66-2   Filed 01/05/18   Page 42 of 62   Page ID #791
Civil Action No. 8:17-cv-00132 CJC (#791)

11/08/2017
Jamal Hamadah

```
 1      A.    Not in Arizona.  In Riverside, in California.

 2      Q.    California?

 3      A.    Yes.

 4      Q.    Okay.  After he said that --

 5      A.    Yes.

 6      Q.    -- you and Dr. Sannoufi agreed that you are

 7  going to establish a company in California to buy this

 8  practice, right?

 9      A.    No.  We established -- already he did.  He

10  established a company in California.

11      Q.    Okay.  And your agreement was that you're going

12  to be each 50/50 member of this California LLC, correct?

13      A.    50/50.

14      Q.    Yes.

15      A.    And 50/50 she sended for me, I have it in the

16  email, six time 50/50 --

17      Q.    Okay.  For this --

18      MR. COHEN:  No.  No.  He's in the middle of

19  answering --

20      MS. MOUSAVI:  You know what?

21      MR. COHEN:  -- and you're cutting him off.

22      MS. MOUSAVI:  You don't get that say.

23      MR. COHEN:  No.  No.  No.

24      THE WITNESS:  You don't let me finish.

25      MR. COHEN:  You tell him not to cut you off.
```

393

```
 1        MS. MOUSAVI:  Roger --

 2        MR. COHEN:  You're cutting off his answers.

 3        MS. MOUSAVI:  -- stop raising your voice.  Stop

 4   raising your voice.  This is my deposition, not yours.

 5        MR. COHEN:  But you're cutting off his answer.

 6        MS. MOUSAVI:  No, I'm not.

 7        MR. COHEN:  That's not proper.

 8        MS. MOUSAVI:  No.

 9   BY MS. MOUSAVI:

10        Q.   Okay.  Whatever agreement that you guys were

11   going to have with respect to LLC --

12        A.   Not 50/50.  50/50 profit, but 51 for him.

13        Q.   Okay.  51 for him, 49 for you?

14        A.   To be legal.

15        Q.   Okay?  Okay.

16        A.   Yes.

17        Q.   But that was supposed to be in California,

18   right?

19        A.   In California should be, you know.  The

20   business in California.

21        Q.   Okay.  And then the profits of this business

22   that was supposed to be 50/50 was from this California

23   LLC, right?

24        A.   I don't know.  I was in Las -- no, no.  What

25   the name.  In Phoenix.  I was in Scottsdale when they
```

394

```
 1  called me, his relative Ghaida, and US whatever you
 2  told.  I don't know what he -- he do it for me.
 3      Q.   No, no, I'm not talking about that,
 4  Mr. Hamadah.
 5      A.   Yes.
 6      Q.   I'm talking about every agreement that you made
 7  with Dr. Sannoufi was concerning this Walk-In Urgent
 8  Care & Family Practice, LLC --
 9      A.   Yes.
10      Q.   -- in California, correct?
11      A.   In California, yeah.
12      Q.   And --
13      A.   Riverside, California.
14      Q.   In Riverside, California.
15      A.   Riverside.
16      Q.   Okay.  Okay.  And so did you ever see a signed
17  or unsigned document from Ethan Nelson of the limited
18  asset purchase agreement with Dr. Kistler?
19      A.   Honestly, everything, what I receive, I send it
20  to him.
21      Q.   Okay.
22      A.   Because in that time I have, like, divorce.  I
23  have a lot of thing.
24           And he say, Jamal, okay.  Go ahead.  Sign it,
25  please.  Send it.  Sign.  Send it.
```

395

11/08/2017

Jamal Hamadah

```
 1
 2
 3                 DECLARATION UNDER PENALTY OF PERJURY
 4
 5          I, the undersigned, do hereby declare under
 6  penalty of perjury that I have read the foregoing
 7  transcript of my deposition under oath; that I have made
 8  such corrections, additions, or deletions as appear
 9  herein; that my testimony as contained herein, as
10  corrected, is true and correct.
11
12          Executed this _____ day of _____,
13  20___, at _____, California.
14
15
16
17
18          _____
19                    JAMAL HAMADAH
20
21
22
23
24
25
                                                        402
```



40 Exchange Place #1301
New York, NY 10005

8/12/2013

Dear Jamal Hamadah,

It has been our pleasure assisting you in filing the Articles of Organization for your new business.

We are happy to inform you that your new company, **WALK-IN URGENT CARE & FAMILY PRACTICE CLINIC LLC**, has been officially formed in the State of California. We are enclosing your company's Certificate of Filing and EIN Confirmation Letter for your records.

**We have submitted the Statement of Information for your business to the State. You should receive confirmation within 4-5 Months. In the meantime, feel free to engage in normal business operations within your new company.**

Thank you for being a customer of MyUSAcorporation.com. If you have any questions or concerns, do not hesitate to call us toll-free at 1(877) 330-CORP or send us an email at info@myusacorporation.com. Our team wishes your business great success in the future!

Very truly yours,

Team of MyUSAcorporation.com

+1 (877) 330-2677

info@MyUSAcorporation.com

Deposition Exhibit_____/_____
Sandra Jo Roberts, CSR
For Identification
12/18/17 Deposition of
Jamal Hamadah

# LIMITED ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is entered into to as of _____, __ 2013, by and between Jack Kistler ("Seller") and Walk-In Urgent Care & Family Practice Clinic, L.L.C., a California Limited Liability Company ("Buyer").

The purpose of this Agreement is for Buyer to purchase certain assets from Sellers practice, specifically a contract for medical services between PrimCare and Seller ("PrimCare Contract"). THIS AGREEMENT IS CONDITIONED UPON BUYER SUCCESSFULLY BECOMING ACCREDITED WITH PRIMCARE AND ASSUMING THE PRIMCARE CONTRACT.  If Buyer cannot assume the PrimCare Contract, or become accredited according to PrimCare's requirements, THIS AGREEMENT IS NULL AND VOID AND BUYER WILL HAVE NO FURTHER OBLIGATION TO PERFORM OR TAKE CONTROL OF SELLER'S ASSETS.

Buyer is not purchasing Seller's business or practice.  Buyer is buying the PrimCare Contract, subject assumption, credential, and to the limitations contained herein.  Certain tangible assets (as outlined in Article 1 below) are also included in the purchase but Buyer and Seller agree that these assets contain no value to Buyer without the proper assumption of the PrimCare Contract.

Initials of Buyer:_____   Initials of Seller: _____

## RECITALS

A. Seller is the owner of a family medical practice ("Practice") with an office at 6900 Brockton Ave suite 11 Riverside, CA 92506 (referred to hereinafter as "Premises") and desires to sell certain specific assets of said practice (as defined below) to Buyer. Seller is not selling his Practice to the Buyer. Seller expressly acknowledges that the PrimCare Contract is the most important asset contemplated by this agreement in addition to the limited hard assets listed in Exhibit A. Seller expressly acknowledges that it is receiving fair market value for the hard assets from Buyer. To the extent that any of the after stated provisions imply Buyer is purchasing Seller's Practice, this paragraph will supersede such paragraph. Seller will maintain its business names, remain subject to its business liabilities, and retain all of its assets not listed in Exhibit A.

B. Buyer is a Limited Liabilities Company which desires to purchase Buyer's PrimCare Contract, intellectual properties, clients, and defined hard assets.  Buyer's primary purpose in entering into this Agreement is to assume the PrimCare Contract.

## ARTICLE 1

## ASSETS TO BE SOLD AND PURCHASED

1.01 Assets: Subject to the terms, conditions, covenants and agreements hereinafter provided, Buyer shall purchase and Seller shall sell and deliver to Buyer at the closing described in Article 7 hereof (the "Closing" or "Date of Closing"), free and clear of all liens, encumbrances, claims and charges, except as expressly provided herein, the Tangible Personal Property (as defined in Section 1.02), all assignable warranties and repair and maintenance agreements (if any) relating to the Tangible Personal Property, the Books and Records (as defined in Section 1.03), patient list, the Prim care contract and relationship, telephone number, website, and email address. The assets as listed in this Section 1.01, the Tangible Personal Property and the Books and Records shall be collectively referred to hereinafter as the "Assets."

1

Deposition Exhibit___ 19
Sandra Jo Roberts, CSR
For Identification
12/18/17 Deposition of
Jamal Hamadah

Dr.Sann 000054
19-1

1.02 Tangible Personal Property: The Tangible Personal Property consists of all tangible personal property owned by the Seller directly related to the operation of the Practice, including without limitation, inventory, furniture, medical equipment, medical supplies, advertising materials, office equipment; including such drapes, carpeting, shades, heating and cooling fixtures, appliances and all other related equipment belonging to Seller, but specifically and excluding any of the above that belongs to the lessor of the Premises.

1.03 Books and Records: The Books and Records consist of all Practice patient records and patient information owned by the Seller and all books and records pertaining to the Assets. The transfer of the ownership of the Books and Records shall comply with any California law pertaining thereto, if any. The transfer shall include all hard and electronic copies of such records in the possession of the Seller.

1.04 Assets Excluded: Seller's cash, Business name, company or corporation, and outstanding accounts receivable for services Seller performed prior to executing this Agreement.

1.05 Non-Assumed Liabilities: Except as otherwise provided for herein, Buyer - PMC shall not assume and shall not be liable for any debt, obligation, responsibility or liability of Seller, or any claim against Seller or Dr. Kistler , whether known or unknown, contingent or absolute, asserted or unasserted, or otherwise and regardless of whether or not disclosed herein or in a schedule hereto. The foregoing limitation shall include any liability and/or obligation arising out of activities, events, facts or circumstances occurring or existing prior to the Closing or the operation of the Practice prior to the Closing, including but not limited to any interest- bearing debt of Seller, trade payables, accrued taxes, back rent or prior due to the Closing lease obligations, employee related costs (including wages, unused vacation time or sick leave due), or other operational liabilities.

1.06 Collection of Accounts Receivables: All monies owed for account receivables prior to August 1, 2012, including monies owed from patients and insurance companies belong to the seller. It is the sellers responsibility to collect receivables.

**ARTICLE 2**

**CURRENT OFFICE LEASE**

2.01 Lease Agreement: This Agreement is further contingent upon Buyer being able to successfully negotiate with the lessor of the Premises a waiver of any all Seller obligations under the existing lease. Buyer will, upon assumption and credential of the PrimCare Contract, negotiate terms to operate Buyer's business at the location terms satisfactory to Buyer in Buyer's sole discretion.

**ARTICLE 3**

**PURCHASE PRICE; METHOD OF PAYMENT**

3.01 Purchase Price: In consideration of the sale, transfer, conveyance, assignment and delivery of the Assets, and in reliance upon the representations and warranties made herein by Seller, Buyer will pay to Seller a total purchase price of One hundred sixty  thousand Dollars ($160,000.00) (the "Purchase Price"). The purchase price shall be paid:

(a)Five-Thousand Dollars ($ 5,000.00) as escrow at signing of the contract.  This amount is to be paid as earnest money while Buyer works to secure the PrimCare Contract and obtain credential. If Buyer cannot assume the PrimCare Contract, or secure credential under the PrimCare Contract, Buyer will retain this $5,000.00 as liquidated damages and shall not be entitled to any further damages.

2

(b)Fifty-Five Thousand Dollars ($55,000.00) upon assumption and credential approval of the PrimCare Contract.  Buyer has no obligation to pay this amount to Seller, regardless of delay or continuation of execution of this Agreement, if Buyer cannot assume and obtain Credential of the PrimCare Contract.

(c)Four-thousand ($4,000) to be paid monthly, beginning September 1, 2013, for 25monthly payments totaling One Hundred Thousand Dollars ($100,000.00) free of interest.  If the contract is not executed, after 45 days, the deal is null and void.  Buyer has no obligation to pay this amount to Seller, regardless of delay or continuation of execution of this Agreement, if Buyer cannot assume and obtain Credential of the PrimCare Contract.

3.02 Time and Fairness of Payment: The Purchase Price shall be paid to Seller on or before the 5th of each month, by check, and as provided above. The parties agree that the Purchase Price is fair and equitable, and that it represents the fair market value of Seller's total interest in the Assets.

3.03 Allocation of Purchase Price: Seller and Buyer hereby agree to allocate the Purchase Price as set forth in Section 3.01. Buyer and Seller agree that the above allocation represents the fair market value of the Assets in their current condition and location. Further, each party to this Agreement agrees to report such values for federal and state income tax purposes consistent with the allocation in this Agreement.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

4.01 Organization and Authority: Seller represents and warrants that it is a limited liability company organized and existing under California law. Seller further represents and warrants that it has the power and authority to make this Agreement and to carry out the provisions hereof. The execution and delivery of this Agreement has been duly authorized by Seller.

4.02 Absence of Conflict: To the best of Seller's knowledge, the execution and delivery of this Agreement and the performance and compliance with the terms hereof by Seller will not conflict with or result in the material breach of any of the terms, conditions or provisions of, or constitute a default under any trust agreement, indenture, mortgage, lease, agreement, or any other instrument, or any order, law, rule, regulation, judgment or decree to which Seller is a party or by which Seller or any of the Assets are bound.

4.03 Title to Assets: Seller is vested with legal, marketable, beneficial and equitable title to the Assets, free and clear of all pledges, options, leases, mortgages, security interests, liens, encumbrances, claims, charges, or defects in title of any kind. To the extent any are found to exist Seller, at Closing, shall immediately pay off and satisfy any such mortgages, security interests, liens or other encumbrances on the assets listed in this contract.

4.04 Condition of Assets: The Assets will be in a general good state of operating condition, maintenance and repair for use in the ordinary course of business, except for ordinary wear and tear.

4.05 Warranty of No Litigation: There is not pending, nor, to the best of Seller's knowledge, has there been threatened nor is there a meritorious basis for, any action, suit, proceeding or governmental investigation which, if decided unfavorably, would have a material adverse effect on the Assets or the transactions contemplated by this Agreement.

4.06 Consents: To the best of Seller's knowledge, no consent of any person, entity, third party, government or governmental agency is required to be obtained by Seller for the consummation of the transaction contemplated herein.

3

Dr.Sann 000056

19-3

**4.07** Insurance: Seller will provide Buyer a list of all insurance policies pertaining to the Assets, and the nature, coverage and deductible amounts of such policies. Seller shall maintain all insurance policies, as well as professional liability coverage for doctors, in effect until Closing. Insurance coverage for the Assets shall be Buyer's responsibility following Closing.

**4.08** Present Compliance with Obligations and Laws:
Seller warrants and represents that it is not:
    (a) in violation of its Articles of Organization and by-laws or other governing documentation (collectively, the "Governing Documents");
    (b) in default in the performance of any obligation, agreement or condition of any debt instrument, which (with or without the passage of time or the giving of notice) afford to any person the right to accelerate any indebtedness or terminate any right;
    (c) in default of or in breach of (with or without the passage of time or the giving of notice) any other contract to which it is a party or by which it or any of its assets are bound; or
    (d) in violation of any law, regulation, administrative order or judicial order, decree or judgment applicable to it or its business or assets or to which it is subject or by which any of its assets or business may be bound, where any such violation or default could materially adversely impact the transactions contemplated herein. Seller represents, to the best of its knowledge, that it has conducted the Practice in material compliance with all applicable regulatory laws, both federal and state, pertaining to the referral of patients and payments/contracts with referral sources.

**4.09** Payment of Taxes: Seller has duly and timely filed all federal, state, local, and foreign government income, excise, gross receipts or franchise tax returns, real estate and personal property tax returns, sales and use tax returns, employee tax and contribution returns, and all other tax returns, reports and declarations, including valid extensions therefore, or estimated taxes required to be filed by it, with respect to all applicable taxes ("Tax Returns") including without limitation, with respect to all income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage withholding, severance, stamp, occupation, and windfall profit taxes, of every kind, character or description, and imposed by any government or quasi-governmental authority (domestic or foreign), and any interest or fines, and any and all penalties or additions relating to such taxes, charges, fees, levies or other assessments ("Taxes"). All of the Tax Returns are complete and correct in all material respects. All Taxes shown to be due on each Tax Return have been paid or are being contested in good faith by Seller. All Taxes and other assessments and levies which Seller is required to withhold or collect have been withheld or collected and paid over or will be paid over to proper governmental authorities as required. No deficiencies have been asserted or assessments made against Seller, nor is the Internal Revenue Service or any other taxing authority now asserting or, to the knowledge of Seller, threatening to assert against Seller any deficiency or claim for additional taxes or interest thereon or penalties in connection therewith. Seller has not extended the time for the filing of any Tax Return or the assessment of deficiencies or waived any statute of limitations for any year, which extension or waiver is still in effect.

**4.10** Contracts and Commitments: Seller is not a party or subject to:

    (a) any contracts or commitments pertaining to the Practice that will extend past the Closing for which Buyer will be responsible, except for those listed on Exhibit D. Buyer shall be responsible only for charges arising after Closing for which Buyer has received the benefits, products or services;

    (b) any contract containing covenants limiting the freedom of Seller to compete in any line of business or with any person or entity.

**4.11** Labor and Employee Relations:

4

Dr.Sann 000057

19-4

Seller warrants and represents as follows:

(a) There are no currently affective consulting or employment agreements or other material agreements relating to the Practice which cannot be immediately terminated. Buyer shall have no responsibility to hire any of the former employees of the Seller. Buyer can hire such of the former employees of the Seller under such terms as are mutually acceptable to the Buyer and the former employee of the Company.

(b) Seller shall release, discharge, waive and hereby agrees not to enforce any covenant not to compete or covenant not to recruit, solicit or hire Practice employees contained in or made part of any agreement between Seller and Practice employees, including those that may be contained in any Physician employment contract with Seller.

(d)None of the Practice employees of Seller is covered by any collective bargaining agreement with any trade or labor union, employees' association or similar association. Seller has, to its knowledge, complied with all applicable laws, rules and regulations relating to the employment of labor, including without limitation those relating to wages, hours, unfair labor practices, discrimination, and payment of social security and similar taxes, except where failure to comply would not adversely impact the transaction contemplated herein. There are no representation elections, arbitration proceedings, labor strikes, slowdowns or stoppages, or claims of discrimination or unfair labor practices pending or, to the knowledge of Seller, threatened, with respect to the Practice employees of Seller.

(d) There are no complaints against Seller pending or, to the knowledge of Seller, threatened before the National Labor Relations Board or any similar state or local labor agencies, or before the Equal Employment Opportunity Commission or any similar state or local agency, by or on behalf of any Practice employee or former employee of Seller.

(e)There is no contingent liability for sick leave, vacation time, severance pay or similar items with respect to Practice employees, or if such contingent liability exists, Seller shall be solely responsible for such liability and will indemnify and hold Buyer harmless for such liability.

(f)Seller has made available to Buyer a copy of its employee handbook which contains a fair summary of all material employment policies currently in effect under which Seller operates or has communicated to its employees with respect to the Practice.

(g)With respect to the Practice, there has not been any citation, fine or penalty imposed or asserted against Seller under any law or regulation relating to employment, immigration or occupational safety matters.

4.12. Employees: Benefits:

(a) Immediately preceding the Closing Date, Buyer in its sole discretion may offer employment to some or all of the individuals who are employees of the Seller ("Employees"). Employees who are extended and accept offers of employment from Buyer shall become employees of Buyer as of the Closing Date, which employment in Buyer's sole discretion may be on a probationary basis (the "Continuing Employees"). Buyer in its sole discretion may terminate the employment of any Continuing Employee at any time after the Closing Date. None of the Seller's prior employment practices or promises shall be considered binding on the Buyer.

(b) Buyer shall not assume any obligations for any pre-Closing Date payroll expenses and for any employee benefit plan maintained by, or contributed to by, Seller ("Seller Plans") or for any other obligations of Seller to Employees. Seller will fully provide or pay for all liabilities or obligations to the Employees arising or accruing prior to the Closing Date under any payroll system, Seller

5

Dr.Sann 000058

19-5

Plans or any other employee benefit or compensation arrangements (including, without
limitation, accrued salary, accrued bonuses or commissions, insurance, accrued vacation and
severance). For any Employee who ceases to be an Employee of Buyer within one month of
Closing, Seller shall provide such coverage as Seller is required to provide pursuant to the
Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), if any.

(c) Seller will bear the cost and expense of any workers' compensation claim asserted and arising
out of an injury sustained by any Employee prior to the Closing Date.

(d) Seller shall be responsible for any costs and consequences associated with the termination of
employment of any of Seller's Employees or prior employees (those employees whose
employment with Seller has ceased prior to the Closing and all other persons entitled to COBRA
benefits, hereinafter "Prior Employees") for any reason. In the event any Employee or Prior7
Employee shall be entitled, from Buyer, to a monetary amount, services, and/or benefits
(including but not limited to COBRA and whether or not such COBRA obligation of Seller is
imposed under statutory or other law upon Buyer) as a result of the transactions contemplated by
this Agreement or any other actions by Seller, notwithstanding that such Employee or Prior
Employee may or may not be hired or terminated by Buyer or does not resign from Buyer's
employment, Seller shall pay or reimburse Buyer if Buyer has paid, will have to pay, or will have
to pay increased indirect costs (such as an increase in the overall cost of benefits for Buyer's
employees due to costs and consequences as contemplated in this subsection (d)) for any such
monetary amount, services, and/or benefits as a result of the consummation of this transaction by
Buyer.

(i) Seller shall pay or reimburse Buyer for any costs and/or consequences Buyer is subjected
to under subsection (d) within thirty (30) days upon receipt of written demand by Buyer or if
Seller contests such governmental or quasigovernmental determination resulting in the
aforesaid Buyer's costs or consequences, Seller shall provide notice to Buyer and indemnify
Buyer in connection with such claim. In no event shall any payment amount to render Buyer
whole and/or indemnify Buyer be withheld during the pendency of such contest.

(ii) In the event that Seller does not pay or reimburse Buyer within thirty (30) days upon
receipt of written demand, Buyer shall reduce any payment obligation to Seller under this
Agreement and the Note by the amount owed under this subsection (d), or seek
Indemnification under Article XI, or both. These remedies are not exclusive and shall include
all remedies available at law and equity.

(e) Nothing in this Agreement, expressed or implied, shall confer upon any Employee any rights
or remedies, including any right to employment or continued employment for any period except
as expressly provided otherwise.

(f) Seller shall make available to Buyer, prior to Closing, personnel records and information
relating to any pending disciplinary action or claim, relating to Employees, except for
information that is privileged or not relevant to Buyer's hiring decisions. 4.13 ERISA and
Employee Benefits. As of the Closing Date, none of the Assets will be subject to any lien arising
under the Employee Retirement Income SecurityAct ("ERISA") or the Internal Revenue Code,
and Seller will not have any liability in respect to any ERISA employee benefit plan for which
Buyer could be held liable. For purposes of this Agreement, "Employee Benefit Plans" means all
pension, retirement, profit sharing, deferred compensation, stock ownership, stock purchase,
stock option, restricted stock, bonus, severance or termination pay, payroll practice, vacation,
cafeteria, medical, group life, health, accident, disability, death, or other employee benefit plans
or arrangements, including (without limitation) any pension plan (within the meaning of Section
3(2) of ERISA) and any welfare plan (within the meaning of Section 3(1) of ERISA), covering
any present or former employees, consultants, officers, or directors (or dependents or
beneficiaries of any such persons) of the Seller or to which the Seller is a party or bound by

6

Dr.Sann 000059

19-6

which the Seller otherwise may have any liability to any present or former employee, consultant, officer, or director (or to any dependent or beneficiary8 of any such person) of Seller.

### 4.14. Environmental Matters:

(a) Any and all hazardous waste, hazardous substances, toxic substances, medical waste or hazardous materials used or generated by Seller in connection with the Practice hava always been or are being generated, used, stored or treated on and at any of the properties or facilities owned or leased by Seller (for the purposes of this Section 4.14, all of the foregoing are a "Site") will be disposed of by the Seller prior to closing in strict compliance with federal, state and local laws, regulations and ordinances.

(b) No hazardous waste, hazardous substances, toxic substances, medical waste or hazardous materials used or generated by Seller in connection with the Practice have ever been, are being, are intended to be or are threatened with being spilled, released, discharged, disposed, placed, leaked, or otherwise caused to become located in the air, soil or water in, under or upon a Site in any material or reportable quantity.

**4.15 Permits**: Seller holds and is in compliance with all licenses, permits, registrations, orders, authorizations, approvals and franchises which are required to permit it to conduct the Practice as presently conducted, except where failure to so comply would not materially adversely impact the transactions contemplated herein. Seller has not received any written notification of any asserted present failure (or past failure which has not been remedied) by it to have obtained any such license, permit, registration, order, authorization, approval or franchise. Seller has not received any written notification of non-compliance or violation with any such license, permit, registrations, order, authorizations, approvals or franchises.

**4.16 Disclosure**: The financial, patient and other information provided by Sellers to Buyer is and shall be true, accurate and complete in all material respects at the date hereof and at the date of Closing and fairly reflects the business and operations conducted by the Sellers during the time frame the information covers.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date of this Agreement each of the following:

**5.01 Power and Authorization**: Buyer has the power and authority to enter into and perform this Agreement in accordance with its terms. The execution and performance of this Agreement have been duly authorized and approved by all necessary persons and bodies. The persons executing and all documents in connection with this Agreement are fully authorized and have power to do so.

**5.02 Absence of Conflict**: The execution and delivery of this Agreement and the performance and compliance of its terms hereby by Buyer will not conflict with or result in the material breach of any of the terms, conditions or provisions of and trust agreement, indenture, mortgage, lease, or other instrument, or any order, statute, law, ordinance, rule, regulation, judgment or decree to which Buyer is a party of by which it is bound.

## ARTICLE 6

## TRANSACTIONS PRIOR TO CLOSING

7

Dr.Sann 000060

19-7

<u>6.01 Conduct and Transactions of Seller Prior to Closing</u>: Between the date of this Agreement and the Closing, Seller shall retain full control of the Assets in the ordinary course of business. In order to assure protection and preservation of the Assets to be acquired at Closing by Buyer as well as Seller's performance of its obligations under and related to this Agreement, Seller agrees that between the date hereof and Closing:

(a) Upon reasonable notice by Buyer, Seller shall give Buyer, its counsel, accountants, appraisers and other representatives or experts retained by Buyer full access during business hours to all the Assets and Books and Records pertaining to the Practice. Seller shall also furnish to Buyer such information with respect to the Assets, subject to applicable law and medical ethics, as Buyer may from time to time reasonably request. In the event of termination of this Agreement for any reason, Buyer and its representatives will return all documents and materials obtained from Seller, and will not retain any copies of same.

(b) Seller will not (1) sell, lease, abandon, assign, transfer, pledge, subject to any lien, charge, encumber or otherwise dispose of the Assets or any interest therein or portion thereof except in the ordinary course of business, or (2) enter into any agreement to do any of the foregoing except in the ordinary course of business; provided, however, this provision shall not prohibit Seller from continuing or extending any agreement presently in effect.

(c) The Assets will be kept and maintained by Seller in their present condition, ordinary wear and tear excepted.

(d) At Seller's expense, the Practice will continue to maintain in full force and effect all policies of insurance listed on any hard asset through the date of Closing. At Buyer's request Seller will give all notices and present all claims arising prior to Closing under all policies of insurance in due and timely fashion.

## ARTICLE 7

## CLOSING

<u>7.01 Closing</u>: Each party agrees to diligently exercise its best efforts in good faith to close this transaction on or within 45 days of July 31, 2012 ("Closing Date"). The Closing shall take place at an agreed upon location and at a time mutually agreeable to the parties.

## ARTICLE 8

## OBLIGATIONS OF SELLER AT CLOSING

Upon due performance before Closing by Buyer of its pre-closing obligations specified in this Agreement and subject to Seller's conditions precedent to Closing set forth in Article 10, at Closing Seller shall do the following which, unless otherwise indicated, will be at Seller's expense:

<u>8.01 Documents of Title</u>: Execute, acknowledge and deliver to Buyer a bill of sale as to the Tangible Personal Property, an assignment as to any warranties and repair and maintenance agreements relating to the Tangible Personal Property and such other instruments of sale, conveyance, transfer and assignment, as shall be required or as may be desirable in order to effectively vest in Buyer, good, insurable and marketable title to the Assets free and clear of all non-assumed liens, encumbrances, pledges, security interests, equities, charges, conditional sale or other title retention agreements, covenants, restrictions or reservations except for Assumed Contracts and accrued property taxes not yet due and payable.

<u>8.02 Possession</u>: Deliver to Buyer possession of the Assets provided, however, Seller shall have after Closing, upon advance notice, reasonable access during business hours to the Books and Records for

8

Dr.Sann 000061

*19-8*

purposes of defending lawsuits or claims, collecting its accounts receivable and for other reasonable business purposes.

<u>8.03 Additional Requested Documents</u>: At the request of Buyer, at Closing and at any time thereafter, take all actions necessary to put Buyer in actual possession of the Assets, and execute and deliver such further instruments of sale, conveyance, transfer and assignment and take such other action as Buyer may reasonably request in order to effectively sell, convey, transfer and assign to Buyer the Assets, to confirm title to same to Buyer thereto or to assist Buyer in exercising rights with respect thereto.

<u>8.04 Seller Transition</u>: For four months after closing, Seller shall take all reasonable steps necessary to assist Buyer in transitioning Seller's former clients to Buyer. Seller agrees to appear at the location, when necessary and requested by Buyer, and to provide support to Buyer in the transition of these clients.

## ARTICLE 9

## OBLIGATIONS OF BUYER AT CLOSING

<u>9.01 Resolutions and Approvals</u>: At Closing, Buyer shall deliver to Seller a copy of all requisite approvals of all parties whose approval or consent is required, authorizing the execution, delivery, and performance of this Agreement and the execution, delivery and performance of all certificates, security agreements and other instruments required hereunder.

## ARTICLE 10

## CONDITIONS PRECEDENT TO CLOSING

The parties' obligations under this Agreement are subject to the satisfaction on or before the Closing of the conditions contained in this Article 10. The waiver by either party of any of the11 conditions precedent hereunder in order to close the transactions shall not constitute a waiver or forfeiture of either party's right to indemnification.

<u>10.01 Compliance</u>: Each party shall have completed all the actions required to be taken under Articles 8 and 9 and shall have otherwise performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to or on the Closing.

<u>10.02 Representations and Warranties</u>: The representations and warranties of Seller and Buyer set forth in this Agreement will be true and correct in all material respects on and as of the Closing Date with the same effect as though made at such time.

<u>10.03 No Claims or Litigation</u>: No claims or litigation shall be pending or, to the knowledge of Seller, threatened which would in any way contest the power of either party to execute, deliver or perform its obligations hereunder or which would materially adversely affect the Assets or their value.

<u>10.04 No Default</u>: At the date of Closing, no event has occurred and continues which, with the lapse of time or the giving of notice, or both, would constitute a default under this Agreement.

<u>10.05 Consents and Approvals</u>:. Buyer shall have received all consents, approvals and assignments required for Buyer to consummate the transactions contemplated hereby.

9

Dr.Sann 000062

19-9

10.06 Release of Liens: All liens, including UCC filings, in the Assets shall have been released on or before Closing, except for Assumed Contracts and accrued property taxes not yet due and payable, which shall remain the responsibility of Seller.

10.07 No Bankruptcy: Seller shall not (i) have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, in solvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or substantially all of its property, or have consented to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against them, or have made a general assignment for the benefit of their creditors, or (ii) have an involuntary case or other proceeding commenced against it seeking liquidation, reorganization or other relief with respect to them or their debts under any bankruptcy, insolvency or other similar law now or hereinafter in effect or seeking the appointing of a trustee, receiver, liquidator, custodian or similar official of it or substantially all of its property or (iii) have an attachment placed on all or a significant portion of its assets.

10.08 No Adverse Change: There shall be no material adverse change to the Assets or to Buyer's Practice, taken as a whole, from the date of this Agreement to the time of Closing.

## ARTICLE 11

## DEFAULT BY PARTY

11.01 Default of Seller: In the event that Seller shall default hereunder or breach any of the terms or provisions of this Agreement not caused or resulting from default by Buyer, then, in that event, in addition to all other rights and remedies to which Buyer may be entitled by law, equity or agreement, Buyer may, at its option, maintain an action for specific performance with respect to compliance by Seller of the terms and provisions hereof and further shall be entitled to such injunctive relief.

11.02 Default of Buyer: In the event of a default of or a breach of this Agreement by Buyer not caused or resulting from default by Seller, then, in that event, in addition to all other rights and remedies to which Seller may be entitled by law, equity or agreement, Seller shall retain the earnest money payment described in paragraph 3.01(a), as the full measure of its liquidated damages for Buyer's default, and not as a penalty, the parties acknowledging that such damages are difficult to calculate and that such sum represents a reasonable estimate of the same.

11.03 Defaulting Party's Right to Cure: Except for default of payment hereunder, any party claiming a breach or default hereunder will give the defaulting party written notice of such default or breach and the defaulting party will have thirty (30) days to cure said breach or default.

## ARTICLE 12

## INDEMNIFICATION

12.01 Seller's Indemnification: Seller agrees to indemnify Buyer and hold Buyer harmless from and against any and all losses, damages, costs, liabilities and expenses (including reasonable attorneys' fees for counsel of Buyer's choice), resulting from or incident to:

(a) any breach by Seller of any of its obligations under this Agreement to be performed prior to or at Closing or the incorrectness of any representation or warranty made by Seller to Buyer in this Agreement;

(b) any contract, agreement, indebtedness or liability, liquidated or unliquidated, of Seller not expressly assumed by Buyer in writing;

10

19-10

(c) any liability, payment or obligation for any taxes owing by Seller of any kind or description for periods prior to Closing, including taxes accrued but not payable prior to Closing;

(d) any third party action, whether by a governmental authority or other third party, for damages, including fines and penalties or clean-up costs or other compliance costs under any environmental law arising out of or caused in whole or in part13 by the operations of Seller in connection with the Practice prior to Closing;

(e) any fraud of Seller with respect to this Agreement and the transactions contemplated herein;

(f) any third party claim, including liens, mortgages, security interests, or other encumbrances, to the Assets conveyed under this Agreement not expressly assumed herein by Buyer.

(h)any acts of fraud, illegal or faulty billing practices or medical malpractice occurring prior to Closing.

12.02 Buyer's Indemnification: Buyer agrees to indemnify Seller and hold Seller harmless from and against any and all losses, damages, costs, liabilities, and expenses (including all reasonable attorneys' fees) resulting from or incident to:

(a) any breach by Buyer of any of its obligations or duties under this Agreement to be performed prior to or at Closing or after the Closing or the incorrectness of any representation or warranty made by Buyer to Seller in this Agreement or any document executed in connection herewith.

(b) any contract, agreement, indebtedness or liability, liquidated or unliquidated, expressly assumed by Buyer from Seller in writing or which is incurred after Closing; or 12.03 Indemnity Period.

(c) any liability arising out the actions or failure to act of Buyer, its employers and agents, which arise after the Closing Date.

12.03 Termination of Indemnity Obligation:

(a) The obligations under Sections 12.01(a) and 12.02(a) shall cease one (1) year from the Date of Closing, unless the party demanding indemnity or to be held harmless under this Article 12 (the "Demanding Party") properly delivers to the other party (the "Indemnifying Party") written notice of such demand prior to the expiration of said one-year period.

(b) Subject to Section 12.03(c), all other obligations under this Article 12 with respect to those matters described in Sections 12.01 and 12.02 shall continue for the applicable statute of limitations period.

(c) Notwithstanding anything in Section 12.03(b) to the contrary, a Demanding Party's right to be indemnified and held harmless under this Article 12 shall be barred with respect to any given claim (the "Indemnified Claim") if the Demanding Party fails to deliver written notice of such Indemnified Claim to the Indemnifying Party within one (1) year from the date the Demanding Party acquires actual knowledge of the Indemnified Claim or sooner if the Indemnifying Party is prejudiced thereby.

(d) If written notice is timely given of a claim under this Article 12, the Indemnifying Party shall have thirty (30) days after the delivery of such notice to pay, assume, satisfy or otherwise discharge or provide a surety bond to the claimant with respect to the Indemnified Claim, to the

Dr.Sann 000064

19-11

reasonable satisfaction of the Demanding Party, prior to the Demanding Party taking any independent action.

## ARTICLE 13

## ADDITIONAL COVENANTS AND AGREEMENTS

13.01 Practice Name: The Buyer shall not have the right, to use the Seller's Name.

13.02 Survival of Representations: Warranties and Agreements. Subject to Article 12, each of the representations, warranties and covenants made by Seller and Buyer shall remain operative and in full force and effect, shall survive consummation of the transactions contemplated by this Agreement, and shall be unaffected by any investigation undertaken by the parties hereto.

13.03 Payment of Debts: Seller shall as promptly as possible after Closing pay all debts and obligations not to be assumed by Buyer hereunder within their existing credit terms.

13.04 Brokers: Each party hereto covenants, warrants and represents to the other that no brokers have been involved in any manner with respect to the transactions contemplated hereunder and each party agrees to indemnify and hold the other harmless from and against any claim or liability of any broker.

## ARTICLE 14

## CONFIDENTIALITY AND PUBLIC DISCLOSURE

14.01 Confidentiality and Public Disclosure: Before the Closing, neither Buyer nor Seller shall make any public announcement or any public release of information regarding the matters contemplated by this Agreement except (a) upon the prior written approval of all parties of a joint press release, (b) that Buyer and Seller may each continue such communications with employees, customers, suppliers, franchisees, lenders, lessors, shareholders, and other particular groups as may be legally required or necessary or appropriate and not inconsistent with the best interests of the other party or the prompt consummation of the transactions contemplated by this Agreement, and (c) as required by law. Buyer is allowed to contact the Arizona Department of Health to notify them that the Buyer is taking over the leased facility and obtain the necessary licenses.  Except as set forth above, the terms and conditions, other than the existence and duration, of this Agreement shall not be disclosed by either party to any third party.

///
///
///

## ARTICLE 15

## MISCELLANEOUS

15.01 Assignment: Neither party may assign this Agreement without the prior written consent of the other party, except that Buyer may assign Buyer's interest in this Agreement to an existing or a new entity controlled by Buyer.

15.02 Applicable Law: This Agreement shall be construed in accordance with the laws of California.

Dr.Sann 000065

19-12

**15.03 Notices and Communications:** Any and all notices or other communications required or permitted under this Agreement shall be in writing and shall be deemed sufficient when delivered in person or when received by Federal Express, United Parcel Service, or United States certified mail, as set forth on the return receipt, and addressed:

| If to Seller: Dr. Jack Kistler, *Inc*<br>Address: 35 731 STuK St<br>Telephone: Murricta, C 49252<br>Email: 951-529-4306 2 | If to Buyer: Walk-In Urgent Care & Family Practice Clinic, L.L.C.<br>Address:<br>Telephone<br>With copy to:<br>Telephone: Email: |
|---|---|

Any party may change the address to which notice and other communications to him or it are sent by delivering to the other party written notice of the change.

**15.04 Headings and Exhibits:** Any table of contents and headings in this Agreement or Exhibits hereto are for convenience of reference only and shall not be deemed to alter or affect any provisions hereof. All Exhibits hereto shall be initialed for identification or may be physically annexed hereto, but in either event, such Exhibits shall be deemed a part hereof.

**15.05 Benefit:** This Agreement shall be binding upon and shall inure to the exclusive benefit of the parties hereto their successors or permitted assigns. This Agreement is not intended to, nor shall it, create any rights in any other party.

**15.06 Partial Invalidity:** The invalidity or un enforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted. Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

**15.07 Waiver:** Except as expressly provided in this Agreement, neither the failure nor any delay on the part of any party hereto in exercising any rights, power or remedy hereunder shall operate as a waiver thereof, or of any other right, power or remedy; nor shall any single or partial exercise of any right, power or remedy preclude any further or other exercise thereof, or the exercise of any other right, power or remedy.

**15.08 Counterparts:** This Agreement may be executed simultaneously in two or more counterparts each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**15.09 Interpretation:** All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or entity, or the context, may require. Further, it is acknowledged by the parties that this Agreement has undergone several drafts with the negotiated suggestion of both; and, therefore, no presumptions shall arise favoring either party by virtue of the authorship of any of its provisions.

**15.10 Authority:** The persons signing below represent and warrant that they have the requisite authority to bind the entities on whose behalf they are signing.

**15.10 Advice of Counsel:** The Parties hereby represent and warrant that before executing this Agreement, they have considered its provisions and have had the opportunity to fully discuss the same with legal counsel, that the Parties are executing this Agreement based upon their own independent review of the Agreement, and that they are not relying on any statement, promise or

13

Dr.Sann 000066   *19-13*

representation made by or on behalf of any other Party to this Agreement or its representatives, except as expressly provided herein.

15.11 Entire Agreement:  This Agreement embodies the entire agreement and understanding between the Parties and supersedes all prior agreements and understandings relating to the subject matter hereof.  No course of prior dealings between the Parties, no usage of the trade, and no parol or extrinsic evidence of any nature shall be used or be relevant to supplement, explain or modify any term used herein.  Each Party represents and warrants that they are not relying on any other Party for tax or bankruptcy advice.  This Agreement is a product of negotiation and preparation by and among the Parties.  Therefore, the Parties acknowledge and agree that this Agreement should not be deemed prepared or drafted by one Party or the other and shall be construed accordingly.

15.12 Attorney's Fees:  Should litigation or arbitration be commenced between the undersigned in connection with any dispute arising out of or otherwise related to this Agreement, the party prevailing shall be entitled to, in addition to such other relief as may be granted, a reasonable sum for attorneys' fees and costs.

15.13 Arbitration Provision:  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Riverside, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

///
///

## ARTICLE 16

## NON-SOLICITATION

16.01 Non-Solicitation of Patients: Seller and Dr. Jack Kistler, jointly and individually, promise that they shall not, after the close of this sale, solicit any of the patients who were patients of the Practice sold herein at the time of Closing.

16.02 Non-Disparagement: The Parties agree to refrain from any defamation, libel, or slander of the other, or tortious interference with the contracts or relations of the other.

16.03 Consideration: Seller and Dr. Kistler acknowledge that the above non- solicitation provisions are reasonable and are an important part of the consideration being purchased by Buyer pursuant to this Agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first above mentioned.

14

Dr.Sann 000067  19-14

Buyer:
Walk-In Urgent Care & Family Practice Clinic, L.L.C.,
a California limited liability company,

By: Dr. Sam Sanhoufi

Seller
Dr. Jack Kistler

By: Dr. Jack Kistler

15

## Addendum to the Asset Purchase Agreement

This Addendum hereinafter amends Article 3.01 of the ASSET PURCHASE AGREEMENT (the "Agreement") is entered into to as of _____, __ 2013, by and between Jack Kistler ("Seller") and Walk-In Urgent Care & Family Practice Clinic, L.L.C., a California Limited Liability Company ("Buyer").

## PURCHASE PRICE; METHOD OF PAYMENT

<u>3.01 Purchase Price</u>: In consideration of the sale, transfer, conveyance, assignment and delivery of the Assets, and in reliance upon the representations and warranties made herein by Seller, Buyer will pay to Seller a total purchase price of One hundred sixty  thousand Dollars ($160,000.00) (the "Purchase Price"). The purchase price shall be paid:

(a)  Five-Thousand Dollars ($ 5,000.00) as escrow at signing of the contract.  This amount is to be paid as earnest money while Buyer works to secure the PrimCare Contract and obtain credential. If Buyer cannot assume the PrimCare Contract, or secure credential under the PrimCare Contract, Buyer will retain this $5,000.00 as liquidated damages and shall not be entitled to any further damages.

(b)  Fifty-Five Thousand Dollars ($55,000.00) upon assumption and credential approval of the PrimCare Contract, <u>payable in three monthly payment of Eighteen Thousand Three Hundred Sirty Four Dollar ($18,334.00) due October 1, 2013, November 1, 2013, and December 1, 2013</u>. Buyer has no obligation to pay this amount to Seller, regardless of delay or continuation of execution of this Agreement, if Buyer cannot assume and obtain Credential of the PrimCare Contract.

Four-thousand ($4,000) to be paid monthly, beginning <u>January 1, 2013</u>, for 25monthly payments totaling One Hundred Thousand Dollars ($100,000.00) free of interest.  If the contract is not executed, after 45 days, the deal is null and void.  Buyer has no obligation to pay this amount to Seller, regardless of delay or continuation of execution of this Agreement, if Buyer cannot assume and obtain Credential of the PrimCare Contract.

Buyer:
Walk-In Urgent Care & Family Practice Clinic, L.L.C..,
a California limited liability company,

By: Dr. Sam Sannoufi


Seller
Dr. Jack Kistler

By: Dr. Jack Kistler