# EXHIBIT 2

1          IN THE UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA (SOUTHERN DIVISION)

3

4  JAMAL HAMADAH, an individual, )  Case No.
                                )   8:17-cv-00132-CJC-JCG
5          Plaintiff,           )
                                )
6       vs.                     )
                                )
7  SAMER SANNOUFI, M.D., aka SAM )
   SANNOUFI, M.D., an individual,)
8                               )
           Defendant.           )
9  _____)

10

11

12

13

14

15              DEPOSITION OF

16          SAMER SANNOUFI, M.D.

17        TUESDAY, DECEMBER 19, 2017

18

19

20

21

22  Reported By:  Shirley Koch, RPR
                  California CSR No. 10849
23                Washington CCR No. 3096
                  Hawaii CSR No. 467
24

25

REGAL

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

1    Q.   And how did you find out that it was -- that
2  there was the illegality issue?
3    A.   By my attorney and by accident.  We were
4  talking about different issue, and then she --
5         MS. MOUSAVI:  You cannot -- you cannot talk
6  about the communication because --
7         MR. COHEN:  No.  Actually, he can.  He's waived
8  the privilege.  He's alleged --
9         MS. MOUSAVI:  I will instruct you not to answer
10  any -- as to any communication between me and you.  You
11  can say that -- who you learned it from --
12         MR. COHEN:  Okay.
13         MS. MOUSAVI:  -- your attorney.  That's it.
14         MR. COHEN:  Okay.  We'll take this up with the
15  court.
16         MS. MOUSAVI:  Yes.
17         MR. COHEN:  I -- I'm going to -- I'm not -- I'm
18  going to be polite.  I'm not going to be harsh at all
19  today.  Let's just -- let's just be nice.  Okay?
20         THE WITNESS:  My attorney, anyway.
21  BY MR. COHEN:
22    Q.   All right.  And I'm -- I'm going to ask you --
23  and she's going to -- she's going to object and make the
24  instruction.
25         ++ But I'm going to ask you:  What else did

                                                         10

1  your attorney tell you that day?

2         MS. MOUSAVI:  I'm going to instruct you not to

3  answer.

4         THE WITNESS:  I'm going to follow my attorney's

5  advice.

6  BY MR. COHEN:

7     Q.   ++ Tell me each and every thing your attorney

8  told you about illegality.

9         MS. MOUSAVI:  Same instruction.  I instruct you

10 not to answer.

11 BY MR. COHEN:

12    Q.   ++ And tell me each and every thing that your

13 attorney -- your attorney told you about any other

14 subject matter that day.

15        MS. MOUSAVI:  Same instruction.

16 BY MR. COHEN:

17    Q.   When was the first time you advised Mr. Hamadah

18 that there was a probable illegality?

19    A.   Immediately, by phone.

20    Q.   When was the first time you advised him by --

21 in writing?

22    A.   In -- sometimes [sic] in either November or

23 December.  Some -- sometimes [sic] around that.

24    Q.   All right.  At the time that the Walk-In Urgent

25 Care Clinic shut down, was there a contract between the

11



 1  clinic and PrimCare?

 2     A.   There is a contract between Dr. Sannoufi and

 3  PrimCare.

 4     Q.   All right.  The payments from PrimCare were

 5  coming to a fictitious name, were they not?

 6     A.   True.

 7     Q.   And what was the fictitious name it was --

 8     A.   Walk-In Urgent Care & Family Practice Clinic.

 9     Q.   Are you telling me that that was a -- in

10  essence, a d/b/a of Dr. Sannoufi?

11     A.   No.  But if there was another doctor to

12  practice, they would not pay Walk-In Urgent Care &

13  Family Practice Clinic.

14     Q.   I'm sorry.  Say that again.

15     A.   If there was another doctor to replace

16  Dr. Sannoufi in that particular practice, they would not

17  pay Walk-In Urgent Care & Family Practice Clinic.

18     Q.   My question, though, is slightly different.

19  Were you, Dr. Sannoufi, doing business as Walk-In Urgent

20  Care & Family Practice Clinic?

21     A.   Correct.

22     Q.   When was the first time you told Mr. Hamadah

23  that you personally were doing business under that name?

24     A.   We never discussed because that's basically

25  common sense.

www.regalcourtreporting.com
866-228-2685



JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1   11.
 2          Can you hand that to him.
 3          MS. MOUSAVI:  Sure.
 4   BY MR. COHEN:
 5      Q.   Do you recognize this document as something
 6   that was prepared by Ms. Hager?
 7      A.   Yeah.  I recognize the name, but I've never
 8   seen it before.
 9      Q.   Okay.  You'll agree with me that -- that every
10   year the clinic was open, you took out money in the form
11   of expenses rather than -- than salary; correct?
12      A.   That was the agreement with the --
13          MS. MOUSAVI:  No, no, no.  I'm going to object.
14   Since you're referring to this document, if you could
15   please go line by line because --
16          MR. COHEN:  I'm going to.
17          MS. MOUSAVI:  I know.  It's $150,000.  I don't
18   even know what that is.
19          MR. COHEN:  Amy, look, I'm inviting you.  Go
20   ahead.  Here, have a seat.  Have a seat.  You know,
21   you're -- you're so anxious to --
22          MS. MOUSAVI:  Mr. Cohen --
23          MR. COHEN:  -- to run the deposition.
24          MS. MOUSAVI:  -- I only learned from the best
25   yesterday.
```

55

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1            MR. COHEN:  Okay.  Well, no --

 2            MS. MOUSAVI:  From you.

 3            MR. COHEN:  I never did that.  I never --

 4            MS. MOUSAVI:  Yes, you did.

 5            MR. COHEN:  I never -- I never tried to

 6   question the witness.  Okay?

 7            MS. MOUSAVI:  You even testified.

 8            MR. COHEN:  I'm asking -- I'm asking questions.

 9            MS. MOUSAVI:  Let's go off the record.

10            MR. COHEN:  I'm --

11            THE REPORTER:  Do you agree to go off the

12   record?

13            MR. COHEN:  Sure.

14            (Recess taken from 11:04 a.m. to

15            11:05 a.m.)

16            MR. COHEN:  All right.  Read back the last

17   question and answer, please.

18            (Record read as follows:

19            "QUESTION:  Okay.  You'll agree with

20            me that every year the clinic was

21            open, you took out money in the form

22            of expenses rather than salary;

23            correct?

24            "ANSWER:  That was the agreement with

25            the --")
```

56

REGAL

1          THE REPORTER:  And then an objection came in.

2          MS. MOUSAVI:  Okay.  We can continue.

3  BY MR. COHEN:

4     Q.   Can you finish the answer, please.

5     A.   That was the agreement with Jamal, because we

6  did not have enough money to satisfy my -- my salary.

7     Q.   Okay.

8          MR. COHEN:  All right.  And -- trying to find

9  the summary.

10         Okay.  Let's mark this as Number 30.

11         (Exhibit No. 30 was marked for

12         identification.)

13  BY MR. COHEN:

14    Q.   Dr. Sannoufi, do you remember -- do you -- do

15  you recognize Exhibit 30 as a summary printed from the

16  company's accounting system?

17         MS. MOUSAVI:  I'm going to object to that.  Do

18  you recognize this document and the what?

19         MR. COHEN:  What is the basis of your

20  objection?

21         MS. MOUSAVI:  The objection is that you're

22  asking him to recognize something without qualification,

23  without putting foundation for this document.

24         MR. COHEN:  I --

25         MS. MOUSAVI:  I'm going to object based on lack

57

REGAL

```
 1   if the -- if the -- if you believe a question is unclear

 2   or it's vague or it's ambiguous, say, Objection.  Say --

 3          MS. MOUSAVI:  I'll object.

 4          MR. COHEN:  -- Objection.  Ambiguous.  That's

 5   an objection.  You don't get to say, Do you understand

 6   what he's asking?  What he's asking is this.  Maybe he

 7   understood, or maybe that's not what I was asking.

 8          MS. MOUSAVI:  Well, that's --

 9          MR. COHEN:  I asked him a question --

10          MS. MOUSAVI:  Can you please repeat the

11   question.  Thank you.

12          (Record read as follows:

13          "QUESTION:  You understand that the

14          corporate records show that he put in

15          90, but you dispute that?")

16          THE WITNESS:  I disputed what?

17   BY MR. COHEN:

18      Q.  Do you dispute that Dr. -- that Mr. Hamadah

19   contributed $90,000 to the -- to the LLC?

20      A.  My understanding, he put 80.

21      Q.  Okay.  All right.  We'll -- we will get to that

22   later.  So that's -- there's -- we've now established

23   the nature of the disagreement.

24          Does the operating agreement say anything about

25   your salary?
```

94

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1      A.   No.
 2      Q.   The operating -- does the operating agreement
 3  say anything about distributions?
 4      A.   No.
 5      Q.   No.  The --
 6           MS. MOUSAVI:  I'm going to -- hold on.  Take
 7  your time to read the agreement and see if there is
 8  anything about distribution in there.
 9           THE WITNESS:  There's not -- it's not a
10  distribution.  It says the percentage of ownership,
11  which is 50-50.  If that's what you meant by that.  To
12  me distribution --
13           MR. COHEN:  Please read the question back.
14           And ask the witness to answer it, not the
15  lawyer.
16           THE WITNESS:  Well, my lawyer is here to
17  help -- to basically --
18           MR. COHEN:  No, she's not.
19           THE WITNESS:  -- say --
20           MS. MOUSAVI:  Mr. --
21           (Simultaneous speakers.)
22           THE REPORTER:  Excuse me.
23           MS. MOUSAVI:  Mr. Hamadah --
24           THE REPORTER:  I cannot make a record when
25  three of you speak at the same time.
```

95

REGAL

1  signed the -- as members, appointing you as the manager;

2  right?

3      A.    Correct.

4      Q.    Okay.  Thank you.

5            Now, the second sentence of 3.2 says,

6  "Distributions in liquidation of the Company or" --

7            MS. MOUSAVI:  Mr. Cohen, can you please wait

8  until the witness has that page.

9            THE WITNESS:  Okay.  3.2.

10 BY MR. COHEN:

11     Q.    Section 3.2, the second sentence says,

12 "Distributions in liquidation of the Company or in

13 liquidation of a Member's interest shall be made in

14 accordance with the positive capital account balances

15 pursuant to Treasury Regulation 1.704-1" -- blah-

16 blah-blah.

17           Do you see that?

18     A.    I see that.

19     Q.    Is it your position that the company was

20 liquidated?

21     A.    There was no liquid to liquidate.

22     Q.    Is it your position the company was required to

23 be liquidated?

24     A.    To be closed, yes.

25     Q.    All right.  Now, and what -- what was the --

103

1  well, we've talked -- we've talked about a couple

2  things.  Yesterday your lawyer referred to

3  Section 1.4(b), which says, "The company shall continue

4  for a perpetual period to the occurrence of one or

5  more" -- "one of the following events."  "(b) Any event

6  which makes it unlawful for the business of the Company

7  to be carried on by the Members."

8          Is it your position that the company was

9  required to be terminated under that statement?

10     A.    Yes.

11     Q.    All right.  What was the event that made it

12  unlawful for the business of the company to be carried

13  on by the members?

14     A.    Just learning about the law, that was enough

15  event [sic] for me to make a decision.

16     Q.    All right.  So it wasn't the -- it wasn't the

17  illegality itself?  You're saying that what made it --

18  what the event was that you learned it was illegal?

19     A.    Yes.

20     Q.    All right.  And up to that point, you thought

21  it was legal?

22     A.    Yeah.

23     Q.    And the reason you thought it was legal is that

24  you were the sole manager; right?

25          MS. MOUSAVI:  I'm going to object to that.

104

REGAL

1   Misstates testimony.

2   BY MR. COHEN:

3       Q.   The reason that you -- that you believed it was

4   legal is that you were the sole manager; correct?

5       A.   From a HIPAA relation point, I knew that

6   personally, with my limited knowledge about the law,

7   that it's okay.

8            And there's another event happen [sic] when I

9   sold my practice in Arizona.  The practice was sold to a

10  person who was a nondoctor, and he was an Indian

11  investor who hires doctors.

12           And that's why I thought it's okay.  As long

13  Mr. Hamadah doesn't get in touch with any documents or

14  any clinical records or any HIPAA violation, then we're

15  good.

16      Q.   Okay.  And so you were, for lack of a better

17  word, extrapolating from Arizona law; right?

18      A.   No.  Actually, when I hired an attorney and I

19  gave him to look up the -- the purchase agreement with

20  Dr. Kistler, part of that was him knowing that it --

21  we're going with a company, which is LLC, and he gave

22  his blessing.  And assuming that I have a lawyer to look

23  at those, I knew that this should be fine.

24      Q.   That's Mr. Nelson?

25      A.   Mr. Ethan Nelson, yes.

105



JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
1        Q.    All right.  Have you sued Mr. Nelson for
2    malpractice?
3        A.    I have not done anything to Mr. Nelson.
4             MS. MOUSAVI:  I'm going to object to that.
5             You have not.  That's it.
6    BY MR. COHEN:
7        Q.    Do you intend to?
8             MS. MOUSAVI:  I'm going to object to that based
9    on it requires a legal conclusion.  Statute of
10   limitations.  All those good things --
11   BY MR. COHEN:
12       Q.    Do you --
13            MS. MOUSAVI:  -- that require each of --
14            THE WITNESS:  No, I don't.  I don't.
15   BY MR. COHEN:
16       Q.    The question is:  Do you intend to?
17       A.    No.
18       Q.    Okay.
19            MR. COHEN:  I didn't ask him why.  I just asked
20   did he intend to.
21   BY MR. COHEN:
22       Q.    Now, what were the -- what were the assets of
23   the company on the date you discovered that there was an
24   illegality?
25       A.    Whatever we had in the account, which is not --
```

106

REGAL

1  much less than probably $2,000, if any, plus -- which we

2  distributed, by the way.  Plus the -- the old 50-,

3  60-year-old furniture, that I have pictures of

4  completely and I basically trashed when I left the place

5  because they ordered me to take off everything and empty

6  the place.  I wasn't willing to take any of the stuff

7  with me.

8      Q.   What about the contract with PrimCare?

9      A.   The contract with PrimCare is -- automatically

10  had to be renewed under the new company.  So if I would

11  have gone anywhere, this is -- would be the case.

12     Q.   All right.  But the company owned that contract

13  with PrimCare, didn't it?

14     A.   Patients are not owned by a company.  Patients

15  are -- basically are human beings that follow the doctor

16  they want.  It's not about the contract.  So PrimCare

17  cannot force -- I cannot force PrimCare, and they cannot

18  force the patients to follow.

19          Patients will follow me if I go to Irvine, if I

20  move to somewhere else.  And this is not about the

21  company.  It's about what the patients want, which

22  actually had -- some of the patients left me, which is

23  20 to 30 percent.

24          MR. COHEN:  Read -- please read back the

25  question.

107

REGAL

```
 1  that your company was buying the PrimCare contract,

 2  doesn't it?

 3       A.   I'd have to look again because I'm not

 4  recalling that.  So if you have a document you want to

 5  show me, show me.

 6       Q.   Sure.

 7            MR. COHEN:  Do you have Exhibit 19?

 8            MS. MOUSAVI:  Yes.

 9  BY MR. COHEN:

10       Q.   All right.  And by then way, you wrote this

11  contract, didn't you?

12       A.   I didn't.  The -- the -- my lawyer that's --

13       Q.   Your lawyer said you wrote the contract.

14       A.   Actually, no.  It is that Jack Kistler prepared

15  the draft.  I sent it to my lawyer.  The lawyer looked

16  at it, and he added some stuff and -- between both of

17  them.  And then he said everything is okay.

18       Q.   Your lawyer said that you wrote it, though,

19  didn't he?

20       A.   I got it from Dr. Kistler.  I don't know what

21  he said -- he wrote -- I --

22       Q.   All right.  We will get to that in a minute,

23  then.

24            Now, did -- this is an agreement between Jack

25  Kistler, seller, and Walk-In Urgent Care & Family
```

112

REGAL

1   Practice Clinic, LLC, a California limited liability

2   company, as buyer; right?

3       A.   Correct.

4       Q.   Okay.  And that's the LLC that Mr. Hamadah was

5   investing in; right?

6       A.   Correct.

7       Q.   And that's the -- the company that he put in

8   either 80- or $90,000; right?

9       A.   Correct.

10      Q.   And his money was --

11      A.   He says -- he said 90,000 --

12      Q.   Either 80 or 90.

13      A.   Okay.

14      Q.   Okay.  And his money was used to pay the

15  purchase price to Dr. Kistler; right?

16      A.   True.

17      Q.   Okay.  And this agreement, Paragraph (c), third

18  paragraph, do you see this?  It says, "Buyer is not

19  purchasing Seller's business or practice."

20           Do you see that?

21      A.   Buyer is not purchasing -- yes.

22      Q.   And then it says, "Buyer is buying the PrimCare

23  Contract, subject assumption, credential, and to the

24  limitations contained herein"; right?

25      A.   Correct.

113

REGAL

1    Q.   Okay.  So that was your agreement with

2  Dr. Kistler, that the company was buying the contract;

3  correct?

4    A.   Correct.

5    Q.   And it was buying the contract with

6  Mr. Hamadah's money?

7          MS. MOUSAVI:  I'm going to object to that.

8          THE WITNESS:  Kistler --

9          MS. MOUSAVI:  It's the company --

10         THE WITNESS:  Kistler did not care about who

11  was what.  But my -- the reason why we put that in

12  because what if PrimCare did not approve me as a

13  physician?  Then I would be paying Dr. Kistler for

14  nothing.

15  BY MR. COHEN:

16   Q.   All right.  And you provided a draft -- a

17  copy -- a draft copy of this agreement to Mr. Hamadah

18  before he put his money in the company; right?

19   A.   I'm sure he looked at, of course, yeah.

20   Q.   Okay.  And so you provided him the document

21  that shows that his -- the company was buying the

22  PrimCare contract; right?

23   A.   Uh-huh.

24   Q.   And you never told Mr. Hamadah that the company

25  wasn't really buying the contract, did you?

114

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1      A.    No.  But when you have malpractice insurance --
 2            MS. MOUSAVI:  Insurance.
 3            THE WITNESS:  Anytime you have that, you ask
 4   your malpractice insurance about anything that raises
 5   [sic].  And when they raised that, I called them and I
 6   told them, I have this issue.
 7            And their recommendation was, Since you got
 8   this letter of reprimand, you don't have to fight it.
 9   Just sign off.
10   BY MR. COHEN:
11      Q.    Okay.  And have you also been subject to
12   discipline in California?
13      A.    No.
14      Q.    You didn't have to pay a fine related to the
15   use of a fictitious name, did you not?
16      A.    Oh, yeah.  I'm sorry.  Yes.  Recently, after
17   you guys did submit that to the board.
18            MS. MOUSAVI:  A complaint.
19            THE WITNESS:  A complaint to the board.  And
20   they looked up that, and they reviewed it.  And they
21   gave me -- not a disciplinary.  It's not a discipline.
22   It's a citation.  There's a difference between citation
23   and disciplinary.  And citation because -- for the fact
24   that we're not -- we did not register the name of Walk-
25   In Urgent Care with them.
```

REGAL

  1  BY MR. COHEN:

  2      Q.   And also for violation of the professional

  3  practice statute; correct?

  4      A.   Well --

  5           MS. MOUSAVI:  Yeah, it was practicing --

  6           THE WITNESS:  Yes.

  7           MS. MOUSAVI:  -- with LLC.

  8           THE WITNESS:  With LLC, exactly.  Yes.

  9  BY MR. COHEN:

 10      Q.   Going back to the time when you first met

 11  Mr. Hamadah, did you ever talk about any -- any business

 12  matters?

 13      A.   Not at all.  I didn't know what he does.  I

 14  didn't know anything about him.  And I wasn't interested

 15  of [sic] making a relationship with him.  He was just

 16  acquaintance who basically introduced himself, and he

 17  appeared polite.  And that's it.

 18      Q.   Did you form any impression of his business

 19  acumen?

 20      A.   None.

 21      Q.   Did you form any impression regarding his

 22  education?

 23      A.   I could tell he's not educated.

 24      Q.   Do you know whether he had any experience as an

 25  investor?

125

REGAL

1    Q.   What is -- what is that?

2    A.   This is not my company.  This is a company

3  that's -- we -- I was actually leasing an office space

4  in Arizona with them.

5    Q.   Okay.

6    A.   And they went bankrupt or something like that.

7         MS. MOUSAVI:  See, you answered the question.

8  You need to stop.

9  BY MR. COHEN:

10   Q.   Are you familiar with a company called

11  TBF Financial, LLC?

12   A.   Yes.  Those are copy machine, like they hold --

13  they -- they lease copy machines.  And we were leasing a

14  copier machine from them.

15   Q.   Do you know an individual named Thomas Touhy,

16  T-O-U-H-Y?

17   A.   I don't recall his name.

18   Q.   Okay.  Okay.  When -- when did you first speak

19  to Mr. Hamadah after you were in jail?

20   A.   Mr. Hamadah, out of the blue, he showed up to

21  see me over there.  And he sympathized with me, telling

22  me that, I learn of what happened to you.  And although

23  at that time I was not in -- you know, friend with

24  Hamadah, but I appreciated him coming in.

25         And he told me that he was in the same boat,

129



 1  were accused of some attempt of -- in Chicago, of some

 2  Jewish temple involvement, and they put him in jail.

 3  Whatever.  And then he got released.  And he feels with

 4  me.  And he told me, By the way, I have -- I'm filing

 5  divorce with my wife, and she's filing a restraining

 6  order.  And things like that.

 7          So he started just coming in.  And he came

 8  probably a couple of times after that for the same

 9  reason.

10      Q.   Okay.  Did he tell you that he had been

11  contacted by someone who suggested that he get in touch

12  with you?

13      A.   No.  But when he first met me, he had -- a

14  person told him about me.  That person also -- I knew of

15  him.  And he told me that he learned from that person

16  that something happened to me, if I recall right.  So

17  that's why he came.

18      Q.   And who is that person?

19      A.   His name is Husam, and he lives in -- here in

20  California, although I've never seen him since I moved

21  to California.  But he's a person who basically lives in

22  California.

23      Q.   Okay.  And what's Husam's last name?  Do you

24  know?

25      A.   I forgot.

                                                          130



1  to make a settlement with you?

2       A.   They're not pushing.  But I requested, I

3  requested that basically if there's anything that need

4  to be done -- because to me friends matter.  And I don't

5  want basically to come in and become a person who did --

6  I want to do the right thing.  So I wanted to talk to

7  Hamadah.  Go there and say, Okay.  This is the

8  situation.  How can we civilly solve it?

9          And that's what I said in my e-mail to him, by

10 the way, that I sent, that you translated.  I made it

11 clear in the e-mail that I want to make sure that we

12 keep a good relationship and we solve it in a -- in good

13 terms.  We stay in good terms.

14      Q.   Okay.  Going back to -- to 2012, early 2013,

15 you considered Mr. Hamadah a very close friend, didn't

16 you?

17      A.   No.  In 2012?  No.

18      Q.   How about right in the mid -- beginning 2013?

19      A.   2013, I got basically acquitted.  And I went

20 with my father to his jewelry -- I didn't know anything

21 about him, where he lives, what he has, and things.  So

22 I went to his jewelry store, because they told me he had

23 a jewelry store, and I went there to thank him for being

24 there.  And, of course, I was astonished to see an empty

25 jewelry store with him sitting there.  He told me that

133

REGAL

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1      A.   When my -- after he stood by me -- I mean, I
 2   was definitely a person who -- coming out of a big
 3   crisis.  And we have a saying people who are drowning
 4   and they find a straw, they hang to the straw.  And to
 5   me this person was one of, you know, the straws.  That
 6   he proved that basically he is a kind guy at that time
 7   who stood by me.
 8          And he involved himself with my friends.  When
 9   my friends gathered to try to do something for me, they
10   invited him to be part of this.  And they basically
11   helped me out financially, and they included him with
12   that.  And I sent the same text to everyone.  So that
13   basically everyone who did this, I sent them the same
14   text.
15      Q.   Okay.  How many other people did you send --
16      A.   Six people.
17      Q.   Six?
18      A.   Yeah.
19      Q.   Rashid was one?
20      A.   Rashid was one.  And --
21      Q.   Who else?
22      A.   You need names?
23      Q.   Sure.
24      A.   Rashid.  Najib.  The third one was Jihad.  The
25   fourth one is Sam.  And the fifth one was Wajdi, his
```

135

REGAL

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

```
 1  $20,000.
 2      Q.   It's $240,000.
 3      A.   Okay.  So 220, 240 is pretty close considering
 4  the facts.
 5      Q.   Okay.
 6      A.   So it's not I'm asking for --
 7      Q.   All right.
 8      A.   -- half a million dollars.
 9      Q.   Okay.  This one is a yes-or-no question.  Do
10  you have an agreement, a written agreement, signed by
11  both of you that says Dr. Sannoufi gets a $220,000
12  salary?
13      A.   No.
14      Q.   Okay.  I do want to look at this, but it's not
15  overwhelmingly important.
16           MR. COHEN:  This is Exhibit 39.
17           (Exhibit No. 39 was marked for
18           identification.)
19  BY MR. COHEN:
20      Q.   Were there occasions -- well, first of all, do
21  you recognize this as an e-mail between -- the bottom
22  part is an e-mail between you and Coleen Hager with a
23  copy to Jamal regarding some expenses?
24      A.   Correct.
25           MS. MOUSAVI:  Please read the whole document
```
245

REGAL

1         for identification.)

2         THE WITNESS:  Thank you.

3   BY MR. COHEN:

4     Q.   Now, when you became licensed in California,

5   did you understand that you were obligated to comply

6   with California law?

7     A.   That's common sense.

8     Q.   Okay.  And you knew that there -- also common

9   sense, you understood that there were some rules about

10  how you would -- how you could go about conducting your

11  business; right?

12        MS. MOUSAVI:  Objection.  Assuming facts not in

13  evidence.

14        THE WITNESS:  I don't know what you exactly

15  mean.

16  BY MR. COHEN:

17    Q.   Well, you understood that -- that there must be

18  some rules that govern who could own a practice; who

19  could be a doctor; what you -- what you could do; what

20  you couldn't do?

21        MS. MOUSAVI:  Same objections.

22        THE WITNESS:  I as a physician know that HIPAA

23  and how to practice with HIPAA.

24  BY MR. COHEN:

25    Q.   Okay.

250

REGAL

1  anything to -- to determine what the rules were that you

2  needed to comply with?

3     A.   Exactly.  The lawyer.  That's what Mr. Nathan

4  was about.

5     Q.   So you --

6     A.   And that's why we hired him.

7     Q.   Okay.

8     A.   Otherwise, I would have drafted everything by

9  myself and not paid 750 to a lawyer just to look at

10  things and make sure it's legal.

11     Q.   Okay.  Now I'm going to show you Exhibit 41.

12  Do you recognize -- well, I'm sorry.

13        Have you ever seen Exhibit 41?  Or -- the

14  original has a color.

15     A.   No, I haven't seen that.

16     Q.   Okay.  I will tell you this is not the complete

17  set of laws.  This goes -- this is up through the end of

18  Section 2.  It goes on to some more sections.

19        Have you ever -- have you ever looked on the

20  medical board website to see if there's a Guide to the

21  Laws Governing the Practice of Medicine?

22     A.   No, I didn't.  But --

23     Q.   Okay.  And do you --

24        MS. MOUSAVI:  I'm sorry.  I think he wasn't

25  finished.

254



 1          THE WITNESS:  But after what happened I

 2   actually personally -- after when I got the citation, I

 3   contacted the medical board.

 4   BY MR. COHEN:

 5       Q.   Uh-huh.

 6       A.   And I requested that I would demand that they

 7   order CME for every doctor so they know those bylaws, so

 8   basically no one can get to do my mistake again.

 9       Q.   Okay.  But you'll agree with me that you could

10   have gone to the medical board website and found this

11   document and looked at it; right?

12       A.   No, because I would not think about it.

13       Q.   I didn't say that you would do.  I said you

14   could have done if it was there.

15          MS. MOUSAVI:  Objection.  Argumentative.

16          THE WITNESS:  I'm not sure, because I've never

17   been onto their website.

18   BY MR. COHEN:

19       Q.   All right.  Okay.  You never looked on the

20   state board --

21       A.   Particular those things, bylaws and things, I

22   never scrolled through them.  I never --

23       Q.   Okay.  You have gone on the website, but you

24   never scrolled down to see the -- the publication

25   regarding laws governing the practice of medicine; is

255

JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

 1    Q.   All right.  And that's based on the $750 you
 2  paid to Ethan Nelson?
 3    A.    Which it actually takes a doctor one minute to
 4  look at your throat and know if you have tonsillitis or
 5  you have something else.
 6           MS. MOUSAVI:  It's okay.  That's not --
 7           THE WITNESS:  So in a sense -- like -- that's
 8  why it's a lawyer.  So it's a lawyer.  It's not about --
 9           MS. MOUSAVI:  Objection.  Argumentative.  Stop
10  this.
11           MR. COHEN:  You're objecting to your own --
12           MS. MOUSAVI:  No.  I'm objecting to you.
13           MR. COHEN:  There's no -- there's no question
14  pending.  Okay?  There's no question pending.  Your
15  client is making a statement, and you objected.  That's
16  really funny.
17           MS. MOUSAVI:  Can you continue on.
18           MR. COHEN:  It's hilarious.
19           MS. MOUSAVI:  Well, you know what?  For a
20  change it's good to see you're not yelling at me.
21  BY MR. COHEN:
22    Q.   All right.  You'll agree with me that as a
23  licensed physician, you have an obligation to know the
24  law regarding the practice of medicine; correct?
25    A.    It's better to know.  But in reality no one

267

REGAL

1  knows all the laws.  You're talking about law, and this

2  is a very hard thing to accomplish.

3      Q.   All right.

4      A.   You have to know the basic thing that actually

5  makes sense.

6      Q.   Okay.  But it's not -- it's -- it's the

7  physician's obligation to know the law even if you don't

8  know every minute detail; right?

9      A.   No.

10         MS. MOUSAVI:  I'm going to object as

11  argumentative.

12         THE WITNESS:  It's not an obligation.  It's not

13  an obligation.

14  BY MR. COHEN:

15      Q.   Okay.  Do you believe you have any obligation

16  as a physician to comply with the law?

17      A.   I just told you.  Comply with every law that's

18  basically instructed by those entities to -- basically

19  to perform business.  Whether it's through the medical

20  board, what they tell you to do and -- or the -- you

21  know, the other agencies that basically come and check

22  everything in your office.

23      Q.   And that's your obligation as a physician;

24  correct?

25      A.   Of course, because --

268



JAMAL HAMADAH vs SAMER SANNOUFI, M.D.
Samer Sannoufi, M.D. on 12/19/2017

1      Q.   Okay.

2      A.   Yeah.

3      Q.   All right.  Give me a couple minutes.  I may be

4   done.  Okay?

5      A.   Okay.

6      Q.   Thank you.

7           Earlier in the deposition I asked you some

8   questions about communications that you had with

9   Ms. Mousavi regarding illegality.  Are you still

10  refusing to answer those questions?

11     A.   Yes.

12     Q.   I also had some questions regarding bankruptcy

13  schedules.  Are you still refusing to answer those

14  questions?

15     A.   Yes.

16     Q.   And I had some questions regarding the -- I

17  think regarding the lawsuit against Maricopa County.

18  Are you still refusing to answer those questions?

19     A.   Yes.

20          MS. MOUSAVI:  I thought he answered all the

21  questions about Maricopa County.  No?

22          MR. COHEN:  No.

23          MS. MOUSAVI:  I don't think that was one of

24  the -- he answered.  Do you remember you even asked how

25  much his settlement was, and he answered that?

www.regalcourtreporting.com
866-228-2685



From: ray@myusacorporation.com
Date: Tue, 21 May 2013 09:41:38 -0500
Subject: California LLC registration
To: sannoufi@gmail.com; gmnour@msn.com

As per our conversation earlier,

You will be able to register the company on behalf of anyone you need using our online application. You will want to please arrange with the team who will be signing the initial documents (if multiple owners, all owners will need to sign via their own email addresses, respectively).

For the initial application, on step 2, you will want to use the address where the documents will be delivered to, and the email address for the main point of contact please. :) It is ok if this is different than the business details, that will be added on step 3.

An LLC may elect to be taxed as an S-Corp if it desires so, this option is available on the application.

You can view the costs and options to register the LLC on the application for California LLC -
https://www.myusacorporation.com/form-llc/state/CA

Going by the minimum requirements, which involve the state filing fee, our $49 service fee, the state required operating agreement, Statement of Information, the cost is about $306.

* On the application, there is a (?) next to each line that offers a description and cost upfront. You can add or remove any services, such as optional expedite options, simply using the appropriate check-boxes.


Best regards,



*raymond***albert**
Sales Representative
MyUSAcorporation.com
Phone: 877-330-2677
Fax: 877-330-1035
E-mail: ray@myusacorporation.com



1

HAMADAH000041

**From:** Ghayda <gmnour@msn.com>
**Sent:** Monday, August 5, 2013 11:33 AM
**To:** Sam Sannoufi
**Cc:** jamalhamadah@msn.com
**Subject:** Re: REMINDER: Order #44189: Operating Agreement for WALK-IN URGENT CARE & FAMILY PRACTICE CLINIC LLC

I reviewed the documents and they made a mistake by not adding Dr. Sannoufi's name.
I contacted them and they will send another operating agreement.
For now they need the following information :

1) Please confirm  the percentage of ownership for each member in the LLC.
2) please let me know if you intend to list in the operating agreement any initial contributions- $0- is fine too

Sent from my iPhone

On Aug 5, 2013, at 10:37 AM, Sam Sannoufi <sannoufi@gmail.com> wrote:

Dr. Sam Sannoufi

Begin forwarded message:

**From:** Jamal Hamadah <jamalhamadah@msn.com>
**Date:** August 5, 2013, 10:08:10 AM MST
**To:** "sannoufi@gmail.com" <sannoufi@gmail.com>



1

**Subject: FW: REMINDER: Order #44189: Operating Agreement for WALK-IN URGENT CARE & FAMILY PRACTICE CLINIC LLC**

I don't under stand  y he send this ,, sallaaaam

*Caesar's Jewelry llc*
14202 N Scottsdale # 141 Scottsdale AZ 85254 Phone (602)863-0666
Jamalhamadah@msn.com
*www.caesarsjewelryllc.com*



---

From: dse@docusign.net
To: jamalhamadah@msn.com
Date: Sun, 4 Aug 2013 06:10:14 -0700
Subject: REMINDER: Order #44189: Operating Agreement for WALK-IN URGENT
CARE & FAMILY PRACTICE CLINIC LLC

Please review and sign your document



From:    Richard Mercedes (richard@myusacorporation.com)
My USA Corporation

Hello JAMAL HAMADAH,
Dear JAMAL HAMADAH,

Attached is the Operating Agreement we drafted for your company WALK-IN URGENT CARE & FAM
PRACTICE CLINIC LLC. Please read it CAREFULLY, and if you are satisfied with it please sign in all
designated spots.

View Documents

Alternately, you can access these documents by visiting docusign.com, clicking the
"Access Document" link, and using this security code:

00918406D37C4642A758AB5F672CFEBA1

DocuSign. The fastest way to get a signature.®

This message was sent to you by Richard Mercedes who is using the DocuSign Electronic Signature Serv
you would rather not receive email from this sender you may contact the sender with your request.

2

HAMADAH000482



**From:** Ghayda <gmnour@msn.com>
**Sent:** Monday, August 5, 2013 3:17 PM
**To:** Jamalhamadah@msn.com
**Subject:** Fwd: Asset Purchase Agreement

Hello Mr. Hamadah,

Please reply to this email, authorizing Mr. Ethan Nelson to run your credit card for the amount of $750.00 to the card information below.

Thank you

Sent from my iPhone

Begin forwarded message:

> **From:** Ethan Nelson <ethannelsonesq@gmail.com>
> **Date:** August 5, 2013, 1:50:38 PM PDT
> **To:** Sam Sannoufi <sannoufi@gmail.com>, Ghaida Kanawati <gmnour@msn.com>
> **Subject: Re: Asset Purchase Agreement**
>
> Sam:
>
>  I am writing to inform you that I will charge $750.00 to the card (information below) that you previously provided.  Please send a letter, signed and dated by Mr. Jamal Hamadeh, authorizing me to charge the card.
>
>  Name on the Card Jamal Hamadeh
> Discover 6011000576707487; Ex 10/15; Back no # 538;  14202 n Scottsdale rd #141;  Scottsdale az 85254
>
>  Let me know if you have any questions.
>
>  Sincerely,
>
>  Ethan Nelson



EXHIBIT

38

Sannoufi 12/9/17

HAMADAH000057

# The Law Office of Ethan H. Nelson

4 Park Plaza, Suite 1025
Irivne, CA 92614
Ph.: 949-229-0961
Fax: 949-861-7122

The information contained in this communication is confidential, is intended only for the use of the recipient named above, and is legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please resend this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

On Tue, Jul 30, 2013 at 2:28 PM, Sam Sannoufi <sannoufi@gmail.com> wrote:
Hi Ethan,
I did hear back from his lawyer, there are couple of mistakes typoI fixed and waiting to hear their final ok.
Thank you for checking.

Dr. Sam Sannoufi

On Jul 30, 2013, at 1:48 PM, Ethan Nelson <ethannelsonesq@gmail.com> wrote:

Dr. Sannoufi:

 Just writing to check in to see how the purchase is going?  Let me know if you have any questions or need additional help.

 I also wanted to let you know that I have not run your credit card for payment yet.  The company I used to set up my online payments through my website made a mistake in submitting paperwork, but it should be up and running in 48 hours.   I will send you an e-mail before I charge the $750.00 for my services.

Sincerely,

Ethan Nelson

# The Law Office of Ethan H. Nelson

4 Park Plaza, Suite 1025
Irivne, CA 92614
Ph.: 949-229-0961
Fax: 949-861-7122

2

HAMADAH000058

The information contained in this communication is confidential, is intended only for the use of the recipient named above, and is legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please resend this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.


On Thu, Jul 18, 2013 at 10:02 AM, Ethan Nelson <ethannelsonesq@gmail.com> wrote:
Dr. Sannoufi:

  Attached please find a copy of the Asset Purchase Agreement for the Riverside practice (in Word and PDF format).  As we discussed, I reviewed and amended the contract, which you drafted, to suit your needs for purchase.  I included a few provisions to protect you, namely an arbitration provision and an attorney's fees provision.  I also reworded the introductory paragraph, pursuant to our conversation, to ensure the purpose of this contract was clear between the parties.

  I also cleaned up some of the phrasing of the document you provided to me, spaced the paragraphs, and checked for typos and grammatical errors.  Other than that, I did not make any material alterations which wuld effect the contract you provided to me.

  As agreed, I will charge the card you provided $750.00 total for the services I performed.

  Please let me know if you have any questions.  Also, please confirm your receipt of this e-mail and attachments.

Sincerely,

Ethan Nelson

# The Law Office of Ethan H. Nelson

4 Park Plaza, Suite 1025
Irivne, CA 92614
Ph.: 949-229-0961
Fax: 949-861-7122

The information contained in this communication is confidential, is intended only for the use of the recipient named above, and is legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error,

3

please resend this communication to the sender and delete the original message
and any copy of it from your computer system. Thank you.

HAMADAH000060



Guide to the

# Laws Governing the Practice of Medicine

by Physicians and Surgeons

Medical Board of California • Seventh Edition: 2013



EXHIBIT

41

Cover illustration: RNA polymerase ll
David Bushnell, Ken Westover and Roger Kornberg, Stanford University

Guide to the

# Laws Governing the Practice of Medicine

by Physicians and Surgeons

Seventh Edition: 2013



Medical Board of California

# Contents

## The Medical Board of California . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Offices of the Medical Board of California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Section I: The Licensing Program . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1.1 General Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.2 License Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
1.3 Failure to Renew License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
1.4 Inactive Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
1.5 Reporting Address Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
1.6 Fictitious-Name Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
1.7 Medical Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
1.8 Continuing Medical Education (CME) Requirements . . . . . . . . . . . . . . . 13
1.9 Disclosure of Financial Interests in
      Health-Related Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
1.10 Prohibited Referrals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
1.11 Outpatient Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Section II: The Enforcement Program . . . . . . . . . . . . . . . . . . . . . . 19
2.1 General Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
2.2 Mandatory Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
2.3 Reporting Requirements for Peer Review Bodies . . . . . . . . . . . . . . . . . . . 22
2.4 Complaint and Investigative Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
2.5 Disciplinary Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
2.6 Competency Examinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Section III: Allied Health Care Professions . . . . . . . . . . . . . . . . . . 31
3.1 General Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## Section IV: Laws Relating to Other Health Care Personnel . . . . 39

## Section V: Laws Relating to Controlled Substances . . . . . . . . . . 46
5.1 The Drug Enforcement Administration (DEA) . . . . . . . . . . . . . . . . . . . . . . 47
5.2 Schedules of Controlled Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
5.3 Federal Registration of Practitioners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
5.4 Federal Registration of Interns, Residents, and Foreign-Trained Physicians
      Who Are Fellows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

5.5 Order Forms ............................................................ 51

5.6 Inventory ............................................................... 51

5.7 Records ................................................................. 51

5.8 Security/Storage ........................................................ 52

5.9 Discontinuation of Practice by a Physician ............................... 52

5.10 California Drug Laws ................................................... 52

5.11 Prescribing Controlled Substances ...................................... 53

5.12 Internet Prescribing ................................................... 53

5.13 Written Prescriptions for Controlled Substances ........................ 53

      Guidelines for Prescribing Controlled

      Substances for Intractable Pain .......................................... 55

      California Physicians and Medical Marijuana .............................. 61

**SECTION VI: Other Law and Information Pertaining to the Practice of Medicine ................................... 64**

6.1 Medical Records ........................................................ 65

6.2 Closing Your Medical Practice .......................................... 68

6.3 HIPAA Privacy Rule .................................................... 69

6.4 Physician-Patient Communication ....................................... 69

6.5 Births and Deaths ...................................................... 72

6.6 Reportable Conditions .................................................. 74

6.7 Cases Reportable to the County Coroner ................................. 80

6.8 The Physician's Responsibility to Give a Written Record of Immunization Administered ........................................................... 82

6.9 Identifying Potential Organ Donors ..................................... 83

6.10 Smallpox Vaccination .................................................. 83

**SECTION VII:  Other Information ......................... 84**

7.1 Proficiency Testing Requirement for Laboratory Tests Performed in Physician's Offices ..................................................... 85

7.2 Use of X-ray Equipment by Physicians .................................. 86

**SECTION VIII: Published Laws and Regulations ............. 87**

8.1 Required Use of Federal Vaccine Information Statements ................. 88

8.2 Ordering Government Publications ...................................... 89

**Index ............................................... 91**



# The Medical Board of California

**The Mission of the Medical Board of California**

The mission of the Medical Board of California is to protect health care consumers through the proper licensing and regulation of physicians and surgeons and certain allied health care professions and through the vigorous, objective enforcement of the Medical Practice Act, and, to promote access to quality medical care through the Board's licensing and regulatory functions.

# Offices of the Medical Board of California

**Executive Office**
2005 Evergreen Street
Suite 1200
Sacramento, CA 95815

**Standards & Training**
2005 Evergreen Street
Suite 1200
Sacramento, CA 95815

**Operation Safe Medicine**
160 E. Via Verde
Suite 245
San Dimas, CA 91773

**Probation North**
2535 Capitol Oaks Drive
Suite 225
Sacramento, CA 95833

**Probation South**
160 E. Via Verde
Suite 230
San Dimas, CA 91773

**Probation L.A. Metro**
12750 Center Court Dr. South
Suite 750
Cerritos, CA 90703

## Northern California Area

**Sacramento District Office**
2535 Capitol Oaks Drive
Suite 220
Sacramento, CA 95833

**Department of Consumer Affairs**
1625 North Market Boulevard
Sacramento, CA 95834

**Pleasant Hill District Office**
3478 Buskirk Avenue
Suite 217
Pleasant Hill, CA 94523-4326

**Fresno District Office**
1277 Alluvial Avenue
Suite 110
Fresno, CA 93720

**San Jose District Office**
1735 Technology Drive
Suite 800
San Jose, CA 95110-1313

## Los Angeles Metropolitan Area

**Cerritos District Office**
12750 Center Court Dr. South
Suite 750
Cerritos, CA 90703

**San Dimas District Office**
1370 South Valley Vista Drive
Suite 240
Diamond Bar, CA 91765-3923

**Glendale District Office**
320 Arden Avenue
Suite 250
Glendale, CA 91203

**Valencia District Office**
27202 Turnberry Lane
Suite 280
Valencia, CA 91355

## Southern California Area

**San Bernardino District Office**
464 West 4th Street
Suite 429
San Bernardino, CA 92401

**San Diego District Office**
4995 Murphy Canyon Road
Suite 203
San Diego, CA 92123

**Rancho Cucamonga District Office**
9166 Anaheim Place
Suite 110
Rancho Cucamonga, CA 91730

**Tustin District Office**
15641 Redhill Avenue
Suite 215
Tustin, CA 92780

# The Medical Board of California

## Foreword

This publication is a reference source on the federal and state laws and additional information which govern your medical practice. It is in summary form and should not be used in place of the laws themselves. For more information, the complete laws are in the California Business and Professions Code, Health and Safety Code, and other codes cited herein. Specific sections or articles of the law are cited in each chapter for your assistance and can be read online at www.leginfo.ca.gov/calaw.html.

This is the seventh edition of this Guide, and is current as of Winter 2012. Please retain this booklet for future reference. It has been designed to give you a summary of information that will assist you in your daily medical activities.

## Introduction to the Medical Board of California

The Medical Board of California is the state agency responsible for regulating physicians and surgeons and a number of other allied health professions. The Board is composed of 15 members (eight physicians and seven public members). Members are appointed by the Governor and the Legislature for terms of four years.

The Medical Board of California is one of 40 regulatory entities within the Department of Consumer Affairs.

Members of the Board meet as one deliberative body, giving all members of the Board knowledge about policy and statutes for both licensing and enforcement functions.

The Board's responsibilities include issuing licenses and certificates under the Board's jurisdiction; the enforcement of the disciplinary and criminal provisions of the Medical Practice Act; the administration and hearing of disciplinary actions; carrying out disciplinary actions appropriate to findings made by a panel or administrative law judge; suspending, revoking, or otherwise limiting certificates after the conclusion of disciplinary actions; reviewing the quality of medical practice carried out by physicians under the jurisdiction of the Board; and more. (BUSINESS AND PROFESSIONS CODE §2004)

(**Note:** Osteopathic physicians and surgeons (DOs) are licensed by the Osteopathic Medical Board of California - www.ombc.ca.gov.)

## SECTION I:
# The Licensing Program



# I. The Licensing Program

### 1.1  General Responsibilities

The Licensing Program of the Medical Board of California (Board) is primarily responsible for licensing physicians and surgeons and providing licensing verification services to the public and the medical community. In addition to licensing physicians, the program licenses midwives, registered dispensing opticians, contact lens and spectacle lens dispensers, research psychoanalysts, student research psychoanalysts and polysomnographic technologists, technicians, and trainees; approves accreditation agencies for accreditation of outpatient surgery settings, reviews and approves non-ABMS specialty boards, issues fictitious name permits for medical businesses, and approves licensing exemptions for medical school faculty appointments.

Each year, the licensing program staff performs more than one million license verifications and issues more than 5,000 new physician licenses.

### 1.2  License Renewal

A license to practice medicine in California must be renewed every two years. It is illegal to practice medicine with an expired license. The license expires at midnight on the expiration date, which is the last day of the birth month of the physician.

To renew a license, the physician must apply within 90 days of the expiration date, allowing eight weeks for processing. The renewal must be on the Board's renewal form and must include the current renewal fee. The license must be renewed before the expiration date regardless of whether a renewal form has been received. At the time of initial licensure, and each time the licensure is renewed, physicians must complete a mandatory physician survey (BUSINESS AND PROFESSIONS CODE §§2425.1 and 2425.3). The purpose of the survey is to gain a better understanding of the physician workforce in California and assist consumers in making more informed decisions when choosing a physician.

> The license expires at midnight on the last day of the month in which the physician was born.

> Physicians must complete a survey when the license is renewed.

Section I

Other renewal requirements include certifying under penalty of perjury that the applicants have completed an average of 50 hours of approved continuing medical education during the renewal cycle, and disclosing the names of all health-related facilities in which they or their family have a financial interest (Refer to sections 1.8 and 1.9 of this guidebook for additional information).

Forms, information about current renewal fees, and other renewal requirements may be obtained by contacting the Medical Board of California at

**A retired physician may not practice medicine.**

2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
(800) 633-2322 (California only), (916) 263-2382
www.mbc.ca.gov

**A physician may be exempt from paying a renewal fee if he or she meets one of the following requirements and notifies the Board accordingly:**

A. Military Status
A licensee with military status requires full-time employment in active service or training in the U.S. Army, Navy, Air Force, Marines, or U.S. Public Health Service (BUSINESS AND PROFESSIONS CODE §2440).

B. Retired Status
A retired licensee is exempt from payment of renewal fee and continuing medical education, but cannot engage in the practice of medicine (BUSINESS AND PROFESSIONS CODE §2439).

C. Disabled Status
Any licensee who demonstrates to the satisfaction of the Board that he or she is unable to practice medicine due to a disability may request a waiver of the license renewal fee. A physician with disabled status may return to work once it has been established that the disability either no longer exists or no longer affects the physician's ability to safely practice medicine, or upon signing an agreement with the Board limiting practice in the manner prescribed by the reviewing physician (BUSINESS AND PROFESSIONS CODE §2441).

D. Volunteer Status
Voluntary license status is for the sole purpose of providing voluntary, unpaid service (BUSINESS AND PROFESSIONS CODE §2442).

### 1.3  Failure to Renew License

Practicing medicine without a valid license may lead to disciplinary action against a physician.

A physician who practices with an expired license may be subject to a citation and fine from the Board. There is no grace period. On the date a license expires, the status is changed to "delinquent" if a renewal application has not been processed nor fees paid. If a license has not been renewed within 30 days following the expiration date, the Licensing Program will notify the physician by certified mail.

If a license is renewed more than 90 days following the expiration date, the licensee is required to pay a penalty fee equal to 50 percent of the renewal plus a delinquency fee equal to 10 percent of the renewal fee, in addition to the renewal fee. The renewal of an expired license within six months from date of expiration is retroactive to the expiration date (BUSINESS AND PROFESSIONS CODE §§2424 and 2435).

> A physican who practices with an expired license may be cited and fined by the Medical Board.

After a license has been in "delinquent" status for five years, the license is automatically canceled. A canceled license may not be reactivated. The physician must apply for a new license and meet the current licensure requirements.

### 1.4  Inactive Licenses

Physicians who want to retain a license while not actively engaged in their profession may apply for an inactive license. Applications are available from the Licensing Program (refer to §1.2 for address). An inactive license must be renewed at the same time and with the same fee as an active license.

A physician who holds an inactive license may not practice medicine in California. The holder of an inactive license need not comply with continuing medical education requirements (CME) until he or she wishes to restore the license to active status. At that time, the physician must have completed 50 CME units (the number of continuing medical education units required for a single license renewal period), including any specific types of required units (BUSINESS AND PROFESSIONS CODE §704). For additional information, visit the Board's Web site at www.mbc.ca.gov/licensee/inactive_license.html

Section I

## 1.5 Reporting Address Changes

California law requires physicians to report to the Board, within 30 days, any change of address. If the new address is a post office box, the licensee is required by law to provide the Board with a separate street address which will be kept confidential. Reporting an address change can be completed online or in writing using a Change of Address Form, which can be obtained on the Board's Web site: http://www.mbc.ca.gov/licensee/address_record.html. When filling out the form, include both old and new addresses, license number and signature to assure correct identification (BUSINESS AND PROFESSIONS CODE §2021), and send to the Board's Sacramento headquarters at:

*Physicians must report any change of address within 30 days of moving.*

Medical Board of California
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815

Note: Current address of record and complete physician profile can be checked at www.mbc.ca.gov under Check Your Doctor. Any address listed as the address of record is public record and will be displayed on the Board's Web site.

## 1.6 Fictitious-Name Permits

Sole proprietors, partnerships, groups, and medical corporations intending to use a fictitious name for their practices must first register the name and obtain a fictitious-name permit from the Board prior to its use. The name may not be deceptive, misleading, or confusing. The initial permit fee is $50. The biennial renewal fee is $40 (BUSINESS AND PROFESSIONS CODE §§2415 and 2443). For additional information, visit the Board's Web site at www.mbc.ca.gov/licensee/fictitious_name.html.

## 1.7 Medical Corporations

After the formation of a professional medical corporation, there is no requirement to obtain a "certificate of registration" from the Board, which is a common requirement for some other professions (CORPORATIONS CODE §13401). Refer to §1.6 for additional information on corporations.

You should contact the California Secretary of State if you are looking for information regarding:

The Secretary of State can be reached at:

California Secretary of State
1500 11th Street
Sacramento, CA 95814
(916) 653-6814

Visit the California Secretary of State's Web site at
http://www.sos.ca.gov/business/business.htm

### 1.8  Continuing Medical Education (CME) Requirements

California physicians must meet the Board's standards for continuing medical education to renew their licenses. The following is an overview of the Board's requirements, audits, and coursework.

For additional information on CME, visit the Board's Web site at www.mbc.ca.gov/licensee/continuing_education.html.

Briefly, the CME requirements are:

#### A.  Required Hours

Physicians must complete an average of 50 hours of approved CME during the renewal cycle, i.e., the two-year period immediately preceding the expiration date of the license.

All physicians also must complete a mandatory, one-time requirement of 12 hours continuing education in pain management and the treatment of terminally ill and dying patients (BUSINESS AND PROFESSIONS CODE §2190.5). A list of courses meeting the pain management requirement is listed at the Web site address mentioned in §1.8 above.

Additionally, all general internists and family physicians who have a patient population of which over 25 percent are 65 years of age or older must complete at least 20 percent of all mandatory CME in a course in the field of geriatric medicine or the care of older patients (BUSINESS AND PROFESSIONS CODE §2190.3).

> A physician's license cannot be renewed until 50 hours of approved CME have been completed.

#### B.  Reporting Requirements

Each time the license is renewed, the physician must certify completion of the CME requirements.

A physician who cannot certify compliance with the CME requirement must apply for and receive a waiver. Waivers must be based on either disability, military service, or undue hardship. Applications for a waiver are available from the Licensing Program, and on the Board's Web site: www.mbc.ca.gov/forms/cme-1w.pdf

Any physician who submits an application for a waiver which is denied by the Board must bring all CME requirements current before a license renewal can be issued (TITLE 16, CALIFORNIA CODE OF REGULATIONS §1338) (www.oal.ca.gov/ccr.htm).

It is unprofessional conduct, which may result in disciplinary action or a citation and fine, for any physician to misrepresent his or her compliance with the CME requirement.

Section I

## C. CME Audits

Each year the Board audits a random sample of physicians who have reported compliance with the CME requirement. Those physicians selected for audit must document their compliance with the CME requirement.

Any physician who has been certified as complying with the CME requirement by either the California Medical Association (CMA) or the American Academy of Family Physicians (AAFP) will not be required to submit documentation or records of CME coursework completed, but instead may request the records be directly submitted to the Board from those organizations.

**The Medical Board annually audits a random sample of physicians to ensure compliance with the CME requirement..**

## D. Acceptable Continuing Medical Education

**The following programs and courses are accepted by the Board for continuing medical education credit:**

1. Programs or courses that qualify for Category 1 credit from the California Medical Association or the American Medical Association.

2. Programs or courses that qualify for prescribed credit from the American Academy of Family Physicians.

3. CME that meets Title 16, California Code of Regulations §1337 (d-f):

   (d) Any physician who takes and passes a certifying or recertifying examination administered by a recognized specialty board shall be granted credit for four consecutive years (100 hours) of continuing education credit for relicensure purposes. Such credit may be applied retroactively or prospectively.

   (e) A maximum of sixty hours of continuing education shall be granted to a physician for receiving the Board's Physician Humanitarian Award.

   (f) A maximum of six hours of continuing education shall be granted for each month that a physician is engaged in an approved postgraduate residency training program or approved clinical fellowship program accredited by the Accreditation Council for Graduate Medical Education (ACGME) for relicensure purposes.

## E. Note for Physicians on CME Coursework

The California Legislature has directed the Board to consider the inclusion of courses in the following subjects in the continuing medical education requirement for physicians. The Board does not require specific continuing medical education coursework in these subjects at present. However, physicians are encouraged to voluntarily seek continuing education in these areas:

The Licensing Program

- Human sexuality
- Child abuse detection and treatment
- Acupuncture
- Nutrition
- Elder abuse detection and treatment
- Early detection and treatment of substance abusing pregnant women
- Special care needs of drug addicted infants
- Spousal or partner abuse detection or treatment
- End-of-life care
- Geriatric pharmacology
- Pain management

    (BUSINESS AND PROFESSIONS CODE §2191)

> All CME courses must include cultural and linguistic competency related to medicine.

## F. Cultural and Linguistic Competency

Commencing July 1, 2006, all continuing medical education courses must contain curriculum that includes cultural and linguistic competency in the practice of medicine (BUSINESS AND PROFESSIONS CODE §2190.1 (b)(1)). Cultural competency is defined in law as a set of integrated attitudes, knowledge, and skills that enables a healthcare professional or organization to care effectively for patients from diverse cultures, groups, and communities. At a minimum, cultural competency is recommended to include the following:

- Applying linguistic skills to communicate effectively with the target population
- Using cultural information to establish therapeutic relationships.
- Eliciting and incorporating pertinent cultural data in diagnosis and treatment
- Understanding and applying cultural and ethnic data to the process of clinical care

Linguistic competency is defined in law as the ability of a physician to provide patients who do not speak English or who have limited ability to speak English, direct communication in the patient's primary language (BUSINESS AND PROFESSIONS CODE §2190.1(c)(2))

A review and explanation of relevant federal and state laws and regulations regarding linguistic access include, but are not limited to, the federal Civil Rights Act (42 U.S.C. SEC. 1981, ET SEQ.), Executive Order 13166 of August 11, 2000 of the President of the United States, and the Dymally-Alatorre Bilingual Services Act (CHAPTER 17.5 (COMMENCING WITH §7290) OF DIVISION 7 OF TITLE 1 OF THE GOVERNMENT CODE).

Section I

## 1.9 Disclosure of Financial Interests in Health-Related Facilities

Existing law requires physicians to report any financial interest in specified health-related facilities held by them or by members of their immediate families.

At the time of license renewal, physicians must report this information on the renewal application form. Failure to complete the reporting sections will result in a delay of the renewal.

**"Health-related facilities" are defined in this law as those which provide any of the following eight services:**

1. Clinical laboratory services
2. Radiation oncology
3. Physical therapy
4. Physical rehabilitation
5. Psychometric testing
6. Home infusion therapy
7. Diagnostic imaging
8. Outpatient surgery centers
   (BUSINESS AND PROFESSIONS CODE §2426)

*Physicans are required to report any financial interest in health-related facilities.*

## 1.10 Prohibited Referrals

Another law relating to financial interests in health-related facilities makes it unlawful for a physician to refer a patient to a facility which provides any of the services listed in 1–8 above, if the physician or his or her immediate family has a financial interest in the facility which receives the referral. Patient referrals to facilities in which there is a financial interest, and which provide services other than the services described above, are permitted if the physician first discloses the financial interest in writing to the patient at the time of referral, and advises the patient that he or she is free to go elsewhere for the services (BUSINESS AND PROFESSIONS CODE §654.2).

Violation of the no-referrals law by a licensee is unprofessional conduct, and a cause for disciplinary action. Exceptions to the statute relating to patient referrals are included in Business and Professions Code §650.02 (BUSINESS AND PROFESSIONS CODE §652).

It may be difficult for a physician to determine whether or not he or she is required to disclose a particular financial interest. In some cases, exceptions in the law may further blur disclosure requirements. Physicians who need additional guidance should seek independent legal counsel for assistance.

The Licensing Program

### 1.11 Outpatient Surgery

Surgery performed in outpatient settings under anesthesia that places patients at risk of losing their life-preserving protective reflexes can only be performed in a licensed, certified or accredited setting.

The setting must be one of the following:

- An ambulatory surgical center that is certified to participate in the Medicare program under Title XVIII of the federal Social Security Act.
- Tribal clinic located on land recognized as tribal land by the federal government.
- Directly operated by the federal government
- Primary care clinic licensed by the California Department of Health Care Services
- Facility licensed as a general acute care hospital
- Facility used by dentists or physicians as prescribed in Health and Safety Code §1248.1
- Accredited by an accreditation agency approved by the Board

Failure to comply with the law is unprofessional conduct and could result in disciplinary action (BUSINESS AND PROFESSIONS CODE §2216).

> **Violation of the no-referrals law is a misdemeanor and may result in disciplinary action.**

> **Accreditation is granted by an accreditation agency, not by the Medical Board.**

The law also requires outpatient settings to:

- Post a plan of correction to violations for public view.
- Remove certificates of accreditation if suspended, revoked, or if accreditation is denied.
- Disclose a full report of denial if applying for accreditation with a different agency.
- Add in vitro fertilization facilities to the definition of outpatient setting.
- Submit for approval a detailed plan, standardized procedures, and protocols to be followed in the event of serious complications.
- Comply with corrective action within a time frame specified by agency (BUSINESS AND PROFESSIONS CODE §2023.5).
- Filing report after peer review final decision/recommendation. Grounds for disciplinary action (BUSINESS AND PROFESSIONS CODE §805.01).

Outpatient settings do not apply to the Board for accreditation, but to an approved accreditation agency. The agencies listed on the Board's Web site at **www.mbc.ca.gov/outpatient_surgery.html** have been approved.

Section I

Pursuant to SB 100, effective January 1, 2012, Health and Safety Code Section 1248.2(b)(c) and (d) provides that the Board shall obtain and maintain a list of accredited outpatient settings from the information provided by the accreditation agencies approved by the Board. The Board shall notify the public, by placing the information on its Internet Web site, whether an outpatient setting is accredited or the setting's accreditation has been revoked, suspended, or placed on probation, or the setting has received a reprimand by the accreditation agency.

The list of outpatient settings shall include all of the following:

1. The name, address, and telephone number of any owners, and their medical license numbers.

2. The name and address of the facility.

3. The name and telephone number of the accreditation agency.

4. The effective and expiration dates of the accreditation.

Accrediting agencies approved by the Board shall notify the Board and update the Board on all outpatient settings that are accredited.

SECTION II:
# The Enforcement Program



Section II

## II. The Enforcement Program

### 2.1 General Responsibilities

The responsibilities of the Enforcement Program include:

- Receive, review, and evaluate complaints and other information relating to the practice of licensees
- Investigate the circumstances relating to complaints to determine whether the laws relating to physician practice have been violated
- Review proposed stipulated decisions and decisions following administrative hearings, and other disciplinary matters
- Carry out disciplinary action pursuant to final decisions
- Administer a program to oversee physicians on probation

> **The Board makes final decisions on disciplinary matters.**

For disciplinary matters, the Board has the authority to make final decisions on cases (BUSINESS AND PROFESSIONS CODE §2227).

### 2.2 Mandatory Reporting

Required reporting to the Medical Board:

1. **Death In Outpatient Surgery Setting** (BUSINESS AND PROFESSIONS CODE §2240(A))
2. **Peer Review/Health Facility Reporting** (BUSINESS AND PROFESSIONS CODE §805)
3. **Insurers' Report of Settlement, Judgment, or Arbitration Award** (BUSINESS AND PROFESSIONS CODE §801.01)
4. **Reporting Requirements for Coroners** (BUSINESS AND PROFESSIONS CODE §802.5)
5. **Reporting Requirements for Prosecutors' Court Clerks** (BUSINESS AND PROFESSIONS CODE §§801.01, 803.5 AND 803.6)
6. **Report of Charge of Felony, or Conviction of Felony or Misdemeanor** (BUSINESS AND PROFESSIONS CODE §802.1)
7. **Reports of Liability Insurers**
8. **Other Mandatory Reporting** (see Section VI of this book)

Medical malpractice reports against licensees come from several sources, each mandated to report to the Board by separate sections of the Business and Professions Code.

Some sources and code sections are:

**Professional Liability Insurers (§801.01):** Insurers are required to report to the Board every settlement over $30,000 or arbitration/judgment of

any amount in a claim or action for damages for death or personal injury caused by a physician's negligence, error or omission in practice, or rendering of unauthorized professional services. Such reports must be sent within 30 days of the settlement, award or judgment.

**Self-Insured Employers of Physicians (§801.01(c)):**
This requires all agencies, private, state or local government, that self-insure physicians to report all settlements over $30,000 for damages for death or personal injury caused by a physician's negligence, error, or omission in practice, or rendering unauthorized professional services, and a party to the settlement is an entity in which the licensee is employed, contracted, or has ownership interest.

**State or Local Government Agencies that Self-Insure Physicians (§801.01(b)):**
This requires state or local government agencies that self-insure physicians to report all settlements over $30,000 for damages for death or personal injury caused by negligence, error, or omission in practice, or rendering unauthorized professional services, and a party to the settlement is an entity in which the licensee is employed, contracted, or has an ownership interest.

**Uninsured Licensee or their Counsel (§801.01(b)(2)):** This requires an uninsured physician or his/her attorney to report settlements or awards of the type described above.

**Clerks of the Court (§803):** Clerks of the court are required to report a medical malpractice judgment against a physician of any amount, or any criminal conviction.

**Penalties for non-reporting (§801.01):** Failure by either the physician or their counsel to report malpractice actions is a public offense punishable by a fine which could range from $50 to $500. An intentional failure to comply with the reporting requirement could result in a fine of $5,000 to $50,000.

Other entities required by the Business and Professions Code to make reports about physicians are:

**Physicians (§802.1):** Physicians and surgeons must report any indictment or information charging a felony, or any felony or misdemeanor conviction, to the Board, in writing, within 30 days. Failure to make a report is a public offense, punishable by a fine not to exceed $5,000.

**Coroners (§802.5):** A coroner must report a death that may be the result of a physician's gross negligence or incompetence.

Section II

**Prosecuting Attorney Agencies (§803.5):** The district attorney, city attorney, or other prosecuting agency must notify the Board of any filing charging a felony against a licensee. If the charges end in a conviction, the court clerk is obligated to report that conviction to the relevant board.

**Court Clerks (§803.6):** Additionally, the clerk of the court must transmit any felony preliminary hearing transcript concerning a defendant licensee to the Board.

**Health Facility/Peer Review (§805.01):** Requires the chief of staff of a medical or professional staff or other chief executive officer, medical director or administrator of any peer review body & the CEO or administrator of any licensed healthcare facility or clinic to files a report with the Board after a peer review makes a final decision or recommendation regarding the disciplinary action, resulting in a final proposed action to be taken against a licentiate based on the peer review body's determination.

Required reporting to the Office of Statewide Health Planning and Development (OSHPD):

Physicians must report both a patient death that occurred as a result of a procedure performed in an outpatient setting and a procedure performed in an outpatient surgery setting that requires transfer to an acute care hospital for emergency medical treatment (BUSINESS AND PROFESSIONS CODE §2240).

These forms can be downloaded from the Board's Web site at www.mbc.ca.gov, click on *Forms*, and click on the appropriate form.

> Patient deaths as a result of outpatient procedures must be reported, even if the patient was transferred to an emergency room for further treatment.

> California law specifies which unprofessional actions must be reported to the Board by hospitals and peer review bodies.

## 2.3  Reporting Requirements for Peer Review Bodies

Section 805 of the Business and Professions Code requires hospitals and specified peer review bodies to report certain adverse actions to the Board, and also specifies what information can be released by the Board. The law requires the chief executive officer or the chief of the medical staff of a hospital or similar institution to report to the Board all actions taken against physicians, which deny, restrict for 30 days or more in a 12-month period, or terminate staff privileges for medical disciplinary cause or reason. If the termination or restriction occurred due to a resignation or other voluntary action following notice of an impending investigation, that also must be reported. Failure to make the required report is punishable by a fine of not more that $50,000, or, if the failure was intentional, a fine of not more than $100,000.

A report must be made to the Board within 15 days of the action. The report must contain:

- The name and license number of the licensee involved.
- A description of the facts and circumstances of the medical disciplinary cause or reason.
- Any other relevant information deemed appropriate by the person making the report.

Reporting this information does not constitute a waiver of confidentiality of medical records and committee reports. Persons making a report under this section are exempted by law from civil or criminal liability as a result of making the report.

Hospitals and other health facilities must ask the Board if a health facilities report (805 report) has been filed against each licensee under consideration, prior to granting or renewing staff privileges to physicians, or specified healthcare providers (BUSINESS AND PROFESSIONS CODE §805.5).

If an 805 report exists, the Board is required to provide a copy to the health facility within 30 working days. If the Board does not respond within 30 working days, the facility may process the application without regard to any 805 report. All decisions regarding staff privileges remain entirely at the discretion of the health facility. The law requires only that information be obtained from the Board regarding reports from other facilities before a facility makes a final decision. Failure by the health facility to request such information is a misdemeanor.

The reporting requirements are intended to facilitate information sharing among health facilities regarding the qualifications and performance of health professionals. The goal is to enhance the quality of health care by assisting facilities in making informed decisions about providers of care.

Most forms for filing reports under the above sections, with the exception of §802.1, can be downloaded from the Board's Web site at www.mbc.ca.gov, click on *Forms*, and click on the appropriate form.

> The reporting requirements allow health facilities to share information about the qualifications and performance of health professionals.

## 2.4 Complaint and Investigative Process

Anyone may file a complaint, preferably in writing, to:

Central Complaint Unit: Medical Board of California
2005 Evergreen Street, Suite 1200, Sacramento, CA 95815
Or by calling toll-free: 800-MED BDCA (1-800-633-2322) (CA only) or (916) 263-2382.

Additionally, a Consumer Complaint form may be obtained from the Board's Web site at www.mbc.ca.gov

Section II

## A. Complaints

The Board provides forms on which members of the public, physicians or other healthcare professionals, may file written complaints (BUSINESS AND PROFESSIONS CODE §800(b)). The complaint and all accompanying documentation are reviewed by a consumer services analyst and a medical consultant, if applicable, to determine if possible violations of the Medical Practice Act exist that warrant further action.

If a physician is considering filing a complaint against another physician, the complaint can be filed anonymously—although anonymous complaints are more difficult to investigate.

**Medi-Cal providers must give patient records to Department of Health Care Services investigators, if requested.**

## B. Complaints Outside the Board's Jurisdiction

Not all complaints filed against physicians are within the jurisdiction of the Medical Board. If it is determined that a complaint is not within its jurisdiction, the Board will refer the complaint information to the appropriate agency.

**For example:**

- **Ethical matters that do not violate the law:** referred to county medical societies.
- **Fee disputes where fraud or other illegal activity is not involved:** referred to county medical societies.
- **Health facility complaints:** referred to the California Department of Public Health
- **Managed care complaints (involving HMOs, PPOs, etc.):** referred to the Department of Managed Health Care.

## C. Medi-Cal Violations

The Board does not generally have jurisdiction in Medi-Cal disputes except insofar as a physician may be involved in a violation of the Medical Practice Act. Investigation of Medi-Cal fraud or other misuse of the Medi-Cal program is the responsibility of the Department of Justice.

**For information, contact:**
The Bureau of Medi-Cal Fraud and Elder Abuse
P.O. Box 94425
Sacramento, CA 94244-2550
(800) 722-0432 or visit the Web site: oag.ca.gov/bmfea

Medi-Cal providers are required to furnish patient records to the Department of Health Care Services' investigators on demand (WELFARE AND INSTITUTIONS CODE §14124.2). Failure to comply may result in the physician's suspension from the Medi-Cal program. Furthermore, such failure or refusal to comply may constitute

unprofessional conduct as defined in the Medical Practice Act and, therefore, may result in disciplinary action by the Board. Likewise, Medi-Cal fraud is a violation of the Medical Practice Act.

### D. The Investigative Process

The Board investigates complaints or reports which may involve a violation of the Medical Practice Act. Investigations are conducted by investigators, in consultation with deputy attorneys general, medical consultants, and medical experts. The initiation of an investigation is not evidence of wrongdoing.

> An investigation is not a conviction; a person is presumed innocent unless proven otherwise.

It is unprofessional conduct for the repeated failure by a physician, in the absence of good cause, to attend and participate in an interview scheduled by the mutual agreement of the physician and the Board. This subdivision only applies to physicians who are the subject of an investigation by the Board (BUSINESS AND PROFESSIONS CODE §2234(h)).

### E. Medical Records

Business and Professions Code §2266 requires physicians to maintain adequate and accurate medical records. This documentation may prove critical in the event a complaint is filed against a physician. For more information on medical records, refer to section 6.1 of this Guide.

> California law requires that physicians keep complete and accurate records.

### F. Corporate Practice of Medicine

"Corporations and other artificial entities shall have no professional rights, privileges, or powers" (BUSINESS AND PROFESSIONS CODE §2400). BUSINESS AND PROFESSIONS CODE §2052 defines the practice of medicine as "Any person who practices...advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted...or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder..." The policy expressed in these sections against the corporate practice of medicine is to prevent unlicensed persons from interfering with or influencing the physician's professional judgment.

Ownership of a medical practice is largely limited to physicians. Partial or full ownership of a physician's practice by lay persons is prohibited. Business and Professions Code §2400 and similar laws apply to privately held, partnership, and incorporated practices, except that the law (CORPORATIONS CODE §§13400-13410; THE MOSCONE-KNOX PROFESSIONAL CORPORATION ACT) allows some non-physician licensed health professionals to own up to 49 percent of the shares in a professional medical corporation.

Section II

The following types of medical practice ownership and operating structures are also prohibited:

- Non-physicians operating a business for which physician ownership and operation are required: any business advertising, offering, and/or providing patient evaluation, diagnosis, care, and/or treatment—services that can only be offered or provided by physicians.
- Physician(s) operating a medical practice as a limited liability company.
- Management Service Organizations arranging for, advertising, or providing medical services rather than only providing administrative staff and services for a physician's medical practice (non-physicians exercising controls over physician medical practices, even where physicians own and operate the business).
- A physician acting as "medical director" when physicians do not own the practice. For example, a business offering spa treatments that include medical procedures such as Botox injections and laser hair removal that contracts with a physician to be its "medical director."

**A non-physician may not own any part of a physician's practice.**

**In the above examples,** non-physicians would be involved in the unlicensed practice of medicine, and the physician may be aiding and abetting the unlicensed practice of medicine.

**The Board's policies regarding the corporate practice of medicine exist to prevent unlicensed people from interfering or influencing a physician's professional judgment.**

**The following are examples** of some of the types of behaviors and subtle controls that the corporate practice doctrine is intended to prevent. From the Board's perspective, the following health care decisions should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person:

- Determining what diagnostic tests are appropriate for a particular condition.
- Determining the need for referrals to or consultation with another physician or specialist.
- Responsibility for the ultimate overall care of the patient, including treatment options available to the patient.
- Determining how many patients a physician must see in a given period of time or how many hours a physician must work.

## G. Review of Records by the Investigator

Patients are entitled to confidentiality of their medical records and doctor-patient communications. There are statutory exceptions, including requirements of physician reports regarding child and elder abuse, communicable diseases, pesticide poisonings, and so forth, and Board investigations (BUSINESS AND PROFESSIONS CODE §2225) (refer to section 6.6 of this guidebook).

Board investigators have peace officer authority (Penal Code §830.3). The Board may secure patient medical records in any of three ways: 1) through securing a properly executed patient release of records; 2) with a search warrant; or, 3) with a subpoena duces tecum. BUSINESS AND PROFESSIONS CODE §§2225 and 2225.5 require the production of records within 15 days, and provide for a civil penalty of $1,000 per day for a physician's failure to comply.

The Board is a state regulatory and oversight agency and therefore exempt from the usual requirements of HIPAA.

## H. Citation and Fine

Under regulations adopted in 1994, the Board may issue administrative citations for technical violations of the law or regulations. Along with the citation, the Board may impose a fine of not more than $5,000 per violation. A citation is not considered discipline, but is publicly disclosed on the Board's Web site.

## I.  Formal Accusation

If an investigation produces evidence that a physician appears to have violated the Medical Practice Act, the Board transmits the case file to the Health Quality Enforcement Section (HQES) of the Office of the Attorney General. An attorney in the HQES drafts a formal accusation (the name of the charging document), and represents the Board in any subsequent disciplinary process. The information contained in a formal accusation is public record.

Not all alleged violations result in an accusation. Some offenses may be resolved through a public letter of reprimand (BUSINESS AND PROFESSIONS CODE §2233), citation and fine, or other actions.

By law, a physician has a right to a hearing when formal charges are filed. There are legal protections available to the physician that can best be pursued with the assistance of an attorney experienced in medical-legal matters.

If the physician chooses to contest the charges in an accusation (i.e., defend against them), he or she may request an administrative hearing conducted by an administrative law judge. The hearing will result in a proposed decision that is submitted to the Board for a final decision.

The Board must act on the proposed decision within 100 days, and may adopt it, modify it, or substitute an alternate decision. If the Board wishes to impose a more stringent order, each member participating in the decision must read the transcript of the hearing and deliberate on the decision. Final decisions are public record.

**Technical violations of the law may result in administrative citations.**

**Medical records and doctor-patient communications are confidential.**

**Citations issued by the Medical Board are not disciplinary actions but will be disclosed on the public Web site.**

Section II

Prior to the hearing, the physician may be offered an opportunity to negotiate a resolution to an accusation—in effect, to plea bargain. If this is done, a proposed stipulated decision is prepared by the parties and submitted to the Board. As with a decision after hearing, the Board may adopt the stipulated decision or make changes. The proposed changes then will be offered to the physician. If an outcome satisfactory to both sides cannot be negotiated, the case will proceed to hearing.

## 2.5 Disciplinary Actions

**Information in formal accusations is public record.**

### A. Discipline of a Physician's License by the Board

(BUSINESS AND PROFESSIONS CODE §2227)

Disciplinary action taken against a physician's license may take any of the following forms:

**By law, a physician has a right to a hearing when formal charges are filed.**

- Revoking a license.
- Suspending a license for a period not to exceed one year.
- Placing a physician's license on probation and restricting or limiting the scope or type of practice.
- Imposing as part of probation additional requirements such as undergoing psychiatric treatment, obtaining additional clinical training or education, or practicing under supervision.
- Issuing a public reprimand.

### B. Disciplinary Guidelines

The Medical Practice Act mandates, among other things, that the Board "shall promulgate recommended uniform disciplinary measures for particular situations." The Board's *Manual of Model Disciplinary Orders and Disciplinary Guidelines* are codified in Title 16, California Code of Regulations §1361, and available on the Board's Web site.

The guidelines are for the intended use of those involved in the physician disciplinary process:

- Administrative law judges.
- Defense attorneys.
- Physician respondents.
- Trial attorneys from the Office of the Attorney General.
- Board's disciplinary panel members who review proposed decisions and stipulations, and make final decisions.

These guidelines set forth the discipline the Board finds appropriate and necessary for the identified violations.

The Enforcement Program

The Model Disciplinary Orders contain three sections:

1. Disciplinary Orders.
2. Standard conditions that generally appear in all probation cases.
3. Optional Conditions - whose use depends on the nature and circumstances of the particular case.

The guidelines are designed to assure reasonable consistency in the decisions of the Board. The guidelines are revised periodically to reflect changes in policy and in law and court rulings, and to keep current with medical and legal practices.

The Board recognizes that these orders and conditions of probation are merely guidelines. Variations can and are made to accommodate the unique circumstances of individual cases.

**For copies of the disciplinary guidelines, write:**
Medical Board of California
Discipline Coordination Unit
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
Or download at: http://www.mbc.ca.gov/publications/disciplinary_guide.pdf

> The rules of professional conduct for healthcare providers are available on the Board's Web site.

## C. Public Letter of Reprimand

The Board may by stipulation or settlement with the affected physician, after it has conducted an investigation, issue a public letter of reprimand, which may include a requirement for specified training or education, in lieu of filing a formal accusation. The physician must indicate agreement or non-agreement in writing within 30 days of formal notification. Use of public letters of reprimand is limited to minor violations and the physician has the right to reject the proposed letter. If this occurs, the Board will pursue an accusation. A public letter of reprimand is discipline and is subject to public disclosure (BUSINESS AND PROFESSIONS CODE §2233).

> The Medical Board may issue a public letter of reprimand instead of filing a formal accusation.

## 2.6 Competency Examinations

The Board has the legal authority to compel a physician, who is suspected of not being able to practice medicine with reasonable skill, and safety to patients, to take an oral competency examination (BUSINESS AND PROFESSIONS CODE §2292). The law states that the Board can order an examination if it finds there is reasonable cause to doubt the physician's competence to practice.

Section II

"Reasonable cause" is defined in the law as:

- A single incident of gross negligence.

- A pattern of inappropriate prescribing.

- An act of incompetence or negligence causing death or serious bodily injury.

- A pattern of substandard care.

The physician has the opportunity to review and rebut the petition for the examination. A competency examination is administered by a panel, usually consisting of three physicians, selected by the Board or its designee. The examination focuses on the physician's specialty, or on the areas of medicine relating to specific suspected deficiencies. The exam is tape-recorded. A failing grade from two examiners constitutes failure of the examination. A passing grade constitutes prima facie evidence of present competence in the area covered by the examination. The physician has the right to a hearing to appeal a failing grade or to request re-examination. However, if there is no appeal, or the re-examination is denied, the Board has the authority to proceed to disciplinary action for incompetence and any other appropriate charges (BUSINESS AND PROFESSIONS CODE §2234).